[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13225

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-61327-CV-PCH

RICHARD F. THOMPSON,

Plaintiff,

L. ALAN JACOBY,

Plaintiff-Appellant
Cross-Appellee,

versus

RELATIONSERVE MEDIA, INC.,
a.k.a. Sendtec, Inc.,

Defendant-Appellee,

DANIELLE KARP,

Defendant-Appellee
Cross-Appellant,

MANDEE HELLER ADLER,
WARREN "PETE" MUSSER,
SCOTT YOUNG, et al.,

Defendants-Appellees.

_____

No. 07-13477

_____

D. C. Docket No. 06-61327-CV-PCH

RICHARD F. THOMPSON,

Plaintiff,

L. ALAN JACOBY,

Plaintiff-Appellant
Cross-Appellee,

versus

RELATIONSERVE MEDIA, INC.,
a.k.a. Sendtec, Inc.,

Defendant-Appellee,

DANIELLE KARP,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 30, 2010)

Before TJOFLAT and BLACK, Circuit Judges, and EVANS,[*] District Judge.

BLACK, Circuit Judge:

_____

[*] Honorable Orinda D. Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

This case comes to us as an appeal from the dismissal of appellant L. Alan Jacoby's putative class action lawsuit. In his Second Amended Complaint, Jacoby alleged RelationServe Media, Inc.[1] and eleven of its directors and employees[2] violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by failing to disclose, before the company went public, that $2,000,000 in stock had been privately offered for sale by unregistered brokers in ten different states. In the district court, Jacoby joined co-plaintiff Richard Thompson, who had previously initiated this action. Thompson represented a subclass seeking recovery premised on state law claims in the Second Amended Complaint. After twice allowing the plaintiffs to amend their complaint, the district court dismissed with prejudice Jacoby's § 10(b) and § 20(a) claims pursuant to Fed. R. Civ. P. 12(b)(6). The district court found the allegations of the Second Amended Complaint failed to

---

[1] The principal defendant in this case, RelationServe Media, Inc. (RelationServe), is an internet marketing firm that maintains its principal place of business in Fort Lauderdale, Florida. RelationServe and Chubasco Resources Corporation merged on June 13, 2005. Following the merger, Chubasco Resources Corporation changed its name to RelationServe. On July 26, 2006, RelationServe changed its name to SendTec, Inc. For purposes of this opinion, we refer to SendTec, Inc. as RelationServe.

[2] These defendants, with the exception of one, are (or were) officers and/or directors of RelationServe (Officers). Between June 2005 and February 2006, Danielle Karp served as President, Scott Hirsch served as Chief Operating Officer, and Adam Wasserman served as Chief Financial Officer (CFO). Eric Obeck has served as President since February 2006. Mandee Adler served as Chief Executive Officer (CEO) between June 2005 and November 2005, followed by Shawn McNamara as interim CEO and Vice President until June 2006. In February 2006, Paul Soltoff became CEO, and Donald Gould became CFO. Warren Musser was appointed Chairman of the Board of Directors in June 2005 and served until October 2005, at which point Michael Brausser became Chairman of the Board and served until September 2006. Scott Young was the founder and president of Chubasco and served in that capacity until June 13, 2005.

satisfy the heightened pleading requirements of the Private Securities Litigation

Reform Act (PSLRA)[3] and Rule 9(b) of the Federal Rules of Civil Procedure. The

court then dismissed Thompson's state law claims without prejudice after

concluding it no longer had supplemental jurisdiction over those claims. In

separate orders, on three different occasions, the district court denied defendant

Danielle Karp's motions for attorneys' fees and Rule 11 sanctions.

Jacoby appeals the dismissal of his federal securities-law putative class

action. Additionally, Karp cross-appeals the denial of her request for Rule 11

sanctions and attorneys' fees.[4] Because we conclude the Second Amended

Complaint fails to satisfy the standard for pleading scienter, we affirm the district

court's dismissal of Jacoby's § 10(b) and § 20(a) claims. With regard to sanctions,

we remand to the district court to make findings in accordance with the PSLRA.

---

[3] The PSLRA applies to private actions seeking relief on the basis of alleged violations
of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* 15 U.S.C. § 77z-1(c)
(1933 Act) and 15 U.S.C. § 78u-4(c) (1934 Act).

[4] Karp also cross-appeals the dismissal of Thompson's state law claims, contending she
is aggrieved because Thompson re-filed the claims in state court and she "is now facing the same
frivolous allegations." Thompson's state court action has subsequently been dismissed with
prejudice, so we decline to consider this aspect of Karp's cross-appeal.

## I. FACTUAL ALLEGATIONS[5]

On May 24, 2005, RelationServe entered into an Independent Consulting Agreement with Summit Financial Partners, LLC (Summit). Under the agreement, Summit sold shares of RelationServe through a private offering to investors in exchange for 1,050,000 shares of stock and a 7% seller's fee.

On June 14, 2005, RelationServe filed a Form 10-QSB quarterly statement, its first Securities and Exchange Commission (SEC) filing, indicating Chubasco Resources Corporation (Chubasco) had completed a reverse acquisition of RelationServe. RelationServe Media Inc. Quarterly Report–Small Business (Form 10-QSB), at 5 (June 14, 2005).[6] On June 16, 2005, RelationServe filed a Form 8-K and disclosed, for the first time, the Independent Consulting Agreement[7] with Summit. RelationServe Media Inc., Current Report (Form 8-K), at 29 (June 16, 2005).[8] On June 28, 2005, twelve days after RelationServe disclosed its

---

[5] In considering a motion to dismiss, we accept all well-pleaded facts as true, and we make all reasonable inferences in favor of the plaintiff. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir 1999)). Because the Second Amended Complaint alleges violations of securities laws, we may also take judicial notice of relevant SEC filings. *Id.* at 1278.

[6] RelationServe had no duty to file securities filings prior to the merger with Chubasco.

[7] A full copy of the Agreement between RelationServe and Summit was attached to the SEC filing as an exhibit; this attachment included language which explicitly noted Summit was not acting as a broker/dealer for RelationServe, but rather serving as a promoter of the company.

[8] The Second Amended Complaint omitted any reference to RelationServe's June 16, 2005, Current Report.

relationship with Summit, Richard F. Thompson, an Indiana resident, purchased 50,000 shares at $2.00 per share. Tony Altavilla, a Summit employee, had advised Thompson about the private offering and helped facilitate Thompson's purchase of the shares. On June 30, 2005, RelationServe became a publicly-traded company and reported to the SEC it had received $2,000,000 in subscriptions through a private offering.[9] That same day, RelationServe listed its non-restricted shares on the Over the Counter Bulletin Board. On July 22, July 26, and August 12, 2005, L. Alan Jacoby purchased a total of 10,000 shares of RelationServe on the open market.

On March 3, 2006, Thompson filed a lawsuit in Indiana state court against RelationServe and several of the defendants named in this federal action. Unrelated to this litigation, RelationServe filed a registration statement with the SEC on March 20, 2006. This statement did not mention the Thompson litigation. On May 1, 2006, RelationServe amended the registration statement to provide the public with notice of the lawsuit, and indicated it believed the suit lacked merit. In

---

[9] The report filed with the SEC disclosed RelationServe "completed a private offering of Units to 'accredited investors,'" RelationServe "received and accepted $2,000,000 of subscriptions in the Offering," and "[t]he Units were issued in reliance on an exemption from registration provided under Regulation D of the Securities Act and are restricted securities as defined by the Securities Act." RelationServe Media, Inc., Current Report (Form 8-K), at 2 (June 30, 2005).

6

response to an inquiry from the SEC requesting more details about the lawsuit, RelationServe updated its filings on May 23, 2006.[10]

On May 23, 2006, RelationServe stock was valued at $1.35 per share. Three weeks later, on June 15, 2006, the stock was valued at $0.63 per share. Jacoby attributes this decline in value to the public disclosure of Thompson's lawsuit.

## II. PROCEEDINGS IN THE DISTRICT COURT

On August 28, 2006, Thompson initiated this action by filing a class action in the United States District Court for the Southern District of Florida. RelationServe and the other defendants moved to dismiss the complaint; the district court then denied these motions and ordered that Thompson file an amended complaint. On November 13, 2006, Thompson filed the First Amended Complaint, which added Jacoby as a co-plaintiff. The defendants again moved to dismiss, and on March 6, 2007, the district court dismissed the amended complaint without prejudice.

---

[10] The May 23 amendment stated, in part, "[t]he Company intends to file a motion to dismiss this action because the shares did not need to be registered under Indiana Law, as they were exempt from registration as a 'federal covered security.'" RelationServe Media, Inc., Amendment No. 2 to Form SB-2 Registration Statement (Form SB-2/A), at 64-65 (May 23, 2006). The amendment also noted "Mr. Altavilla did not sell shares on the Company's behalf[,]" although he "did receive, in addition to other compensation, a finder's fee in the amount of 7% of total gross funding provided for introductions made by him to investors not already having a preexisting relationship with the Company." *Id.*

On March 19, 2007, Thompson and Jacoby filed the Second Amended Complaint, raising claims for two putative classes: one, led by Thompson, which included all purchasers of securities through unregistered broker/dealers of RelationServe, and another, led by Jacoby, which included all purchasers who bought RelationServe stock on the open market prior to May 23, 2006. Defendants then moved to dismiss the Second Amended Complaint for failure to state a claim, and this time the district court granted the motion with prejudice, concluding Jacoby had failed to state a claim for a violation of either § 10(b) or § 20(a) of the Securities Act. The district court also dismissed without prejudice Thompson's state law claims for lack of subject matter jurisdiction.

Once before and twice after the district court dismissed the Second Amended Complaint, defendant Karp moved for Rule 11 sanctions and attorneys' fees, contending the claims against her were frivolous and demonstrated an utter lack of legal or factual investigation. The district court denied the motions in three separate orders. This appeal and cross-appeal ensued.

## III. DISCUSSION

Our discussion is divided into three parts. First, we address whether the Second Amended Complaint satisfies the standard for pleading scienter. Second, we address whether the Second Amended Complaint states a claim of secondary

8

liability under § 20(a). Third, we address the district court's refusal to impose Rule 11 sanctions and award attorneys' fees.

*A. Scienter Pleading Requirements*

We review the grant of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) *de novo. Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007).

In Count I, Jacoby asserted a violation of § 10(b) of the Securities Act and SEC Rule 10b-5. Section 10(b) of the Securities Act makes it unlawful to "use or employ, in connection with the . . . sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Pursuant to § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim for a violation of § 10(b), a plaintiff must allege: (1) the existence of a material misrepresentation (or omission), (2) made with scienter (i.e., "a wrongful state of mind"), (3) in connection with the purchase or sale of any security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss. *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341-

42, 125 S. Ct. 1627, 1631 (2005); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir. 1999) (elaborating on the scienter requirement).[11] Because Rule 10b-5 sounds in fraud, the plaintiff must plead the elements of its violation with particularity. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (stating Rule 9(b) requires securities fraud complaints "to state with particularity the circumstances constituting fraud").

When a § 10(b) claim is brought by a private litigant, it is subject to the PSLRA, under which a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this context, a "strong inference" of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 2504-05 (2007). Three guidelines govern our review: courts must (1) "accept all factual allegations in the complaint as true," (2) "consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," and (3) "take into account plausible opposing inferences." *Tellabs*,

---

[11] Because we hold the Second Amended Complaint fails to satisfy the standard for pleading scienter, we do not reach the questions of whether the Second Amended Complaint adequately pleads the other elements of a § 10(b) claim.

551 U.S. at 322-23, 127 S. Ct. at 2509; *see also Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009).  Moreover, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute."  *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004).

Although the PSLRA imposes a heightened standard for pleading scienter, it does not alter the substantive intent requirements necessary to establish a § 10(b) and Rule 10b-5 violation.  *Mizzaro*, 544 F.3d at 1238.  In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness."  *Id*. (*quoting Bryant*, 187 F.3d at 1282).  An allegation of "severe recklessness" must satisfy a demanding standard:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.

*Bryant*, 187 F.3d at 1282 n.18.  Accordingly, to survive a motion to dismiss, Jacoby "must (in addition to pleading all of the other elements of a § 10(b) claim) plead 'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."  *Mizzaro*, 544 F.3d at 1238.

11

The Second Amended Complaint alleges RelationServe did not disclose a broker was involved in the securities sale to hide the fact that RelationServe sold securities through unregistered brokers. Further, the Second Amended Complaint asserts this act of hiding RelationServe's use of a broker "could not have been perpetrated over a substantial period of time . . . without the knowledge and complicity of the . . . individual Defendants." Viewed holistically, the Second Amended Complaint alleges the following facts as supporting a reasonable inference of scienter: (1) ten of the individual defendants "signed [or authorized] one or more certification[s] pursuant to the Sarbanes-Oxley Act that impermissibly omitted material facts;" (2) each individual defendant held a management position at RelationServe; (3) each individual defendant was "involved in the drafting, producing, reviewing, and/or dissemination of misleading statements and [was] aware [of]—or recklessly disregarded—the fact that misleading statements were being issued and approved or ratified these statements;" (4) each individual defendant, "by virtue of [his or her] receipt of information . . . , control over or receipt of RelationServe['s] materially misleading statements and/or [his or her] associations with RelationServe . . . [was an] active and culpable participant[];" (5) several individual defendants signed SEC forms "that failed to indicate

RelationServe had contracted with Summit;" and (6) there were "accounting irregularities" in RelationServe's financial statements.

These conclusory allegations are insufficient to establish a "strong inference that the defendants acted with the required state of mind." *See Tellabs*, 551 U.S. at 314, 127 S. Ct. at 2504. The inference that the individual defendants purposely failed to disclose the use of unregistered brokers to mislead the public regarding the company's worth is not as compelling as the competing inference that the defendants did not disclose its use of unregistered brokers because the brokers were exempt from registration. Without an allegation that any of the named defendants knew the Summit employees (1) were not registered brokers and (2) were required to be registered brokers, we cannot conclude the inference of nefarious wrongdoing is "at least as compelling as any opposing inference of nonfraudulent intent." *See id*.

Even if the Second Amended Complaint alleged the sales were not exempt transactions, it would still not be a "cogent" possibility that the defendants failed to disclose the use of unregistered brokers for the purpose of misleading the public. The Second Amended Complaint does not allege facts tending to show that any of the individual defendants were even aware of RelationServe's relationship with Summit. This is particularly so with respect to defendants Soltoff, Obeck, and

13

Gould—who, according to the Second Amended Complaint, were not employed by RelationServe until after the events relied on by plaintiffs occurred—and with respect to defendant Young—who, according to the Second Amended Complaint, was not employed by RelationServe.

Simply put, the allegations in the Second Amended Complaint are insufficient to create a "strong inference" of scienter. Accordingly, the district court did not err by dismissing Jacoby's § 10(b) and Rule 10b-5 claims against the individual defendants under the heightened pleading standards imposed by the PSLRA.

Although the Second Amended Complaint failed to adequately plead scienter for any of the individual defendants, theoretically, the Second Amended Complaint could create a strong inference that the corporate defendant, RelationServe, acted with the requisite state of mind. *Mizzaro*, 544 F.3d at 1254. Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them. *Id.* Here, the Second Amended Complaint fails to sufficiently plead scienter as to any of the individuals who served as corporate directors or officers of RelationServe, and there are no other allegations that give rise to an inference of scienter. Thus, we affirm the district court's dismissal of

Count I for failure to state a cause of action under § 10(b) and Rule 10b-5 of the

Securities Exchange Act.

B.  *Secondary Liability Under Section 20(a)*

In Count II, Jacoby asserted a violation of § 20(a) of the Securities Exchange

Act.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, unless the controlling person acted in good
> faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Section 20(a) is not a freestanding claim but rather a means of

imposing liability "not only on the person who actually commits a securities law

violation, but also on an entity or individual that controls the violator."  *Laperriere*

*v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).

Because a primary violation of the securities law is an essential element of a

§ 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a

motion to dismiss only if the primary violation is pleaded with legal sufficiency.

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).  As the

Second Amended Complaint failed to allege primary liability under § 10(b), there

can be no secondary liability under § 20(a).  Thus, we affirm the district court's

dismissal of Count II for failure to state a cause of action under § 20(a) of the Securities Exchange Act.

## C. Rule 11(b) Sanctions

We review the denial of sanctions under Federal Rule of Civil Procedure 11 for abuse of discretion. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1478 (11th Cir. 1992). A district court's denial of sanctions under the PSLRA is reviewed under the same standard. *See Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (noting review of "all aspects" of a district court's Rule 11 determination is for abuse of discretion, and "[n]othing in the Reform Act's sanctions provision changes this standard of review"); *Hartmarx Corp v. Abboud*, 326 F.3d 862, 866-67 (7th Cir. 2003) (reviewing the district court's imposition of sanctions under the PSLRA for abuse of discretion); *Gurary v. Nu-Tech Bio-Med, Inc.*, 303 F.3d 212, 219 (2d Cir. 2002) (same).

Congress passed the PSLRA in 1995, "motivated in large part by a perceived need to deter strike suits by opportunistic private plaintiffs that filed securities fraud claims of dubious merit in order to exact large settlement recoveries." *Laperriere,* 526 F.3d at 719 (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). Through the PSLRA, Congress hoped to put an end to "the abuse of the

16

discovery process to impose costs so burdensome that it is often economical for the victimized party to settle." *Id.*

In addition to raising the standard for pleading scienter, the PSLRA "mandate[s] imposition of sanctions for frivolous litigation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81, 126 S. Ct. 1503, 1511 (2006). The PSLRA provides:

> In any private action arising under this chapter, upon final adjudication of the action, the court *shall* include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1) (emphasis added). If the court finds a party or attorney violated any requirement of Rule 11(b), the court "shall" impose sanctions in accordance with Rule 11. 15 U.S.C. § 78u-4(c)(3). If a complaint substantially fails to comply with Rule 11(b), the presumptive sanction is attorneys' fees and expenses. 15 U.S.C. § 78u-4(c)(2). Accordingly, the PSLRA's provisions eliminate a district court's discretion on two fronts: (1) in choosing whether to conduct the Rule 11(b) inquiry and (2) in determining whether to impose sanctions following a finding of a Rule 11(b) violation. *See Morris*, 448 F.3d at 276 ("Because the sanctions instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion, the district court

must impose sanctions for each violation found." (internal citation and quotation marks omitted)); *Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir. 1999) (noting the PSLRA circumscribes a district court's discretion "in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found").

Although the PSLRA alters the consequences of a Rule 11(b) violation in a private securities fraud action, the substantive analysis under Rule 11 remains the same.[12] *See* 15 U.S.C. § 78u-4(c); *see also Citibank Global Mkts., Inc. v. Santana*, 573 F.3d 17, 32 (1st Cir. 2009) (noting the PSLRA "does not alter the standards used to judge compliance with Rule 11"); *Morris*, 448 F.3d at 276 ("[F]or private securities fraud suits Congress altered the consequences of a Rule 11(b) violation but did not rewrite the conventional standards for evaluating Rule 11(b) compliance."); *Simon DeBartolo Group, L.P.*, 186 F.3d at 167 ("The PSLRA does not in any way purport to alter the substantive standards for finding a violation of Rule 11 . . . ."). Moreover, nothing in the PSLRA changes our abuse of discretion standard of review of the district court's Rule 11(b) findings. This position is

---

[12] Under Rule 11, sanctions are properly assessed when: (1) a party files a pleading that has no reasonable factual basis; (2) the party files a pleading based on a legal theory that has no reasonable chance of success and cannot be advanced as a reasonable argument to change existing law; or (3) the party files a pleading in bad faith for an improper purpose. *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001).

supported by the reasoning in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110

S. Ct. 2447 (1990), in which the Supreme Court held an abuse-of-discretion

standard applies "in reviewing all aspects of a district court's Rule 11

determination," including the legal aspects. *Id.* at 405, 110 S. Ct. at 2461. The

*Cooter & Gell* Court noted "[l]egal issues are raised in considering whether a

pleading is 'warranted by existing law or a good faith argument' for changing the

law and whether the attorney's conduct violated Rule 11." *Id.* at 399, 110 S. Ct. at

2457. It then explained even purely legal issues in the Rule 11 context require a

district court "to consider issues rooted in factual determinations." *Id.* at 401, 110

S. Ct. at 2459. In this regard, "the district court is better situated than the court of

appeals to marshal the pertinent facts and apply the fact-dependent legal standard

mandated by Rule 11." *Id.* at 402, 110 S. Ct. at 2459.

In this case, however, the district court's conclusory Rule 11 analysis is not

sufficient to permit meaningful appellate review. Although the district court

explicitly denied Karp's motion for sanctions,[13] its one paragraph order provides

no explanation of the basis for its ruling and does not include the specific findings

---

[13] The order stated: "Plaintiffs' claims are not frivolous, or so devoid of evidentiary support as to warrant sanctions. Likewise, there is no evidence that Plaintiffs instituted this action for improper purposes, such as to harass Defendants or needlessly increase the cost of litigation."

19

the PSLRA requires.[14]  Specifically, the district court's order does not discuss

"compliance by each party and each attorney representing any party with each

requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any

complaint, responsive pleading, or dispositive motion."  15 U.S.C. § 78u-4(c)(1).

In fact, nowhere in the June 12, 2007, order did the district court even mention the

PSLRA or any of its requirements.  As a result, we remand the case to the district

court to permit it to make the PSLRA-mandated findings in the first instance.[15]

---

[14]  On July 16, 2007, Karp filed a second motion for attorneys' fees and costs and moved the court to reconsider its June 12, 2007, sanctions order, contending the PSLRA required the court to conduct a more exacting inquiry into counsel's compliance with Rule 11(b).  The court denied her motion without explication on July 27, 2007.  On August 3, 2007, Karp moved the court to clarify its ruling to indicate whether it had denied her motion for reconsideration on the merits.  The court, on November 20, 2007, entered an order adhering to its rulings that plaintiffs' counsel had not violated Rule 11(b).  These motions and orders are not before us because the district court lost jurisdiction over the matter of sanctions upon the filing of the notices of appeal.  *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.") (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982)).  Regardless, the district court's November 20, 2007, order added nothing of substance to the June 12, 2007, sanctions order, and is likewise inadequate to allow meaningful appellate review.

[15]  Remand is consistent with the Supreme Court's admonition in *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 128 S. Ct. 1140 (2008), that the circuit court should have remanded to allow the district court to make its "determinations in the first instance, explicitly and on the record."  *Id.*, 128 S. Ct. at 1146.  In *Mendelsohn*, the district court essentially provided no explanation of the basis for its evidentiary ruling, but the circuit court presumed the district court applied the incorrect standard and proceeded to engage in its own analysis.  *Id.* at 1144.  The Supreme Court noted the broad discretion afforded to a district court's evidentiary rulings and concluded the circuit court should have remanded to the district court, instead of engaging in its own inquiry.  *Id.* at 1144-46.  Although *Mendelsohn* dealt with an evidentiary ruling, the reasoning is applicable here.  Both evidentiary rulings and Rule 11(b) findings are reviewed under the deferential abuse of discretion standard.  *See id.*; *Morris*, 448 F.3d at 277.

This approach is consistent with the procedure we use when a district court fails to make the PSLRA sanctions findings altogether. *See Ehlert v. Singer*, 245 F.3d 1313, 1320-21 (11th Cir. 2001) (remanding for compliance with the PSLRA where the district court made no Rule 11 findings).[16]

It may be tempting to engage in sanctions determinations ourselves, given the apparent frivolity of the plaintiffs' claims. In fact, the extensive record on appeal may actually make such determinations possible. But, even assuming we have the ability to conduct a thorough Rule 11 analysis, doing so in this case would be ill-advised. Remand is the better route.

First, as is almost always the case, the district court is "better situated" than this Court "to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *See Cooter & Gell*, 496 U.S. at 402, 110 S. Ct. at 2459. Given the district court's familiarity with the case and the parties, the district court is in a better position "to make these determinations in the first instance, explicitly and on the record." *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387, 128 S. Ct. 1140, 1146 (2008). Moreover, our

---

[16] This approach is also consistent with the procedure followed by the Second Circuit. *See Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (remanding for compliance with the PSLRA when the district court failed to make the required Rule 11 findings); *Gurary v. Winehouse*, 190 F.3d 37, 47 (2d Cir. 1999) (remanding for findings regarding Rule 11(b) compliance pursuant to the PSLRA after the district court implicitly denied a motion for sanctions).

21

analysis of the sanctions issue would likely further develop the record by, for example, expounding upon the relevant SEC filings or drawing inferences from undisputed facts. Consequently, if we elect to make such sanctions findings at the appellate level, the parties would necessarily be less involved in the process and would be unable to object if and when appropriate.

Further, our decision to remand recognizes that when the district court engaged in its sanctions analysis in 2007 our Circuit had not yet explicitly addressed the level of specificity required by the PSLRA. To be sure, the PSLRA, by its own terms, clearly requires findings as to each claim, each party, and each attorney, such that the district court's perfunctory analysis was insufficient even without clear precedent from this Court. It is not until this case, however, that we emphasize just how extensive the district court's sanctions findings must be in the PSLRA context. Thus, in light of our reiteration and accentuation of the PSLRA's requirements, it is appropriate to permit the district court to engage in a PSLRA-compliant sanctions analysis prior to appellate review.

Additionally, we recognize the practical reality that this appeal arises from complex factual circumstances that have not been organized in such a manner to facilitate efficient sanctions review. As a result, prior to engaging in a Rule 11(b) analysis, we would first have to unravel the dense record and examine it in a way

that no other issue in this case requires us to do. This task would require us to obtain a level of familiarity with the parties and the evidence that the district court already has; as a result, we would end up replicating much of the work that the district court has already completed. This is not a wise use of judicial resources. The better solution, from a practical standpoint, is for us to carefully and promptly decide the issues on appeal, and then to remand to the district court to address any outstanding fact-finding tasks. Expeditiousness is every bit as important to a well-functioning judiciary as is thoroughness.

Finally, even if we were to engage in a full PSLRA sanctions analysis, it would still be necessary to remand to the district court to determine a number of outstanding issues. For instance, we would be unable to determine whether either Thompson or Jacoby himself (as distinct from their lawyers) violated Rule 11 (the record is silent on this point), whether the lawyers violated Rule 11(b)(1) by filing the complaints for improper purposes (a subjective analysis that will likely require testimony), or whether the plaintiffs can rebut the PSLRA's presumptive award of attorneys' fees. These issues require the kind of record development in which appellate courts cannot engage. As a result, even if we did expend the enormous judicial resources necessary to parse through the record in the first instance, the district court would still have to reexamine and further develop the record to

address these outstanding issues. Such a process would introduce even more inevitable duplication of effort and would result in further depletion of limited judicial resources.

Accordingly, even if we could in some cases engage in a PSLRA sanctions analysis ourselves, we decline to do so in this case. Careful examination of the relevant considerations counsels against such a use of judicial resources.

## IV. CONCLUSION

With respect to Jacoby's appeal, we AFFIRM the district court's dismissal of Counts I and II of the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. With respect to Karp's cross-appeal, the district court's order entered June 12, 2007, is VACATED and REMANDED for further proceedings consistent with this opinion.

TJOFLAT, Circuit Judge, concurring in the appeal, No. 07-13225, and dissenting in the cross-appeal, No. 07-13477:

In the appeal, I concur in the court's judgment affirming the district court's dismissal of the second amended complaint. I dissent from the court's decision in the cross-appeal, vacating in full the district court's decision denying Private Securities Litigation Reform Act ("PLRSA") sanctions, and remanding the sanctions issues to the district court for reconsideration ab initio. I would reverse the sanctions decision and remand the case with the instruction that the district court sanction plaintiffs' counsel for prosecuting the federal securities law claims in the three complaints they presented to the district court—the initial, first, and second amended complaints—because, in presenting those claims, counsel violated Federal Rule of Civil Procedure 11(b)(2) as a matter of law. They also violated Rule 11(b)(3) with respect to some of these claims because the claims lacked an evidentiary foundation. In remanding the matter of sanctions to the district court, I would instruct the court to hear from counsel for the parties on the questions of (1) whether the remaining claims lacked the evidentiary support required by Rule 11(b)(3), and (2) whether plaintiffs' counsel brought any of the claims for an improper purpose in violation of Rule 11(b)(1).

25

The court is faced with two options in disposing of the cross-appeal. One is to vacate the sanctions decision and remand the case for further proceedings on the sanctions issues. The court has chosen this option. The court believes that it is incapable of meaningfully reviewing the district court's denial of Rule 11 sanctions because the denial is framed in conclusory language, without findings of fact or conclusions of law. The other option is to decide whether plaintiffs' attorneys failed to comply with Rule 11(b)'s requirements, and, if so, whether sanctions are in order. I choose this option because, in the PSLRA context, Congress explicitly requires a district court to impose sanctions whenever Rule 11 is violated. When, as here, the record so clearly indicates a Rule 11 violation, it is both within our capacity and in the broader interest of justice that we direct the district court to impose sanctions that it will have to impose on remand.

An objective examination of plaintiffs' three complaints reveals that plaintiffs' federal securities law claims are frivolous, and, under these facts, a district court would necessarily abuse its discretion to conclude otherwise. Moreover, plaintiffs sued some individual defendants who had no involvement whatsoever in the management of Relationserve Media, Inc., or its predecessor, Relationserve, Inc. The court's disposition will require those uninvolved defendants to participate in the further proceedings on remand. The disposition I

propose would limit their involvement to the simple task of presenting the court with a list of their expenses, including the attorneys' fees they incurred.

The court's disposition is also likely to result in a second appeal, which would put this court in the same position it now occupies. The disposition I would reach would avoid a second appeal and thus would reduce the time, effort, and expenses the district court, the parties, and this court will have to endure as a result of today's decision. To make this clear, I must take the reader through this case as it evolved—from the filing of the initial complaint through the filing and prosecution of the second amended complaint. I shall do so in accordance with the following outline.

I. The Facts
    A. Relationserve Media, Inc.'s and Relationserve, Inc.'s Corporate Histories and the Alleged Fraud

    B. Richard F. Thompson Sues Relationserve, Media Inc. in Indiana State Court

II. The Federal Procedural History
    A. The Initial Complaint
        1. Thompson Files the Initial Complaint

        2. The Defendants Warn Thompson's Attorneys that the Suit is Frivolous

        3. The Defendants Move to Dismiss, Request the Court to Retain Jurisdiction to Impose Sanctions

4. Thompson's Attorneys Move the Court for Leave to Amend and for Limited Discovery to Add Individual Defendants

5. The Court Grants the Attorneys Leave to Amend and Limited Discovery and Warns the Attorneys About Rule 11

B. The First Amended Complaint
1. Thompson & Jacoby File the First Amended Complaint, Each Purporting to Represent All Class Members on All Claims

2. The Defendants Move to Dismiss, Request the Court to Retain Jurisdiction to Impose Sanctions

3. The Court Dismisses the First Amended Complaint

C. The Second Amended Complaint
1. Thompson & Jacoby File the Second Amended Complaint with Jacoby Leading an Open-Market Purchaser Subclass Bringing Federal Securities Claims and with Thompson Leading a Private Offering Purchaser Subclass Bringing State Law Claims

2. The Defendants Move to Dismiss, and Defendant Karp Moves for Sanctions

3. The Court Dismisses the Complaint with Prejudice but Denies Sanctions

4. Jacoby's Appeal, Karp's Cross-Appeal, and this Court's Decision

III. This Court Errs by Summarily Remanding Karp's Cross-Appeal for Sanctions Under the PSLRA
A. The PSLRA Rule 11 Analytical Framework & Requirements

B. A Court of Appeals Should Not Remand for Rule 11 Findings When it Can Determine Conclusively that the District Court Abused its Discretion in Denying Sanctions

IV. With Respect to Plaintiffs' Federal Securities Law Claims, the District Court Abused its Discretion in Denying Sanctions

    A. Rule 11(b)(2) Compliance

        1. The Section 11 Claims

            a. The Initial Complaint's Section 11 Claim

            b. The First Amended Complaint's Section 11 Claim

        2. The Section 12 Claims

        3. The Section 10(b), Rule 10b-5 Claims

            a. Thompson's Rule 10b-5 Claims

            b. Jacoby's Rule 10b-5 Claims

                i. Jacoby Failed to Identify an Actionable Omission

                ii. Jacoby Made Only Frivolous Scienter Allegations

                iii. Jacoby Advanced a Frivolous Loss Causation Argument

        4. The Section 20(a) Claims

    B. Rule 11(b)(3) Compliance

    C. Rule 11(b)(1) Compliance

    D. The Plaintiffs' Attorneys' Rule 11 Violations Trigger the PSLRA's Presumptive Sanction of Attorney's Fees and Other Expenses

    E. Summary

V. The Court Errs by Ignoring Karp's Cross-Appeal for Rule 11 Sanctions on the State Law Claims Advanced in the Second Amended Complaint

VI. Conclusion

## I. The Facts

### A. Relationserve Media, Inc.'s and Relationserve, Inc.'s Corporate Histories and the Alleged Fraud

The principal defendant in this case, Relationserve Media, Inc., is an Internet marketing firm that maintains its principal place of business in Fort Lauderdale,

Florida.[1]  The other defendants, with three exceptions, are (or were) officers and/or directors of the company ("Officers").  Relationserve Media, Inc. was formed when privately held Relationserve, Inc. merged with a wholly owned subsidiary of publicly held Chubasco Resources Corp.  For the sake of clarity, I refer to the predecessor corporation as "Relationserve" and the merged entities as "Relationserve Media" or simply "Media."[2]

Relationserve was incorporated in Delaware on March 29, 2005.  Shortly thereafter, on April 20, 2005, Relationserve commenced a private offering of common stock to "accredited investors"[3] (the "April private offering").

---

[1]  The appeal is from a district court order dismissing the federal securities law claims of the second amended complaint for failure to comply with the heightened pleading requirements of the PSLRA and Rule 9(b); accordingly, the complaint's well-pleaded facts must be accepted as true and all reasonable inferences must be drawn from those facts in favor of the plaintiff.  In the main, the facts set out in part I are taken from the three complaints filed in this case.  They were known to plaintiffs' attorneys prior to their filing of the initial complaint.  The complaints refer to, and quote in part, filings the corporate defendant and some of the individual defendants made with the Securities and Exchange Commission ("SEC").  Regardless of whether pled, we "may take judicial notice . . . of relevant public documents required to be filed with the SEC, and actually filed."  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999).  This can be done "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents."  Id.  "[C]onsidering the SEC documents in this manner . . . is permitted by Fed. R. Evid. 201, is consistent with the overall aims of the [PSLRA], and is not inconsistent with Rule 12(b)(6), common notions of fairness, or the law of this Circuit."  Id.

[2]  Relationserve Media, Inc. changed its name to SendTec, Inc. on July 26, 2006.  Nevertheless, I refer to the company as Relationserve Media or simply Media.

[3]  The term "accredited investors" is a term of art, as defined by the SEC.  See 17 C.F.R. § 230.501(a).  The term delineates those permitted to invest in certain types of high risk investments.  The term generally includes wealthy individuals and organizations, such as corporations, endowments, or retirement plans.  According to the SEC, an individual qualifies as an "accredited investor" if his or her "individual net worth . . . at the time of . . . purchase exceeds $1,000,000," id. § 230.501(a)(5), or if he or she has "an individual income in excess of

Throughout April and May 2005, Relationserve received and accepted $1,125,000 of subscriptions in exchange for Relationserve shares. The shares were issued in reliance on a Regulation D exemption from registration under the Securities Act of 1933 (the "1933 Act"),[4] and were "restricted shares" as defined by the Act. See 17 C.F.R. §§ 230.501 et seq.[5]

While the April private offering was going on, on May 16, 2005, Relationserve acquired two Internet marketing companies, Omni Point Marketing LLC and Friendsand LLC. In exchange for the ownership interest in those companies, Relationserve paid $500,000 cash, 8,000,000 shares of its common stock, and a two-year promissory note for $700,000. Relationserve also issued 4,001,000 shares to its founders as compensation for bridge loan advances and

---

$200,000 in each of the two most recent years . . . and has a reasonable expectation of reaching the same income level in the current year," id. § 230.501(a)(6).

   [4] The 1933 Act is codified at 15 U.S.C. §§ 77a et seq.

   [5] Regulation D allows issuers to sell securities without registering them with the SEC if a series of both general and specific conditions is followed. Generally, the conditions that must be met are: (1) all sales within a certain time period must be "integrated" (that is, treated as one offering); (2) information about the securities must be disclosed to investors; (3) there must be no "general solicitation" of purchasers of the securities; and (4) the securities must contain restrictions on their resale. See 17 C.F.R. § 230.502.
   In this case, Relationserve sought a registration exemption on the basis of SEC-promulgated Rule 506. Id. § 230.506. Rule 506 imposes two specific conditions that must be met. First, "the issuer [must] reasonably believe[] that there are no more than 35 purchasers of securities from the issuer." Id. § 230.506(b)(2)(i). Second, the issuer must reasonably believe that "[e]ach purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." Id. § 230.506(b)(2)(ii).

negotiating the acquisitions. Relationserve's chief operating officer at the time, Scott Hirsch, was also the indirect majority owner and president of Omni Point. Relationserve's then president, Danielle Karp, is Scott Hirsh's sister.

After completing the April private offering[6] and the acquisition of Omni Point and Friendsand, on May 24, 2005, Relationserve entered an Independent Consulting Agreement (the "consulting agreement") with Summit Financial Partners, LLC ("Summit"). Under the consulting agreement, Summit and its president, Tony Altavilla, agreed to "[i]ntroduce [Relationserve] to the financial community" and "[p]erform the functions generally assigned to stockholder relations and public relations departments in major corporations." Relationserve Media Inc., Current Report (Form 8-K), Ex. 2.6, at 1–2 (June 16, 2005).[7] Summit also agreed to act as a "finder" of financing sources or acquisition candidates for

---

[6] I infer that Relationserve completed the April private offering no later than May 19, 2005. Issuers selling securities pursuant to Regulation D must notify the SEC of the sales. Relationserve gave the requisite notice by filing Form D on May 23, 2005. Relationserve, Inc., Notice of Sale of Securities Pursuant to Regulation D (Form D), at 1 (May 23, 2005). Relationserve disclosed its receipt of $1.125 million from twenty-two accredited investors. Id. at 4. Later filings indicate that Relationserve did not receive any more subscriptions from this offering. See Relationserve Media, Inc., Current Report (Form 8-K), at 29 (June 16, 2005) ("On April 20, 2005 Relationserve commenced a private offering . . . . Relationserve received and accepted $1,125,000 of subscriptions."). The shares may not have been issued, however, until June. See Relationserve Media, Inc., Registration Statement under the Securities Act of 1933 (Form SB-2), at 26 (Mar. 20, 2006) ("In May and June 2005, we sold 1,625,000 shares of and granted 812,500 warrants to purchase 812,500 shares of common stock at an exercise price of $2.00 per share for net proceeds of $1,495,026.").

[7] As indicated infra, the consulting agreement was publicly disclosed, in its entirety, in this current report as Exhibit 2.6.

Relationserve. In exchange, Relationserve paid Summit 1,050,000 shares of its common stock and promised to pay a cash finder's fee. Id. at 3, 5. The consulting agreement noted that "IT IS SPECIFICALLY UNDERSTOOD THAT [Summit] IS NOT AND DOES NOT HOLD ITSELF OUT BE [sic] A BROKER/DEALER, BUT IS MERELY A 'FINDER' IN REFERENCE TO [Media] PROCURING FINANCING SOURCES AND ACQUISITION/MERGER CANDIDATES." Id. at 6.

From inception, Relationserve's strategy was to become a publicly traded company by means of a "reverse merger." Accordingly, the April Offering's private placement memorandum explained the company's intent to find

> [a] publicly-traded company . . . which will acquire, by merger of Relationserve . . . all of the issued and outstanding capital stock of Relationserve (and any acquired businesses at the time of merger). Thereafter, the present stockholders of Relationserve and purchasers in the offering will, by virtue of the merger, become the controlling stockholders of the publicly-traded company.

Relationserve, Inc., Private Purchase Offering Document, at 1 (Apr. 20, 2005). Consistent with this representation, Relationserve explored and ultimately entered a merger agreement with Chubasco.

Prior to the merger, Chubasco, a Nevada corporation with its principal place of business in Canada, was an exploration-stage mining company yet to commence operations. In total, Chubasco had 51 shareholders and about $100,000 in assets.

33

The largest shareholder, Scott Young, owned 6.8 million shares and also served as Chubasco's president, chief financial officer, and sole director. The remaining fifty shareholders purchased Chubasco shares in at least one of two exempt Regulation S offerings.[8] Collectively, the fifty shareholders owned 3,216,500 shares. Chubasco became a public reporting company by filing a registration statement for these 3,216,500 shares on October 8, 2004. Once effective, the registration statement would allow the fifty holders to trade that stock publicly. Chubasco Res. Corp., Registration Statement Under the Securities Act of 1933 (SB-2) (Oct. 8, 2004). After a series of amendments, the Registration Statement became effective on February 24, 2005. Chubasco Res. Corp., Quarterly Report (Form 10-QSB), at 10 (Mar. 17, 2005).

Sometime between March and June 2005, Relationserve's management approached Chubasco and suggested a reverse acquisition of Relationserve. After determining that the reverse acquisition would be "less speculative and contain[] greater benefits," Chubasco terminated its mining exploration activities and negotiated a plan of merger and reorganization with Relationserve. Chubasco Res. Corp., Quarterly Report (Form 10-QSB), at 5 (June 14, 2005).

---

[8] Regulation S sets out rules governing exempt sales of securities because the transactions occur outside the United States. See 17 C.F.R. § 230.901 et seq.

34

The terms of the merger included the following. Chubasco would form a wholly-owned subsidiary, Reland Acquisition. Reland would then merge into Relationserve, with Relationserve surviving. Upon consummation of the merger, each share of Reland would automatically convert into the right to receive one share of Relationserve; thus Chubasco would own all of the issued and outstanding shares of Relationserve. Relationserve Media Inc., Current Report (Form 8-K), Ex. 2.1 (Plan of Merger) ¶ 1.5(a) (June 16, 2005). In exchange, Relationserve's stock would automatically convert into the right to receive Chubasco stock on a 1:1 basis. Id. Additionally, Scott Young agreed to cancel his 6.8 million shares of Chubasco and resign from his position as its sole director, president, and chief financial officer. Danielle Karp, Relationserve's president, would become the new president and sole director of Chubasco. Finally, Chubasco would change its name to Relationserve Media, Inc. Id. ¶ 6.4.

The merger took place on June 13, 2005. As a result of the merger, Relationserve Media, Inc., f/k/a Chubasco Resources Corp., held Relationserve as a wholly owned subsidiary. As planned, Scott Young resigned from all positions with Media and Danielle Karp became its sole director and president. Media now had two groups of shareholders. The first group consisted of the former Chubasco shareholders who held 3,216,500 shares; these shares could be traded and

35

constituted Media's "public float."  Id. ¶ 2.01.  The second group consisted of former Relationserve shareholders who owned 13,326,000 shares of Relationserve stock, now convertible into Media stock.  Id.  Because the second group acquired the shares in unregistered offerings and no subsequent registration statement had been filed, the shares continued to be restricted and could not be traded.  The merger did not, of course, alter the duty of Media f/k/a Chubasco to make routine filings with the SEC.

Accordingly, just three days after the merger, on June 16, 2005, the newly formed Media filed an SEC current report (Form 8-K).  Among other disclosures, this report explained the merger and the resultant change in business—from mining exploration to Internet marketing.  This report also disclosed, for the first time, that Media's predecessor, Relationserve, had "entered into an Independent Consulting Agreement with Summit Financial Partners, LLC."[9]  Id. at 29.  A full copy of the consulting agreement was attached to the SEC filing as an exhibit; this attachment

---

[9] There would have been no previous occasion for Relationserve to disclose the relationship with Summit since as a private company, Relationserve had no duty to file securities disclosures regarding its material definitive agreements.  The full text of the report's disclosure is as follows:

> On May 24, 2005, the Company entered into an Independent Consulting Agreement with Summit Financial Partners, LLC.  Under the terms of the Agreement, Summit Financial Partners, LLC. is to provide investor relations and similar services in exchange for issuance of 1,050,000 shares of Common Stock. A copy of the Agreement is annexed hereto as Exhibit 2.6.

Relationserve Media Inc., Current Report (Form 8-K), at 29 (June 16, 2005).

included, of course, Summit's express representation that it would not be acting as a broker/dealer, but rather would serve merely as a finder. As a consequence of the merger, Summit performed the same services for Media as it had for Relationserve.

Shortly after the merger, Media commenced a Regulation D, Rule 506 private offering pursuant to a private placement memorandum dated June 22, 2005 (the "June private offering").[10] It was in this offering that plaintiff Richard F. Thompson, an Indiana resident, purchased 50,000 Media shares at two dollars per share and three-year warrants with an exercise price of $3.50, for a total investment of $100,000.

Thompson bought the shares on June 28, 2005, twelve days after Media had disclosed the consulting agreement with Summit. Gary Altavilla, Summit's president, advised Thompson about the private offering and helped facilitate Thompson's purchase. At the time of his purchase, Thompson signed a subscription agreement wherein he attested to his knowledge of the consulting agreement and that Summit was not licensed and did not hold itself out as a broker/dealer. Indeed, in the subscription agreement that he signed, Thompson

> acknowledge[d] that . . . [he] has read and evaluated, or has employed the services of an investment advisor, attorney or accountant to read and evaluate, all of the documents furnished or made available by the Company to [Thompson] . . . including . . . the Company's Current

---

[10] See supra note 5 for an explanation of Regulation D and Rule 506.

37

Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on June 16, 2005 ("Current Report") and subsequent SEC filings and reports . . . .

Relationserve Media, Inc., Current Report (Form 8-K), Ex. 4.1 (Subscription Agreement), at 1–2 (June 30, 2005).[11]  As indicated above, this June 16, 2005 Current Report included the agreement between Media and Summit in its entirety.

On June 30, 2005, Media completed the June private offering.  In a report filed with the SEC, it disclosed:

On June 30, 2005 we completed a private offering of Units to "accredited investors" as that term is defined in Regulation D of the Securities Act, with each Unit consisting of 50,000 shares of our common stock, $0.0001 par value per share ("Common Stock"), and a three-year warrant to purchase 25,000 shares of Common Stock at $3.50 per share (the "Offering").  We received and accepted $2,000,000 of subscriptions in the Offering.  The Units were issued in reliance on an exemption from registration provided under Regulation D of the Securities Act and are restricted securities as defined by the Securities Act.

Relationserve Media, Inc., Current Report (Form 8-K), at 2 (June 30, 2005).

Attached to this filing was a copy of the "Private Offering Subscription Agreement" the purchasers signed (the "subscription agreement").  As in Relationserve's April offering, all of the shares sold in Media's June private

_____

[11]  In addition to attesting that he had read Media's SEC filings, Thompson also "recognize[d] that Company reserves the right to pay a commission or finders fee of up to 5% of the gross proceeds of the Offering."  Relationserve Media, Inc., Current Report (Form 8-K), Ex. 4.1 (Subscription Agreement), at 3 (June 30, 2005).

38

offering were restricted and therefore could not be resold until registered under the

1933 Act.[12]

In addition to this current report, on July 14, 2005, Media filed a Form D

with the SEC to give further notice of and basic details about the June private

offering. Relationserve Media, Inc., Notice of Sale of Securities Pursuant to

Regulation D (Form D), at 1 (July 14, 2005). At the time, Form D required the

issuer to disclose information about "each person who has been or will be paid or

given, directly or indirectly, any commission or similar remuneration for

solicitation of purchasers in connection with the sales of securities in the offering."

Id. at 3. Media did not disclose Summit's involvement in the June private offering.

Media also filed a notice of the sale of unregistered securities with the

Indiana Secretary of State in compliance with Indiana's securities act. See Ind.

Code §§ 23-2-1-1 et seq. (2005) (repealed 2008). This notice, received and filed

by the Secretary of State's office on July 14, 2005, disclosed that Media's June

---

[12] Absent an exemption, the 1933 Act generally prohibits the sale of unregistered securities. In the subscription agreement, Media promised to register the shares within forty-five days of the closing of the final sale in the June private offering. Relationserve Media, Inc., Current Report (Form 8-K), Ex. 4.1 (Subscription Agreement), at III & Ex. C. (Registration Rights Agreement) (June 30, 2005). Media defaulted on this obligation, but in October 2005, Media's board "ratified waivers obtained from a majority of the purchasers in the June [] 2005 offering and entered into new Consent and Waiver Agreements containing amended registration obligations of the Company." Relationserve Media, Inc., Registration Statement Under the Securities Act of 1933 (Form SB-2), at F-25 (Mar. 20, 2006). Ultimately, as discussed below, Media did not file a registration statement for the shares until March 20, 2006, which did not become effective until July 14, 2006.

private offering had attracted twenty-two accredited investors to purchase an aggregate total of $2 million of Media's common stock. In particular, Media attested to its sale of $340,000 of Media shares to five accredited investors in Indiana.[13]

While the June private offering was going on, Media expanded its management team. Recall that immediately after the merger, Danielle Karp was Media's sole president, chief executive officer, and director; Media's subsidiary, Relationserve, continued to be served by Scott Hirsch as its chief operating officer. On June 21, Media hired Mandee Heller Adler to serve as its chief executive officer and as a director; and on June 22, Media hired Warren "Pete" Musser to serve as a director.

As discussed above, after the merger, the 3,216,500 shares that had been registered by Chubasco could be traded in the open market. Media's shares began to trade on the Over the Counter Bulletin Board (the "OTCBB") in late June 2005. It was from this pool of stock that plaintiff L. Alan Jacoby purchased a total of 10,000 shares of Media stock in three separate transactions. These purchases occurred on July 22, July 26, and August 12, 2005, and Jacoby claimed to have

---

[13] The Indiana Securities Act exempted issuers from registering with the state in certain circumstances. See I.C. § 23-2-1-2(b)(10) (2005) (repealed 2008). As discussed in part IV, infra, Media satisfied the requirements for an exemption.

paid an average of six dollars per share.[14] By March 2006, almost nine months

later, Media's shares had lost 75% of their value in the open market.

Curiously, the plaintiffs alleged that Media's shares traded on the NASDAQ

stock exchange. There is no evidence in Media's SEC filings, however, that

Media's stock traded anywhere except the OTCBB. Media did apply for a

NASDAQ listing on or about July 18, 2005, but there is no evidence that the

application succeeded. To the contrary, Media's Annual Report filed on March 20,

2006 disclosed: "Our Common Stock has been quoted on the OTC Bulletin Board

since June 30, 2005 under the symbol RSVM.OB. Prior to that date, there was no

active market for our Common Stock." Relationserve Media, Inc., Annual Report

(Form 10-KSB), at 7 (Mar. 20, 2006).[15]

---

[14] While the record does not indicate Jacoby's purchase price, I judicially note that, according to the OTCBB website, the closing prices of Media's shares on those dates were as follows: $5.50 per share on July 22; $5.13 per share on July 26; and $8.75 on August 12. Note that this is not necessarily the price that Jacoby paid for Media's shares, but rather is the closing price quoted by OTCBB for the particular days.

[15] The OTCBB can be accessed through a NASDAQ workstation. The OTCBB website warns, however,

> The OTCBB is a quotation medium for subscribing members, not an issuer listing service, and should not be confused with The NASDAQ Stock Market. . . . The OTCBB is unlike The NASDAQ Stock Market in that it: does not impose listing standards; does not provide automated trade executions; does not maintain relationships with quoted issuers; and does not have the same obligations for Market Makers.

OTC Bulletin Board, Comparison of NASDAQ and OTCBB, http://www.otcbb.com/aboutOTCBB/comparison.stm (last visited Apr. 6, 2010).

Around the same time that Jacoby purchased his stake in Media, Media's SEC filings indicate that it entered into two key transactions. First, on August 9, 2005, Media entered an asset purchase agreement to buy the business and substantially all of the assets of theglobe.com's wholly owned subsidiary, SendTec, for $37.5 million. Relationserve Media, Inc., Current Report (Form 8-K) (Aug. 12, 2005). The acquisition was subject to certain terms and conditions and did not close until October 31, 2005. Second, on August 29, 2005, Media merged with its wholly-owned subsidiary, Relationserve, with Media surviving. Relationserve Media, Inc., Current Report (Form 8-K), at 2 (Sept. 2, 2005).

For the purposes of this case, two facts are crucial about the SendTec asset acquisition. First, as part of the terms and conditions mentioned, Media agreed to terminate its contract with Summit. Relationserve Media, Inc., Current Report (Form 8-K), Ex. 10.1 at 10 (Nov. 4, 2005). Second, Media agreed that it would replace certain members of its current management with SendTec-approved managers. Relationserve Media, Inc., Current Report (Form 8-K) (Aug. 12, 2005).

Accordingly, on October 6, 2005, Media terminated its agreement with Summit.[16] The exodus of Media's senior management team began in late October 2005: director Musser resigned on October 31; chief executive officer and director

---

[16] Media's SEC filings indicate this.

Adler resigned on November 11. With one exception, the exodus was complete by the first week of February 2006 with the departure of president and director Karp and chief operating officer Hirsch on February 3 and February 2, respectively. The lone exception was chief financial officer Adam Wasserman who was hired on a part-time basis as chief financial officer on August 9, 2005, and ultimately served Media in some capacity until June 15, 2006.[17] Media's original management team was replaced by Sendtek-approved replacements: Michael Brauser joined as director and chairman of the board on October 31, 2005; Shawn McNamara joined as interim chief executive officer, senior vice president, and assistant secretary on November 30, 2005; and Paul Soltoff, as chief executive officer and director, Erick Obeck, as president, and Donald Gould, as chief financial officer, all joined on February 3, 2006. For a complete listing of the terms of Media's officers' service, see the Table attached to this opinion at 142.

B. Richard F. Thompson Sues Relationserve, Media Inc. in Indiana State Court

---

[17] The plaintiffs alleged that Wasserman ended his tenure on February 3, 2006. (Second Am. Compl. ¶ 17.) The plaintiffs also alleged, however, that Wasserman signed a Sarbanes-Oxley certification as the principal financial officer on March 20, 2006. (First Am. Compl. ¶ 90.) The plaintiffs likely made the former allegation because Donald Gould became chief financial officer on February 3, 2006. Nevertheless, it appears that Wasserman continued to work for Media in some capacity until June 15, 2005. See Relationserve Media, Inc., Current Report (Form 8-K) (June 21, 2006) (noting that Wasserman resigned from all positions on June 15).

On March 3, 2006, in the Circuit Court of Hamilton County Indiana, Thompson sued Summit, Altavilla, Media, and several other entities who used Summit's services, seeking rescission of his shares. Thompson was represented by Cohen & Malad, LLP, an Indiana law firm. Thompson directed three of his fourteen counts against Media: Count 4 claimed that Media sold unregistered, non-exempt securities in Indiana; Count 7 alleged that Media had violated the Indiana Securities Act's anti-fraud provisions by failing to disclose the shares' restricted status; and Count 13 claimed Media deceived Thompson by failing to disclose the shares' restricted status. The other counts of the complaint were brought against Summit, Altavilla, and other named defendants.[18]

Unrelated to this litigation, on March 20, 2006, Media filed a registration statement and its annual report. Media filed the registration statement to register the shares it sold in its private offerings—approximately 85 million shares of common stock—to allow the private offering stockholders to sell their shares. In the annual report, inter alia, Media disclosed that, "[i]n August 2005, the Company paid a $28,500 success fee to Summit for services rendered in connection with a private placement of its common stock." Relationserve Media, Inc., Annual Report

---

[18] With respect to Media, Thompson claimed that Altavilla had represented that, while Media's shares had restrictions on resale, these restrictions would be released within 30 days of Thompson's purchase.

44

(Form 10-KSB), at F-26 (Mar. 20, 2006).  Neither the registration statement nor the annual report disclosed the Thompson litigation.

On May 1, 2006, Media amended this registration statement to give the public notice of Thompson's lawsuit.  Relationserve Media, Inc., Amendment No. 1 to Form SB-2 Registration Statement (Form SB-2/A), at 53 (May 1, 2006). Media also related that Thompson sought rescission because the shares were not registered as required under Indiana Law and because Media failed to disclose a commission to Altavilla.  Media also asserted its belief that the suit lacked merit but noted that it could not predict the range of any loss.  This disclosure prompted the SEC to send a letter to Media requesting more information about the Thompson litigation.

Responding to the SEC's letter, on May 23, 2006, Media augmented the amendment it had made to its registration statement.  Answering the SEC's questions, Media added that: (1) Thompson sought rescission of 50,000 shares of stock, (2) Media did not register the shares in Indiana because they qualified for an exemption, and (3) Altavilla did not sell shares on the company's behalf but did receive a seven percent finder's fee for introducing investors to Media.  Media reiterated its belief that the action lacked merit.  Relationserve Media, Inc., Amendment No. 2 to Form SB-2 Registration Statement (Form SB-2/A), at 64–65

45

(May 23, 2006).  The last amendment to this registration statement took place on July 13, 2006, and the SEC declared it effective on July 14, 2006.

On May 9, 2006, Relationserve Media moved the Hamilton County Circuit Court to dismiss it from Thompson's lawsuit.  It argued that the forum selection clause in the subscription agreement required that all litigation be conducted in Broward County, Florida.  Thompson responded to this motion by filing an affidavit in which he averred that he had no direct communication with Media and in fact did not read the private offering memorandum or any other materials concerning Media; rather, his son, Greg Thompson, read the materials.  The court agreed with Media's position and, on July 19, 2006, dismissed Media from the case.

Just before the Indiana circuit court dismissed the case, on July 17, 2006, Thompson sold 10,000 shares at $0.40 a share, and another 10,000 shares at $0.35 a share.  These sales obviously limited his ability to seek a full rescission of his 50,000-share initial purchase.  Thompson's investment strategy took a turn later in the day, though, as he bought another 10,000 shares of Media at $0.42 a share on July 17, only to sell 10,000 shares the next day at $0.39 a share. One month later, on August 16, 2006, Thompson dumped the rest of his shares in three sales at $0.37, $0.36, and $0.35 a share.

II. The Federal Procedural History

A. The Initial Complaint

1. Thompson Files the Initial Complaint

On August 28, 2006, Thompson brought the present lawsuit against Media, three of its former officers and one of its former directors in the United States District Court for the Southern District of Florida. The former officers were Danielle Karp, Mandee Heller Adler, and Ohad Jehassi; the former director was Warren Musser.[19] Thompson was again represented by Cohen & Malad, LLP, and now also by a Florida law firm, Friedman, Rosenwasser & Goldbaum, P.A. Eight days after filing the complaint, on September 5, Cohen & Malad issued a press release publicizing the lawsuit and inviting Media shareholders to contact the firm.[20]

Thompson sued on behalf of a class consisting of "[a]ll persons [including himself] who purchased Relationserve [Media] shares during the period beginning May 24, 2005 and ending on the date of the commencement of this litigation," on

---

[19] Karp served as Media's president from June 13, 2005 to February 3, 2006. Adler was Media's chief executive officer from June 21, 2005 to November 11, 2005. Jehassi was the former chief operating officer of Media, beginning his tenure in July 2005 and ending it on an unspecified date. Musser served on Media's board of directors from June 21, 2005 to October 31, 2005.

[20] The PSLRA required this notice: "Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class . . . ." 15 U.S.C. § 78u-4(a)(3)(A)(i).

August 28, 2006.[21]  While not explicit, the complaint's proposed class consisted of two subclasses:  (1) those who bought shares in the private offerings; and (2) those who bought shares in the public market.  The complaint contained nine counts.  Counts I through III alleged violations of federal securities law and, for remedies, prayed for rescission or damages.  Counts IV through IX alleged violations of Florida and Indiana statutes.[22]

---

[21]  As noted above, Thompson purchased 50,000 Media shares in Media's June private offering.  He also bought 10,000 shares on July 17, 2006, in the open market.  Thompson apparently believed that the July 17 purchase enabled him to "fairly and adequately" represent and "protect the interests of" those of the class who purchased Media shares in the open market.  See Fed. R. Civ. P. 23(a)(4).

[22]  The complaint was a typical "shotgun" pleading, in that each count incorporated by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged were not material to the claim, or cause of action, appearing in a count's heading.  This circuit condemns shotgun pleadings.  See, e.g., Pelletier v. Zweifel, 921 F.2d 1465, 1518 (11th Cir. 1991) ("Anyone schooled in the law who read these [shotgun pleading] complaints . . . [] would know that many of the facts alleged could not possibly be material to all of the counts.  Consequently, [the opposing party] and the district court [have] to sift through the facts presented and decide for themselves which [are] material to the particular cause of action asserted, a difficult and laborious task indeed."); see also Davis v. Coca-Cola Bottling Co., 516 F.3d 955, 984 (11th Cir. 2008) (refusing to award attorneys' fees in a Title VII case because the use of shotgun pleadings "complicated [appellate review] to no end"); M.T.V. v. DeKalb County Sch. Dist., 446 F.3d 1153, 1156 n.1 (11th Cir. 2006) (noting that shotgun pleadings are "frowned upon in this circuit"); Byrne v. Nezhat, 261 F.3d 1075, 1131 (11th Cir. 2001) ("Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice."); Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1567 (11th Cir. 1995) ("The bar would be better served by heeding this advice: 'In law it is a good policy never to plead what you need not, lest you oblige yourself to prove what you cannot.'") (quoting Abraham Lincoln, Letter to Usher F. Linder, Feb. 20, 1848, in The Quotable Lawyer 241 (D. Shrager & E. Frost eds., 1986)).  The first 50 paragraphs of the complaint contained allegations of fact that appeared to relate to a particular count of the complaint but not to other counts.  Utilizing this method of pleading, Count I incorporated the first 50 paragraphs of the complaint, many of which had nothing to do with the Count I claim(s).  Counts II through IX successively incorporated the allegations of all preceding paragraphs and counts, such that each succeeding count was loaded down with allegations having no bearing on the claim(s) the count purported to assert.

Count I, "Filing of False Registration Statement," alleged a violation of "Section 11 of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)." Section 11 is actually codified at 15 U.S.C. § 77k, not § 77*l*(a). Section 77k provides relief for persons who purchase securities in reliance on a false or misleading <u>registration statement</u>.[23] Section 77*l*(a), which is a codification of § 12 of the 1933 Act, provides relief for purchasers of securities who rely on a false or misleading

---

[23] The text of 15 U.S.C. § 77k, Civil liabilities on account of false <u>registration statement</u>, states, in pertinent part:

(a) Persons possessing cause of action; persons liable
    In case any part of the <u>registration statement</u>, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity . . . sue—

        (1) every person who signed the <u>registration statement</u>;
        (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the <u>registration statement</u> with respect to which his liability is asserted;

. . . .

(f) Joint and several liability; liability of outside director
        (1) [A]ll or any one or more of the persons specified in subsection (a) shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

(emphasis added).

49

statement in a prospectus or oral communication.[24]  To solve this inaccurate

citation problem, I read Count I to seek relief under both sections 11 and 12 of the

1933 Act.  This squares with Count I's allegation that

> [Media's] filings with the Securities Exchange Commission, including
> the registration statements, prospectus, and amendments thereto
> omitted to state material facts necessary in order to make the
> statements made, in the light of the circumstances under which they
> were made, not misleading in at least the following particulars:
>
> a.  RelationServe [Media] was selling its securities through
> unregistered agents and broker/dealers and paying commissions to
> these unregistered agents and broker/dealers;

---

[24]  The text of 15 U.S.C. § 77*l*, Civil liabilities arising in connection with prospectuses
and communications, states, in pertinent part:

(a) In general
Any person who

. . . .

> (2) offers or sells a security . . . by the use of any means or instruments
> of transportation or communication in interstate commerce or of the mails,
> by means of a prospectus or oral communication, which includes an
> untrue statement of a material fact or omits to state a material fact
> necessary in order to make the statements, in the light of the
> circumstances under which they were made, not misleading (the purchaser
> not knowing of such untruth or omission), and who shall not sustain the
> burden of proof that he did not know, and in the exercise of reasonable
> care could not have known, of such untruth or omission,

shall be liable . . . to the person purchasing such security from him, who may sue
either at law or in equity in any court of competent jurisdiction, to recover the
consideration paid for such security with interest thereon, less the amount of any
income received thereon, upon the tender of such security, or for damages if he no
longer owns the security.

(emphasis added).

50

b. The sale of RelationServe [Media] stock through unregistered agents and broker/dealers was in violation of state and federal securities laws, which caused a substantial contingent liability for claims of rescission by investors and exposed RelationServe to substantial legal fees; and

c. The potential civil liability of RelationServe [Media] for selling shares of its stock in violation of state and federal law, which would have an adverse impact on the RelationServe [Media] financial condition.

(Compl. ¶ 52 (emphasis added).) Count I thus alleged that Media had violated the 1933 Act by selling securities under a false or misleading registration statement(s), prospectus, or oral communication, by failing to disclose its use of unregistered brokers and the contingent liability arising therefrom (the "unregistered-broker theory").

Count II, "Violation of Securities Act of 1933," incorporated all of the preceding allegations of the complaint, including Count I. Count II alleged that Media and the Officers, who were "controlling persons, offered and sold the shares of RelationServe [Media] in violation of 15 U.S.C.A. § 77*l*." (Compl. ¶ 56.) Because I construe Count I to seek relief under § 12, codified at 15 U.S.C. § 77*l*, Count II added nothing to Count I.

Count III, "Violation of Securities Exchange Act of 1934, Rule 10b-5," incorporated all of Counts I and II and further asserted that Media and the Officers "offered and sold the shares of RelationServe [Media] in violation of" the

51

Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 77q, and Rule 10b-5.[25] (Compl. ¶ 60.) Section 10(b) of the 1934 Act,[26] and Rule 10b-5,[27] provide

[25] The complaint referred to the 1934 Act, 15 U.S.C. § 77q, and Rule 10b-5. Actually, however, § 77q codifies § 17 of the 1933 Act. Section 10 of the 1934 Act, which provides the statutory authority for Rule 10b-5, is codified at 15 U.S.C. § 78j. The first and second amended complaints repeated the reference to § 77q. This time, I resolve the pleading ambiguity by assuming the citation to § 17 was an error; notwithstanding the citation to § 17, I read Count III of the initial complaint, Count III of the first amended complaint, and Count I of the second amended complaint to seek relief only under § 10(b) and Rule 10b-5.

This results in no prejudice to the plaintiffs or their attorneys because this circuit has expressly refused to read a private right of action into § 17. Currie v. Cayman Res. Corp., 835 F.2d 780, 784–85 (11th Cir. 1988) ("We therefore hold that section 17(a) does not imply a private cause of action . . . ."); see also id. at 784 n.8 (noting that the Supreme Court has not decided the question). Therefore, reading the complaints to seek relief only under § 10(b) removes a roadblock in the plaintiffs' path to recovery. In any event, the plaintiffs referenced the 1934 Act in Count III's header and never pressed a 1933 Act § 17 claim either in the district court or in this court. Accordingly, notwithstanding the citation error, from this point forward, I treat the plaintiffs as bringing only a § 10(b) claim.

[26] The text of § 10(b) of the 1934 Act, as codified at 15 U.S.C. § 78j, states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[27] The text of Rule 10b-5, as codified at 17 C.F.R. § 240.10b-5, states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

relief for any person who relies on a false or misleading statement in connection with the purchase or sale of a security.

More specifically, Count III alleged that "[t]he Defendants . . . offered and sold the shares . . . in violation of . . . Rule 10b-5." (Compl. ¶ 60.) Because Media and the Officers only "offered and sold" shares to the private offering purchasers, the § 10(b), Rule 10b-5 claim was limited to the private offering subclass. The complaint did not directly identify any false or misleading statement made by any defendant in connection with Media's sale of shares to Thompson or any other private offering purchaser; nor did the complaint allege any device or scheme to defraud. Thompson did, however, refer to the omissions in Count I's section 11 and 12 claims. (Compl. ¶ 58 ("As stated herein, the registration statement and prospectus contained untrue statements of material facts . . . .").) Therefore, Thompson claimed the private offering purchasers could recover based on Media's failure to disclose its use of unregistered brokers in its public offering documents.

Thompson invoked the district court's supplemental jurisdiction for the state law claims asserted in Counts IV though IX. See 28 U.S.C. § 1367. Count IV

---

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

53

alleged that Media, aided and abetted by the Officers, sold Media shares through brokers, dealers, and agents who were not registered in Florida, in violation of Florida Statutes §§ 517.12 and 517.061. Count V alleged that sales were made in Indiana via unregistered brokers, dealers, and agents, in violation of Indiana Code § 23-2-1-8. Count VI alleged that Media, aided and abetted by the Officers, sold Media shares that were unregistered in violation of Indiana Code §§ 23-2-1-2 and 23-2-1-3. Count VII alleged that Media, aided and abetted by the Officers, sold Media shares in violation of the anti-fraud provisions of the Indiana Securities Act, Indiana Code § 23-2-1-12. Count VIII alleged that Media, aided and abetted by the Officers, defrauded the purchasers of Media shares, in violation of Indiana Code § 35-43-5-3. Count IX alleged that Media and the Officers defrauded the purchasers of Media shares, in violation of the common law.

As remedies, Thompson sought rescission or damages for the federal securities claims brought in Counts I through III. As for the state law claims, Thompson sought rescission for Counts IV through VII, trebled compensatory damages for Count VIII, and compensatory and punitive damages for Count IX. Prior to filing his complaint, Thompson disposed of all of his Media shares. Accordingly, the remedy of rescission was not available to him in Counts I through VII. Nor was rescission available to the members of Thompson's open market

54

subclass because they never bought shares from Media; therefore, they could not obtain a judgment requiring the company to return the purchase price—which they never paid to the company—in exchange for the shares they still held.

2. The Defendants Warn Thompson's Attorneys that the Suit is Frivolous

After Media received the initial complaint, but before filing a responsive pleading, Thomas Fleming, one of Media's attorneys,[28] wrote to Cohen & Malad to advise the firm that Thompson's claims were frivolous and that the complaint had been filed in violation of Rule 11(b). While the record does not contain Fleming's letter, it does contain Cohen & Malad's reply. Richard Bell replied on behalf of Cohen & Malad, stating:

> We are in receipt of your letter of October 6, 2006. We strongly disagree with your assessment of this securities litigation filed against your client []. Contrary to your opinion, the lawsuit was filed in good faith and was diligently investigated and researched before it was filed.[29]
>
> . . . .
>
> Lastly at some point in time both our clients will want to resolve or settle this case. So I will commit to be respectful of your legal positions even though I may disagree.

---

[28] Fleming was a member of the New York firm of Olshan, Grundman, Frome, Rosenzweig & Wolosky LLP. The firm withdrew from the case on November 17, 2006, and was later replaced as lead counsel for Media by White & Case.

[29] Rest assured that we do plan to amend the complaint and will add additional defendants. Our investigation is ongoing.

(Pls.' Mot. to Compel Disc. Ex. A (Oct. 11, 2006 Letter from Richard Bell to Thomas Fleming, at 1, 4) (Oct. 24, 2006) (footnote in original).)

### 3. The Defendants Move to Dismiss, Request the Court to Retain Jurisdiction to Impose Sanctions

Shortly thereafter, on October 20, 2006, the defendants moved to dismiss Thompson's complaint on a slew of grounds.[30] As for the federal securities law claims, the defendants pointed to several pleading errors. The Counts I and II claims under § 11 and § 12 of the 1933 Act failed to identify any purchase made in reliance on false or misleading statements in a registration statement or prospectus.[31] The Count III § 10(b), Rule 10b-5 claim failed to identify any false or misleading statements with the particularity and specificity required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.

Turning to Thompson's state law claims, the defendants argued that those claims were barred by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb, which mandates, with limited exceptions not

---

[30] Media filed its motion to dismiss on October 20, 2006. Karp filed her motion to dismiss on October 31, 2006. Jehassi sought and was granted an extension to respond to the complaint but never actually needed to respond because Thompson withdrew the complaint and never again named him as a defendant.

[31] The defendants also noted that because Thompson had purchased his shares in a private offering in June 2005—long before Relationserve Media filed its initial registration statement on March 20, 2006—and because it had not issued a prospectus, Thompson could not make out a violation of §§ 11 or 12 of the 1933 Act.

applicable here, that class action claims involving the purchase or sale of nationally traded securities must be asserted under federal securities law.[32]

In their motions to dismiss, defense counsel also notified Thompson's counsel that they considered the claims to be baseless and in violation of Rule 11. Indeed, both defendants who responded to the complaint moved the court to dismiss the case and to retain jurisdiction to impose sanctions pursuant to the PSLRA and Rule 11.[33]

### 4. Thompson's Attorneys Move the Court for Leave to Amend and for Limited Discovery to Add Individual Defendants

Thompson did not respond to the defendants' motions. Instead, on October 24, his attorneys moved the district court for leave to conduct limited discovery to

---

[32] In relevant part, the SLUSA provides:

(f) Limitations on remedies
  (1) Class action limitations
      No covered class action based upon the statutory or common law
      of any State or subdivision thereof may be maintained in any State
      or Federal court by any private party alleging—
           (A) a misrepresentation or omission of a material fact in
           connection with the purchase or sale of a covered security; or
           (B) that the defendant used or employed any manipulative
           or deceptive device or contrivance in connection with the
           purchase or sale of a covered security.
15 U.S.C. § 78bb.

[33] White & Case LLP represented Media and all individual defendants except Karp, who was represented by McClosky, D'Anna & Dieterle, LLP; Honig, who was represented by Tew Cardenas LLP; and Hill, who was represented by Genovese Joblove & Battista, P.A.

obtain the last known addresses for fourteen of the company's officers and directors so Thompson could amend his complaint and name them as defendants.

### 5. The Court Grants the Attorneys Leave to Amend and Limited Discovery and Warns the Attorneys About Rule 11

On November 3, the district court held a telephone conference to hear argument on the pending motions. During the call, Thompson's counsel informed the court that they wished to file an amended complaint; the court granted them leave to do so.[34] Over Media's strenuous objection that Thompson's request for limited discovery amounted to a scorched-earth litigation tactic,[35] the court granted Thompson's motion. In granting this motion, the court, although it had not yet read the complaint, reminded counsel,

> Also, there's Rule Eleven which provides sanctions if there is no legitimate basis for bringing a suit or serving the various officers and directors . . . .
>
> . . . .
>
> . . . I don't know whether these officers and directors are legitimate targets or not. There is no way I can know. I do know you lawyers being experienced lawyers know about Rule Eleven.

---

[34] On November 7, 2006, the district court entered an order denying the defendants' motions to dismiss. The order stated that the plaintiff had asked for, and had been granted, leave to amend his complaint.

[35] Media argued that plaintiff's counsel were pursuing a scorched-earth tactic in an effort to "coerce some money out of a business where the plaintiff lost maybe $150,000. He has asserted class action claims. He has tried every trick in the book." (Teleconference Tr. 5, Nov. 3, 2006.)

. . . .

> Mr. Goldbaum, I will tell you, you really ought to think long and hard before you just automatically sue everyone that happens to be on the list of officers and directors. That's for you to decide . . . .

(Teleconference Tr. 4, 6–7, Nov. 3, 2006.) Responding to this warning, Thompson's counsel promised the court that they would be mindful of Rule 11 and would name officers and directors as defendants only if they had a reasonable basis for doing so.

## B. The First Amended Complaint

### 1. Thompson & Jacoby File the First Amended Complaint, Each Purporting to Represent All Class Members on All Claims

On November 13, 2006, Thompson, now joined by new co-lead plaintiff L. Alan Jacoby,[36] filed a ten-count first amended complaint against Media, eleven Officers and two non-officers.[37] Recall that Jacoby purchased Media shares in the

---

[36] The first amended complaint never explicitly declared that Jacoby was a lead plaintiff. In securities actions, the PSLRA requires proposed lead plaintiffs to file certifications with the district court. See 15 U.S.C. § 78u-4(a)(2)(A) (requiring a sworn statement that, for example, the proposed lead plaintiff has reviewed the complaint and authorized its filing). Because plaintiffs' counsel filed Jacoby's certification in a separate document and incorporated it by reference in the first amended complaint, I treat Thompson and Jacoby as co-lead plaintiffs. (See First Am. Compl. ¶ 1.)

[37] The first amended complaint dropped Ohad Jehassi as a defendant. The Officers were Danielle Karp, Mandee Heller Adler, Warren "Pete" Musser (these three had been named as defendants in the initial complaint), Scott Young, Scott Hirsch, Adam C. Wasserman, Michael H. Brauser, Shawn McNamara, Paul Soltoff, Eric Obeck, and Donald Gould, Jr. The non-officer defendants were Richard Hill and Barry Honig. Hill was a "founder of Omni Point," the company that Relationserve acquired on May 16, 2005. (First Am. Compl. ¶ 17.) Honig was "not registered with the Securities Exchange Commission" and therefore violated "the securities laws" when he "sold RelationServe securities to Investors and received remuneration." (Id. ¶

open market in July 2005.  Both plaintiffs purported to represent <u>all</u> buyers of Media securities who bought during the class period as to <u>all</u> claims.  (First Am. Compl. ¶¶ 99, 102.)  Like the initial complaint, however, this complaint had two implicit subclasses: one of private offering purchasers, and one of open market purchasers.  Also like the initial complaint, this complaint was a shotgun pleading.

The new complaint differed by adding to its federal securities law claims new theories of the defendants' allegedly false or misleading statements.  In addition to Thompson's unregistered-broker theory, Thompson and Jacoby also alleged that Media failed to disclose its retention of outside counsel to investigate accusations of employee theft and kickbacks (the "kickback theory"); that beginning in the third quarter of 2005, its financial statements recognized income in violation of Generally Accepted Accounting Principles ("GAAP") and company policy  (the "overstated-income theory"); and that it did not disclose that director Musser had been sued by stockholders of two other corporations for securities violations (the "sued-director theory").

---

18.)  According to the complaint, the remainder of the defendants were Officers and/or directors of Media: Hirsch was chief operating officer, Wasserman was chief financial officer, Brauser was chairman of the board, McNamara was senior vice president and interim chief financial officer, Soltoff was chief financial officer, Obeck was president, Gould was chief financial officer, and Young founded Chubasco, Media's predecessor.  The complaint alleged that all of these Officers signed or authorized one or more certifications with the SEC. (<u>Id.</u> ¶¶ 10–22.)

The plaintiffs also tried to strengthen Thompson's original unregistered-broker theory. They added an allegation that Summit and another unregistered broker, Barry Honig, sold securities to a Florida resident, Stuart Feick. (First Am. Compl. ¶¶ 66–67.) Additionally, the plaintiffs essentially listed all of Media's SEC filings to date,[38] with one notable exception. The first amended complaint did not list Media's June 16, 2005 Form 8-K current report, which revealed the Summit consulting agreement, and, with it, Summit's representation that it was not licensed and would not act as a broker/dealer for Media.[39] The amended complaint alleged that all of the listed SEC filings were false or misleading because they failed to state the material facts recounted above, including Media's use of an unregistered broker—Summit—to sell its shares.

---

[38] The plaintiffs alleged that the following documents contained false or misleading statements due to omissions of material fact: (a) the June 13, 2005 Form 8-K; (b) the June 14, 2005 quarterly statement Form 10-QSB filed by Chubasco; (c) the June 27, 2005 Form 8-K; (d) the June 30, 2005 Form 8-K; (e) "several Form 8K's [sic]" filed in July, August and September 2005; (f) the August 18, 2005 quarterly statement Form 10-QSB; (g) the November 18, 2005 quarterly statement Form 10-QSB; (h) "several Form 8K's [sic]" filed in November 2005; (i) "several" Form 8-Ks filed on December 5, 2005; (j) the December 30, 2005 Form 8-A Registration Statement; (k) "several Form 8K's [sic]" filed in February 2006; and (l) the March 20, 2006 Form SB-2 and Form 10-K. (First Am. Compl. ¶¶ 72–92.)

[39] That the amended complaint contained no explicit reference to the June 16, 2005 current report is noteworthy for three reasons. First, the plaintiffs chose to list almost every other SEC filing, made both before and after June 16, 2005. Second, Thompson had attested in the subscription agreement he signed when he purchased his shares in the private offering that he had read and reviewed this June 16, 2005 filing. See supra note 11 and accompanying text. Third, the plaintiffs cited the June 16 filing in the initial complaint verbatim, and the only time the agreement was disclosed was in the June 16, 2005 filing.

Counts I through III replicated nearly verbatim Counts I through III of the initial complaint. Count I alleged that Media violated § 11 by filing a false registration statement; Count II claimed that Media violated § 12 by issuing false or misleading prospectuses or oral communications; Count III alleged violations of § 10(b) and Rule 10b-5. The plaintiffs added a new count, Count IV, "Violation Of Section 20(a) of The Exchange Act Against the Individual Defendants." That count asserted that the Officers were liable for the Count III § 10(b), Rule 10b-5 violations because the Officers were controlling persons under § 20(a) of the 1934 Act, 15 U.S.C. § 78t.[40] For all three federal securities claims, the plaintiffs alleged the same misleading statements—Media's securities filings misled because they omitted Media's use of an unregistered broker, its investigation of kickbacks, its overstatement of income, and its sued director.

Similarly, with two notable exceptions, the plaintiffs re-pled their state law claims almost verbatim. See Part II.A.1, supra. The state law claims were now pled as Counts V through X (they were pled as counts IV through IX in the initial

---

[40] Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of [the 1934 Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

complaint). The two exceptions involved the allegations of fraud in the now Count VIII Indiana Securities Act fraud claim and the now Count IX Indiana deception claim. In the initial complaint's iteration, Thompson alleged that Media fraudulently failed to disclose: sizeable commissions and fees it paid to Altavilla, that the stock was not registered and therefore restricted, and that Media had hired "unregistered agents to sell there [sic] securities." (Compl. ¶¶ 76, 78.) In the amended complaint, Thompson eliminated any claim that Media misled him about the unregistered status of his shares and pled the unregistered-broker, kickback, overstated-income, and sued-director theories of misrepresentation instead. (First Am. Compl. ¶¶ 147, 149.)

### 2. The Defendants Move to Dismiss, Request the Court to Retain Jurisdiction to Impose Sanctions

The defendants responded to the first amended complaint with motions to dismiss, which articulated virtually the same rationales as their previous motions to dismiss. Addressing the Counts I and II claims under § 11 and § 12 of the 1933 Act, the defendants argued that the private offering subclass could not have relied on a Media registration statement or prospectus because none had been issued for those shares. Addressing Jacoby's purchase of 10,000 shares in the open market in July and August 2005, the defendants argued that these shares were purchased under a registration statement and prospectus issued by Chubasco in February 2005

63

and thus could not form the basis for a § 11 or § 12 claim against Media. Turning to the Count III § 10(b), Rule 10b-5 claim, the defendants argued that the plaintiffs failed to plead the claim with the particularity and specificity demanded by Rule 9(b) and the PSLRA. As for the state law claims, the defendants again reiterated that they were barred by the SLUSA, and, even if they were not barred by the SLUSA, they failed to state a claim. Finally, defendants Media, Adler, Musser, Wasserman, Brauser, McNamara, Soltoff, Obeck, Gould, and Young, and, in her separate motion, defendant Karp, reiterated the request that the court retain jurisdiction to impose sanctions.

In response to the defendants' motions, plaintiffs' counsel conceded that their § 11 claim had no merit.[41] Although the plaintiffs also conceded that their § 12 claim could not succeed on the basis of any false or misleading prospectus, they maintained the claim had merit because Thompson relied on certain (unidentified) "oral communication[s]" in the June private offering.[42] (Pls.' Resp. to Defs.' Mot.

---

[41] In their response, plaintiffs' counsel stated: "After reviewing the Defendants' briefs and further investigating the claims, Plaintiffs Jacoby and Thompson have decided to abandon their Section 11 claims." (Pls.' Resp. to Defs.' Mot. to Dismiss 26, Jan. 29, 2007.)

[42] The first amended complaint alleged that Thompson had relied on "oral communications" from Altavilla. Paragraph 56 stated: "Before investing Plaintiff Richard F. Thompson reviewed the public statements on the internet about Relationserve [Media], listened to the sales pitch of Tony Altavilla and reviewed all document[s] presented by Tony Altavilla." Paragraph 58 stated: "In order to complete the purchase of Relationserve [Media] shares by the Plaintiff Richard F. Thompson, Altavilla negotiated the final purchase price between the parties, and facilitated wire transfers of money from the Plaintiff to Relationserve [Media]."

64

to Dismiss 25, Jan. 29, 2007.)[43] As for the § 10(b), Rule 10b-5 claim, counsel argued that they had met the strict pleading requirements of Rule 9(b) and the PSLRA.[44] (Id. at 11.)

Regarding the state law claims, the plaintiffs conceded that the SLUSA barred them from maintaining three of the five claims as class actions: the Count VIII Indiana securities fraud claim, the Count IX Indiana deception claim, and the Count X common law fraud claim. They argued that Counts V, VI, and VII were cognizable. (Id. at 23–24.) Counts V and VI alleged that Media sold securities via unregistered brokers in violation of Florida and Indiana law, respectively; Count VII alleged that Media sold unregistered, non-exempt securities in violation of the Indiana Securities Act. The defendants contended that these claims were "not within the purview of SLUSA because the claims do not allege that the Defendants misrepresented or omitted a material fact in connection with the purchase or sale of such security." (Id. at 23 (quotation omitted).)

### 3. The Court Dismisses the First Amended Complaint

---

[43] Plaintiffs' counsel apparently concluded that they lacked evidentiary support, legal support, or both, for the "oral communication[s]," because, when they filed the second amended complaint, they did not assert a § 12 claim.

[44] The plaintiffs' allegations of fraudulent conduct on the part of the Officers were that they "omitted to state material facts" in documents with the SEC. (See First Am. Compl. ¶¶ 9–22.) For example, "Defendant Danielle Karp was the President and Secretary of Relationserve. Danielle Karp signed one or more certifications per Sarbanes-Oxley Act filed with the SEC which omitted to state material facts." (Id. at ¶ 10.)

The district court heard the defendants' motions to dismiss during a conference call with counsel on March 6, 2007. Referring to the § 10(b), Rule 10b-5 claims, the court questioned whether Thompson was a suitable class representative because of a possible conflict with the open market purchasers. The court also indicated that it had serious concerns about the adequacy of the plaintiffs' pleading. At one point, the court said:

> So I don't see anything where it is alleged that [Thompson and Jacoby] relied on anything specific. Nothing is tied together. There are a lot of things thrown out in the first amended complaint, but I see very little connecting of the dots.
>
> Seems to me there are some real gaps there. Seems to me you may have more than one lawsuit tied into one lawsuit. . . .
>
> . . . .
>
> Again, it's kind of hard to follow. It's like so what, who relied on it, who did what? Where is the reliance causation?
>
> I don't see . . . where anyone is alleged to have relied on any particular filing whether [a Form] 10[-] K, [Form] 10-Q[SB], or registration statement that led that person to purchase something.

(Hr'g Tr. 8, Mar. 6, 2007.) After detailing why the federal securities claims failed, the court offered plaintiffs' counsel "one final time to take care of" the deficiencies. (Id. at 5.) The court therefore dismissed the first amended complaint without prejudice, with leave to file a second amended complaint by March 19, 2007.

C. The Second Amended Complaint

1. Thompson & Jacoby File the Second Amended Complaint with Jacoby Leading an Open-Market Purchaser Subclass Bringing Federal Securities Claims and with Thompson Leading a Private Offering Purchaser Subclass Bringing State Law Claims

The plaintiffs filed a second amended complaint on March 19, 2007. This complaint, unlike the prior ones, pled two class actions: one under federal securities law, with Jacoby as the class representative, and the other under state law, with Thompson as the class representative. Both actions sought rescission or damages for purchasers of Media stock.

As for the federal claims, Jacoby brought his class action in two counts, I and II, "on behalf [of] himself and all others similarly situated that purchased RelationServe Media, Inc. . . . securities on the open market prior to May 23, 2006." (Second Am. Compl. ¶ 1.) In Count I, except for the class definition, Jacoby replicated the claim brought by Thompson in Count III of the initial complaint and by Thompson and Jacoby in Count III of the first amended complaint—that Media and the Officers "offered and sold RelationServe securities in violation of" § 10(b) of the 1934 Act and Rule 10b-5. (Second Am. Compl. ¶¶ 101–03.)[45] In Count II, except for the class definition, Jacoby replicated the §

_____

[45] In drafting the second amended complaint, plaintiffs' counsel did not include the § 11 and § 12 claims asserted in Counts I and II of the initial and first amended complaints, which were based on misrepresentations allegedly made in Media's registration statement and prospectus. See supra parts II.A and B. Nonetheless, in presenting Count I in the second

67

20(a) claim brought by Thompson and Jacoby in Count IV of the first amended complaint—"[b]y virtue of their positions as controlling persons [of Media], the individual Defendants are liable" for Media's violation of § 10(b) and Rule 10b-5. (Id. ¶¶ 104–11.)

The biggest difference between the federal securities claims in the first and second amended complaints was what the second amended complaint omitted. Gone was Thompson from any federal securities claim; gone were two of the individual defendants;[46] gone were the § 11 and § 12 claims; gone were the kickback and the overstated-income theories of misrepresentation.[47] Only Jacoby remained, representing open market purchasers and bringing a § 10(b), Rule 10b-5 claim and a parasitic § 20(a) claim.[48] Jacoby asserted only the unregistered-broker and sued-director theories of misrepresentation.

---

amended complaint, counsel repeated the allegation that "RelationServe[ Media's] registration statement(s) and prospectus contained misleading information and omitted material facts necessary to make the statements alleged therein not misleading." (Second Am. Compl. ¶ 102.)

[46] The plaintiffs dropped Richard Hill and Barry Honig.

[47] The plaintiffs did not even plead the factual predicate for the kickback theory; the plaintiffs did plead the factual predicate for the overstated-income theory (Second Am Compl. ¶¶ 60, 61), but did not plead it as an actionable omission in the § 10(b), Rule 10b-5 claim, (id. ¶¶ 3, 80, 95). Further, in the district court and in this appeal, the plaintiffs advanced it only to demonstrate the defendants' venal character in support of the plaintiffs' scienter argument.

[48] A § 20(a) claim is a parasitic claim because it can only succeed if a predicate § 10(b), Rule 10b-5 claim succeeds; thus the § 20(a) claim lives and dies by the Rule 10b-5 claim.

Thompson asserted his class action in Count III "on behalf of himself and all others similarly situated that purchased RelationServe [Media] securities by way of a private offering." (Id. ¶ 2.) Count III alleged that the defendants

> violated the securities laws of California, Connecticut, Florida, Illinois, Indiana, Nevada, New Jersey, New York, Ohio, and Pennsylvania by way of (1) their sale of RelationServe [Media] securities through the use of broker/dealers and agents who were not registered with the SEC [and those states] and (2) their payment of a commission.[49]

(Id. ¶ 113.) Furthermore,

> [e]ach Defendant having access to RelationServe [Media] business prior to and during RelationServe[ Media's] use of unregistered broker/dealers personally participated or aided in making the sales to Thompson and his putative class and is jointly and severally liable for rescission if the purchaser still owns the security or for damages if the purchaser has sold the security.

(Id. ¶ 114.) Here again, most notable was what was omitted: gone was the claim that Media sold unregistered, non-exempt securities in violation of the Indiana securities act, and gone were all of the state law fraud claims.

The first 100 paragraphs resembled the first 117 paragraphs of the first amended complaint. Like that complaint, the second amended complaint omitted any reference to Media's June 16, 2005 current report, which indicated that Summit was not registered and would not act as a broker/dealer, but, rather would

---

[49] As it pertained to the securities laws of Florida and Indiana, Count III replicated the allegations of Counts IV and V of the initial complaint and Counts V and VI of the first amended complaint.

69

only act as a finder.  Nevertheless, the second amended complaint addressed the licensing issue by alleging that "RelationServe [Media], and its officers and directors, knew and failed to report . . . that Summit and its agents [we]re not registered with the SEC or the state securities divisions."  (Second Am. Compl. ¶ 45.)  It also alleged that the Officers acted with scienter in failing to report this: the Officers "knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public."  (Id. ¶ 80.)

2. The Defendants Move to Dismiss, and Defendant Karp Moves for Sanctions

Once again, the defendants moved to dismiss the plaintiffs' complaint.  They did so on several grounds, among them that (1) the § 10(b), Rule 10b-5 claim's allegations of misrepresentation and scienter were insufficient under the heightened pleading requirements of Rule 9(b) and the PSLRA; and (2) as a consequence, the parasitic § 20(a) claim failed.  As for Thompson's state law class action, the defendants pointed out that of the ten states where Media allegedly sold shares through unregistered brokers, the plaintiffs had identified only one sale in only one state—specifically, Media's sale to Thompson through Summit in Indiana.  Accordingly, the state law claims in all states except Indiana failed from

70

the get-go. As for the Indiana sale to Thompson, the plaintiffs pointed out that Summit did not need to be registered as a broker under Indiana law.

In addition to moving for the dismissal of the complaint, defendant Karp moved for sanctions against the plaintiffs and their attorneys under Rule 11 with respect to all counts and under the PSLRA with respect to the Count I § 10(b), Rule 10b-5 claim and the Count II § 20(a) claim.[50]

3. The Court Dismisses the Complaint with Prejudice but Denies Sanctions

On June 12, 2007, the district court entered an order disposing of the defendants' motions. The court dismissed Count I because it failed to meet the heightened pleading standards of Rule 9(b) and the PSLRA. In the court's view, the § 10(b), Rule 10b-5 elements of misrepresentation and scienter had not been pled with the requisite specificity. Specifically, the § 10(b), Rule 10b-5 claim did not identify one statement of significance in any SEC filing that was allegedly false or misleading due to the omission of a material fact, and it pled scienter in a conclusory fashion, thereby failing to create a strong inference of severe recklessness on the part of Media or the Officers. The court dismissed Count II

---

[50] All defendants except Jehassi sought Rule 11 sanctions when they moved the district court to dismiss the initial complaint; eleven of thirteen defendants renewed this request in their motions to dismiss the first amended complaint; and all defendants renewed this request in their motions to dismiss the second amended complaint. Karp was the only defendant who sought the imposition of sanctions in a separate motion and was the only defendant who appealed the denial of sanctions.

71

because Count I was legally insufficient. The dismissal of Counts I and II left the court with the state law claims of Count III. The court declined to exercise its supplemental jurisdiction over those claims and therefore dismissed them without prejudice.

In a separate order entered on June 12, the court denied Karp's motion for sanctions. The court found "that Plaintiffs' claims are not frivolous, or so devoid of evidentiary support as to warrant sanctions. Likewise, there is no evidence that Plaintiffs instituted this action for improper purposes, such as to harass [Media, Karp, or any other named defendant] or needlessly increase the cost of litigation." (Sanctions Order 1, June 12, 2007 (internal citations omitted).)[51] Karp contended that sanctions were warranted because, "[i]n dismissing the instant matter three times for failing to state a cause of action, the District Court in essence ruled Plaintiffs' claims were frivolous."

4. Jacoby's Appeal, Karp's Cross-Appeal, and this Court's Decision

---

[51] The two page order denying sanctions did not explicitly address Rule 11(b) compliance under the PSLRA with respect to: (1) the § 11 claims brought as Count I in the initial and first amended complaints; (2) the § 12 claims brought as Count II in the initial and first amended complaints; (3) the § 10(b), Rule 10b-5 claims brought as Count III of the initial complaint and first amended complaints and Count I of the second amended complaint; or (4) the § 20(a) claims brought as Count IV of the first amended complaint and Count II of the second amended complaint. After declining to exercise jurisdiction over Count III of the second amended complaint, Thompson's state law claims, the district court did not decide whether Rule 11 sanctions should be imposed for plaintiffs' prosecution of those claims.

72

Subsequently, Jacoby appealed to this court and Karp cross-appealed. Jacoby appeals the district court's dismissal of the § 10(b), Rule 10b-5 and § 20(a) claims of the second amended complaint. Karp cross-appeals the court's denial of PSLRA Rule 11 sanctions for the federal claims and ordinary Rule 11 sanctions for the second amended complaint's state law claims.

Today, the court correctly affirms the dismissal of Jacoby's federal securities law claims. The court disposes of Karp's appeal regarding PSLRA sanctions by vacating the district court's sanctions order and remanding the case for further proceedings, because the district court's PSLRA order is too conclusory to permit meaningful appellate review. The court's disposition contains insufficient instructions as to precisely what the district court must do on remand. In my view, under the court's disposition, the district court must carry out its PSLRA duties from scratch with respect to all parties and their respective attorneys. Finally, the court makes no explicit holding regarding Karp's motion for ordinary Rule 11 sanctions on the state law claims.

## III. This Court Errs by Summarily Remanding Karp's Cross-Appeal for Sanctions Under the PSLRA

In Karp's cross-appeal for Rule 11 and PSLRA sanctions, the court errs for two reasons. First, the court's opinion fails to make perfectly clear that, on remand, the district court must review and make "specific findings regarding"

73

plaintiffs and plaintiffs' counsel's compliance with each requirement of Rule 11(b) with respect to all three complaints.[52]  Second, the court should not have remanded with a blank slate; at bottom, the court should have instructed the district court to sanction plaintiffs' attorneys for noncompliance with Rule 11(b).  This discussion proceeds in two parts.  Part A sets out the duties the PSLRA imposes on district courts and shows that the district court must review all three complaints for Rule 11 compliance on remand.  Part B explains that under the PSLRA, there is no need for a remand when the record demonstrates conclusively that an attorney or party violated Rule 11.

### A.  The PSLRA Rule 11 Analytical Framework & Requirements

The PSLRA mandates sanctions for filing and prosecuting frivolous or abusive securities actions under the 1933 and 1934 Acts and emphasizes the need not only to deter such filings but also to compensate the victims.  See H.R. Rep. No. 104-369, at 39–40 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 738–39.  Accordingly, the PSLRA requires both (1) mandatory findings regarding compliance with Rule 11, and (2) mandatory sanctions whenever any portion of a

---

[52]  See 15 U.S.C. §§ 77z-1(c), 78u-4(c).  Full compliance with the PSLRA requires the district court to review the motions the defendants filed in response to the three complaints as well, but the focus on remand will be the complaints.

plaintiff's complaint fails to comply with Rule 11.[53] 15 U.S.C.

---

[53] Section 78u-4(c), which is materially identical to § 77z-1(c), provides:

Sanctions for abusive litigation

(1) Mandatory review by court

In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) Mandatory sanctions

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

(3) Presumption in favor of attorneys' fees and costs

(A) In general

Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction—

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

75

§ 77z-1(c); 15 U.S.C. § 78u-4(c).

The PSLRA-mandated Rule 11 compliance review is sweeping. In a paragraph entitled "<u>Mandatory</u> review by court," the statute provides that, in any private securities action, "the court <u>shall</u> include in the record specific findings regarding compliance by <u>each party and each attorney</u> . . . with each requirement of Rule 11(b) . . . as to <u>any</u> complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1) (emphasis added). Congress imposed this heavy duty on district courts via statute; thus, whether a party moved for sanctions is irrelevant.

---

(B) Rebuttal evidence

The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that—

(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or

(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

(C) Sanctions

If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

Because the two subsections are materially identical, from this point forward, I cite only to 15 U.S.C. § 78u-4(c).

Moreover, because Congress extended this duty to "any" complaint, when a plaintiff files multiple complaints, each must be scrutinized.  See Reeves v. Astrue, 526 F.3d 732, 734 (11th Cir. 2008) ("Statutory interpretation begins and ends with the text of the statute so long as the text's meaning is clear.").  The PSLRA does not grant a get-out-of-jail-free card—one nonfrivolous complaint does not immunize the earlier filing of frivolous complaints.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 152 (2d Cir. 2009) ("The PSLRA sanctions provision forecloses the kind of safe harbor afforded in Rule 11(c)(2).  The PSLRA explicitly directs courts to make Rule 11 findings 'upon final adjudication of the action' . . . and it is well-settled that no safe harbor could apply retroactively.") (quoting 15 U.S.C. § 78u4-(c)(1)).  Even in the ordinary Rule 11 context, where a complaint contains multiple claims, one nonfrivolous claim will not preclude sanctions for frivolous claims.  E.g., Reed v. Great Lakes Cos., 330 F.3d 931, 936 (7th Cir. 2003) ("The fact that Reed's accommodation claim, while it has failed, was not frivolous would be no bar to imposing sanctions for putting his opponent to the expense of opposing a frivolous claim (or defense) just because he had a nonfrivolous claim as well.").  Here, the district court erred when it based its sanctions review on only the second amended complaint.  The district court should

77

have reviewed all three complaints (as well as, for that matter, each party, each

attorney, and each motion to dismiss) for compliance with Rule 11.

Although the PSLRA forces a district court to conduct the Rule 11 inquiry, it

does not alter the ordinary Rule 11 analysis.  Simon DeBartolo Group, L.P. v.

Richard E. Jacobs Group, Inc., 186 F.3d 157, 167 (2d Cir. 1999).  Rule 11 is

violated when: (1) a paper is presented for "any improper purpose, such as to

harass or to cause unnecessary delay or needless increase in the cost of litigation;"

(2) the legal contentions are not "warranted by existing law" or by a "nonfrivolous

argument" for changing existing law; or (3) the factual contentions lack evidentiary

support.  Fed. R. Civ. P. 11(b) (2006).[54]  A Rule 11(b)(2) or (b)(3)

violation—bringing a legally or factually frivolous claim—is often probative of a

---

[54] When this case was litigated, Federal Rule of Civil Procedure 11(b) provided:

(b) **Representations to Court.**  By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . .  is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
    (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
    (2) the claims . . . and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
    (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11 (2006).  Rule 11 was amended in 2007 "as part of the general restyling of the Civil Rules," this amendment was "intended to be stylistic only."  Fed. R. Civ. P. 11 advisory committee's note, 2007 amendment.   Nevertheless, I refer to the 2006 version of the Rule.

78

Rule 11(b)(1) improper purpose violation. Therefore, it helps to begin the PSLRA examination with Rule 11(b)(2) and (3).

In this circuit, there are two prongs to the Rule 11(b)(2) and (b)(3) inquiry: whether the legal claims or factual contentions are objectively frivolous, and, if so, whether a reasonably competent attorney should have known they were frivolous. Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996). Both inquiries measure attorney conduct under an objective reasonably competent attorney standard. Donaldson v. Clark, 819 F.2d 1551, 1556 (11th Cir. 1987) (en banc).

A legal claim is frivolous if no reasonably competent attorney could conclude that it has any "reasonable chance of success" or is a reasonable argument to change existing law. Worldwide Primates, 87 F.3d at 1254 (quoting Jones v. Int'l Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir. 1995)); McGregor v. Bd. of Comm'rs of Palm Beach County, 956 F.2d 1017, 1022 (11th Cir. 1992) ("If an allegation in a complaint contains no colorable claim for relief, then a Rule 11 sanction is proper."). Not every Federal Rule of Civil Procedure 12(b)(6) dismissal will warrant sanctions, but sanctions may be imposed when settled precedent clearly bars a claim. See Davis v. Carl, 906 F.2d 533, 538 (11th Cir. 1990) (noting that legal claims are frivolous in egregious circumstances such as

when a party ignores the plain language of a statute of limitations or conceals controlling authority); compare Thomas v. Early County, Ga., No. 09-12232, 2010 WL 27970, at *4 (11th Cir. Jan. 7, 2010) (unpublished) (concluding that Rule 11(b)(2) had been violated where "allegations of vicarious liability fail as a matter of long-established law"), with Anderson v. Smithfield Foods, Inc., 353 F.3d 912, 915–16 (11th Cir. 2003) (per curiam) (affirming a district court's dismissal of a RICO count, but reversing the imposition of sanctions when there was "scant on-point authority" to guide the attorney to the conclusion that the claim had no chance of success).

A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis. Davis, 906 F.2d at 535–37. Thus, where no evidence or only "patently frivolous" evidence is offered to support factual contentions, sanctions can be imposed. Id. at 537. If, however, the evidence supporting the claim is reasonable, but simply "weak" or "self-serving," sanctions cannot be imposed. Id. at 536.

Once a court concludes that either the factual or legal contentions are frivolous, the question becomes whether the attorney should have known they were frivolous. Worldwide Primates, 87 F.3d at 1254. We ask what was known or reasonably knowable when the paper was "present[ed] to the court." Fed. R. Civ.

80

P. 11(b).  Again, measured objectively, if a reasonable investigation would have revealed the error to a reasonably competent attorney, then sanctions can be imposed; if not, then sanctions cannot be imposed.  The reasonableness of the inquiry turns on the totality of the circumstances, including, for example, the time available for investigation and whether the attorney had to rely on the client, another member of the bar, or others.  Worldwide Primates, 87 F.3d at 1254.

Rule 11(b)(1) sanctions are appropriate when an attorney or party presents a paper for an improper purpose.  Improper purpose is often inferred from circumstantial evidence.  For example, it can be inferred from "'excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings.'"  Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH, 141 F.3d 1434, 1448 (11th Cir. 1998) (quoting Pierce v. Commercial Warehouse, 142 F.R.D. 687, 690–91 (M.D. Fla. 1992)).  A "motive to harass" can also be inferred from an attorney's filing of factually or legally frivolous claims.  Cf. Carr v. Tillery, 591 F.3d 909, 919–20 (7th Cir. 2010).

Ordinarily, even in the face of a blatant Rule 11 violation, a district court retains discretion to decide how to sanction the party or even not to impose sanctions at all.  This discretion derives from Rule 11's plain text: "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has

81

been violated, the court <u>may</u> impose an appropriate sanction on any attorney, law firm, or party . . . ." Fed. R. Civ. P. 11(c)(1) (emphasis added); <u>see also</u> Fed. R. Civ. P. 11 advisory committee's note, 1993 Amendment ("[W]hat sanctions, if any, to impose for a violation are matters committed to the discretion of the trial court."). Thus, ordinarily, a court can excuse an attorney's negligence, mistake, or plain-old incompetence.

But the PSLRA strips the district court of the discretion to grant mercy—the PSLRA forces a district court to sanction an attorney for violating any prong of Rule 11. The statute provides, in a paragraph entitled "<u>Mandatory</u> sanctions," that "[i]f the court makes a finding . . . that a party or attorney violated any requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion, the court <u>shall</u> impose sanctions on such party or attorney . . . ." 15 U.S.C. § 78u-4(c)(2) (emphasis added). Likewise, the PSLRA curtails a district court's discretion in fashioning the sanction. It does so by erecting a rebuttable presumption that when any complaint "substantial[ly]" fails to comply with Rule 11, the sanction is the defendant's attorneys' fees for the entire action. <u>Id.</u> § 78u-4(c)(3)(A)(ii).[55] Even when the presumption is rebutted,[56] a district court still <u>must</u>

_____

[55] For responsive pleadings and dispositive motions, the PSLRA erects a similar presumption but without the requirement that the violation be "substantial" and limiting the award of fees to those caused by the violation. <u>See</u> 15 U.S.C. § 78u-4(c)(3)(A)(i) (stating the penalty for "failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b)" is an "award to the opposing party of the reasonable attorneys' fees

82

sanction the party in some appropriate manner.  Id. § 78u-4(c)(3)(C) ("If the party

or attorney [to be sanctioned] meets its burden under subparagraph (B), the court

shall award the sanctions that the court deems appropriate pursuant to Rule 11 . . .

.") (emphasis added).

The PSLRA's mandate regarding Rule 11(b) compliance resulted from

Congress's recognition of "the need to reduce significantly the filing of meritless

securities lawsuits without hindering the ability of victims of fraud to pursue

legitimate claims."  H.R. Rep. No. 104-369, at 39 (1995) (Conf. Rep.), reprinted in

1995 U.S.C.C.A.N. 730, 738.  Further, in enacting the PSLRA, Congress

commented that the "[e]xisting Rule 11 has not deterred abusive securities

litigation" and that the PSLRA's sanctions requirement would put "teeth" into Rule

11.  Id.  The Senate Report accompanying the legislation further notes,

> Although private securities class actions can complement SEC
> enforcement actions, the evils flowing from abusive securities
> litigation start with the filing of the complaint and continue through to
> the final disposition of the action.  A complaint alleging violations of
> the Federal securities laws is easy to craft and can be filed with little
> or no due diligence.

---

and other expenses incurred as a direct result of the violation").

[56] The presumption can be rebutted if the party or attorney is able to prove (1) that the sanction would impose an unreasonable, unjust burden and that a failure to impose the sanction would not impose a greater burden on the other party; or (2) that the Rule 11(b) violation was de minimis.  15 U.S.C. § 78u-4(c)(3)(B).  Although they had the opportunity to do so when opposing Karp's requests for sanctions, neither the plaintiffs nor their counsel have made either argument or offered either type of proof in this case.

. . . .

> Most defendants in securities class action lawsuits choose to settle rather than face the enormous expense of discovery and trial. Of the approximately 300 securities lawsuits filed each year, almost 93% settle at an average settlement cost of $8.6 million. These cases are generally settled based not on the merits but on the size of the defendant's pocketbook.
>
> The fact that many of these lawsuits are filed as class actions has had an in terrorem effect on Corporate America . . . . These lawsuits have added significantly to the cost of raising capital and represent a "litigation tax" on business. Smaller start-up companies bear the brunt of abusive securities fraud lawsuits. Many of these companies are high-technology companies which, by their very nature, have unpredictable business prospects and, consequently, volatile stock prices.

S. Rep. No. 104-98, at 8–9 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 687–88 (footnotes omitted).

Accordingly, the PSLRA's sanctions mandate reflects Congress's policy to prevent the misuse of judicial resources in the securities context. To effectuate its goals, Congress imposed a heavy burden on the district courts and removed the courts' discretion to grant mercy for a Rule 11(b) violation.

Significantly, our sister circuits agree with this strict, literal, and unforgiving interpretation of the way Congress has curtailed the district courts' Rule 11 discretion through the PSLRA; the courts of appeals that have considered the issue have uniformly agreed—Congress meant what it said when it made Rule 11

sanctions mandatory whenever a violation is found. See Citibank Global Mkts., Inc. v. Rodriguez Santana, 573 F.3d 17, 31 (1st Cir. 2009) ("The statute requiring such findings does not appear to brook any exceptions"); Morris v. Wachovia Sec., Inc., 448 F.3d 268, 276 (4th Cir. 2006) ("Because the sanctions 'instruction comes in terms of the mandatory "shall," which normally creates an obligation impervious to judicial discretion' . . . the district court must impose sanctions for each violation found.") (quoting Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S.Ct. 956, 962 (1998)); Gurary v. Nu-Tech Bio-Med, Inc., 303 F.3d 212, 215 (2d Cir. 2002) ("If the court determines that a violation has occurred, the imposition of sanctions is mandatory.").

In addition to mandating the Rule 11 inquiry and mandating sanctions for any Rule 11 violation, the PSLRA imposes three procedural requirements. First, the district court's duty to conduct the Rule 11 compliance review is triggered only "upon final adjudication of the action." 15 U.S.C. § 78u-4(c)(1). Second, if, after examining the complaints, responsive pleadings, or dispositive motions, the court concludes that sanctions may be in order, the court "shall give [the] party or attorney [against whom sanctions might be imposed] notice and an opportunity to respond." Id. § 78u-4(c)(2). Although the statute does not specify the type of notice that should issue, an order directing the party or attorney "to show cause"

why sanctions should not be imposed would suffice. <u>Cf.</u> Fed. R. Civ. P. 11 advisory committee's note, 1993 Amendment ("The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order."). Third, a district court must reduce its Rule 11 compliance review to "specific findings." These specific findings are akin to the findings of fact and conclusions of law a district court makes pursuant to Federal Rule of Civil Procedure 52(a) at the conclusion of a bench trial. These findings aid the court of appeals in reviewing the district court's sanctions decision. In this case, in addition to erring by focusing solely on the second amended complaint, the district court erred by entering only a conclusory order.

B. A Court of Appeals Should Not Remand for Rule 11 Findings When it Can Determine Conclusively that the District Court Abused its Discretion in Denying Sanctions

The PSLRA does not explain how a court of appeals should review a district court's failure to conduct an adequate PSLRA examination evidenced by "specific findings" regarding the parties' and their attorneys' compliance with Rule 11. Today, the court equivocates on whether it is possible for an appellate court to determine PSLRA Rule 11 compliance when faced with conclusory findings and declines to do so in this case. <u>Maj.</u> <u>Op.</u> at 20, 23. That conclusion, however, ignores the precedent of this circuit, will set the stage for error on remand, will

86

generate another appeal, and will waste the time and resources of the district court, this court, and the litigants. In my view, under the PSLRA, when it can be determined conclusively that an attorney or party violated Rule 11, the court of appeals should hold that sanctions must be imposed. This is so even where, as here, the court of appeals can reach that holding only as to some of the claims or defenses.

We review a district court's Rule 11 determination for abuse of discretion. Souran v. Travelers Ins. Co., 982 F.2d 1497, 1507 n.10 (11th Cir. 1993). "'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" McGregor v. Bd. of Comm'rs of Palm Beach County, 956 F.2d 1017, 1022 (11th Cir. 1992) (quoting Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990)).

The court seems to doubt whether it can review the district court's exercise of discretion in this case because the record contains only a conclusory, unreviewable order. Accordingly, the court remands the case to the district court so that it can make findings of fact and conclusions of law regarding the parties' and counsel's compliance with Rule 11. There is no doubt, however, that even without extensive findings, it is possible for this court to review PSLRA Rule 11

87

determinations under the abuse of discretion standard. Sometimes, the record on appeal will disclose Rule 11 violations that are so egregious that any refusal by the district court to impose sanctions would <u>necessarily</u> constitute an abuse of discretion. To see why, it is necessary to unpack the abuse of discretion standard and the elements of a Rule 11 violation.

The critical difference between abuse of discretion review and <u>de novo</u> review is that abuse of discretion "recognizes [a] range of possible conclusions the trial judge may reach." <u>United States v. Frazier</u>, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). More specifically,

> [b]y definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a <u>de novo</u> standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."

<u>Id.</u> (quoting <u>Rasbury v. I.R.S.</u>, 24 F.3d 159, 168 (11th Cir. 1994)). That said, abuse of discretion <u>never</u> gives the district court unfettered discretion: the court must not base its discretionary decision on an erroneous view of the law or a clearly erroneous assessment of the evidence. Accordingly, the "range of possible conclusions" varies with the nature of the inquiry (legal v. factual) and the relative merit of the parties' competing positions (whether the question is close). In sum,

when reviewing the elements of a district court's decision of whether to impose sanctions, the relevant question is not whether we would have come to the same decision if deciding the issue in the first instance. The relevant inquiry, rather, is whether the district court's decision was tenable—in the "range of possible conclusions," or, metaphorically, "in the ballpark."

In the non-PSLRA context, the Rule 11 ballpark is large because, as discussed above, a district court has discretion to grant mercy for a violation of Rule 11. Moreover, no hard legal test governs the court's exercise of this ability to be merciful. Thus, in an ordinary Rule 11 case, although a district court could not arbitrarily ignore a Rule 11 violation, it has very broad discretion, and a remand will almost always be necessary. The PSLRA, however, eliminates this wellspring of discretion.

It follows that the PSLRA Rule 11 ballpark is much smaller. And while it is difficult to make generalizations about the size of its fences, because the Rule 11 inquiry is governed by an objective standard, it is clear that they will sometimes be so small as to admit only one conclusion. As discussed in part III.A, supra, to conclude that Rule 11 has been violated, a district court must make two determinations. First, the court must determine that a paper was filed for an improper purpose, or contained legally frivolous claims, or contained factually

frivolous claims.  Fed. R. Civ. P. 11(b).  Second, the court must decide that a

reasonable investigation under the circumstances would have disclosed the

frivolity.  Id.  Thus, if, for example, a statute of limitations clearly bars a claim,[57]

and the record makes clear that the attorney had ample time for pre-filing

research,[58] a district court could only conclude that Rule 11 has been violated

without abusing its discretion.[59]  Put differently, if the district court had the correct

view of the law and facts in mind, it could only conclude that the claim is

frivolous.  See McGregor, 956 F.2d at 1022 ("A district court would necessarily

abuse its discretion if it based its ruling on an erroneous view of the law or on a

---

[57]  The Rule 11(b)(2) determination is whether counsel's view of the law supporting the plaintiff's claim is tenable, or in the ballpark, which is a legal rather than a factual determination.

[58]  Though the reasonable inquiry under the circumstances prong will sometimes necessitate a remand for findings, most complaints are not researched and filed at the eleventh-hour.  Therefore, in most cases, a reasonably competent attorney will have had time to discover the violation.
    In this case, for example, plaintiffs' counsel were fully informed as to the circumstances surrounding Thompson's and Jacoby's purchases of Media stock, had complete access to Media's SEC filings, and had ample time to research and consider the validity of the claims they asserted in the three complaints presented to the district court.  This is evident because the plaintiffs brought a claim based on substantially the same facts in Indiana circuit court five months before filing this suit.  It is obvious that under the objective standard, five months is more than enough time to research a claim.

[59]  By contrast, under the PSLRA, if the Rule 11 determination focuses on whether the paper was filed for an improper purpose, a remand will more likely be necessary because the district court has wider discretion with respect to factual determinations.  Where the ballpark would admit more than one conclusion, a remand is necessary.

clearly erroneous assessment of the evidence.") (emphasis added) (quoting Cooter, 496 U.S. at 405, 110 S. Ct. at 2461).

Encapsulating this in a standard: under the PSLRA, when the court of appeals can determine conclusively that Rule 11 has been violated, it should hold that sanctions must be imposed. In such a case, we would reverse the district court's decision with respect to the claims a reasonably competent attorney could not have presented and remand the case for the imposition of sanctions. This standard finds support in precedent and avoids wasting the courts' and litigants' time and resources.

This standard is consistent with the clear precedent of this Circuit. Pelletier v. Zweifel, 921 F.2d 1465, 1514, n.87 (11th Cir. 1991) (concluding that a remand is unnecessary when the record "demonstrates beyond any question that Rule 11 sanctions are in order"). It also comports with how our sister circuits dispose of cases when a district court's sanctions decision is unreviewable because no explanation is given, but the outcome is clear. See, e.g., Carr v. Tillery, 591 F.3d 909, 919–20 (7th Cir. 2010) (imposing § 1927 sanctions because the suit was "so lacking in merit" that its filing "indicates a motive to harass" made conclusive by the tone of the complaint and the briefs on appeal, even though the district court denied the motion "without explanation"); cf. Citibank Global Mkts., 573 F.3d at

91

32 (concluding that "no purpose would be served by remanding this case to the district court for Rule 11 findings" pursuant to the PSLRA because, in part, the record revealed no basis for finding a Rule 11 violation); Dellastatious v. Williams, 242 F.3d 191, 197 n.5 (4th Cir. 2001) (finding no basis for sanctions under the PSLRA and, thus, concluding that "a remand here would be unnecessary").[60]

A case the court relies upon to justify its decision to remand, Gurary v. Winehouse, 190 F.3d 37 (2d Cir. 1999) ("Gurary I"), illustrates how an unnecessary remand can invite error and waste resources. In Gurary I, because the district court made conclusory PSLRA Rule 11 findings, the court of appeals remanded the case. Id. at 47. On remand, the district court assumed the court of appeals "regarded [its] findings as merely formalistic" and simply gave a more detailed explanation of its original decision. Gurary v. Winehouse, No. 97CIV3803, 2000 WL 20706, at *1 (S.D.N.Y. Jan. 12, 2000). On appeal from that order, the Second Circuit reversed because two of the plaintiff's claims were barred by "both the plain language of the Exchange Act and well-settled case law." Gurary v. Winehouse, 235 F.3d 792, 798–99 (2d Cir. 2000) ("Gurary II").

---

[60] Note that when Citibank and Dellastatious concluded that a remand was unnecessary because there was no basis for sanctions under the PSLRA, they were implicitly holding that a district court would necessarily abuse its discretion if it imposed sanctions. There is no meaningful difference between this and the conclusion that a district court would necessarily abuse its discretion if it refused to impose sanctions.

92

Specifically, the Guary II court held that the plain language of Rule 10b-5 would "prohibit a court from adopting a rule that would support Gurary's claim." Id. at 799. Accordingly, the court remanded the case for a determination of the amount of sanctions. Ultimately, it took a third appeal and one more remand to close the case,[61] but the parties and the court would have avoided considerable time and expense had the Gurary I court pointed out the obvious.

To be sure, courts of appeals must exercise caution when deciding whether to remand a case. Sometimes the Rule 11 violation will not be so clear as to admit only one conclusion. Sometimes the party or attorney against whom sanctions have been imposed did not have the opportunity to be heard. Sometimes the procedural history of the case will indicate that extenuating circumstances altered the standard of care for the prefiling inquiry. Sometimes, particularly with respect to the fact-heavy prongs of Rule 11, the record will not allow the court of appeals to determine conclusively whether sanctions were warranted. In those cases, a remand would be appropriate. But not in this case.

## IV. With Respect to Plaintiffs' Federal Securities Law Claims, the District Court Abused its Discretion in Denying Sanctions

---

[61] Gurary v. Nu-tech Bio-Med, Inc., 303 F.3d 212 (2d Cir. 2002) ("Gurary III").

93

After clearing the ground of any objection plaintiffs and their attorneys might have to a conclusion that they violated Rule 11, I explain why the plaintiffs' federal securities law claims and some of the factual allegations are so frivolous that the district court necessarily abused its discretion when it denied sanctions. That is, the violations are so clear that no matter what rationale the district court might have had, it abused its discretion when it denied sanctions. Part A examines the federal securities law claims in all three complaints for Rule 11(b)(2) compliance; Part B examines all three complaints' factual allegations pertaining to the securities law claims for Rule 11(b)(3) compliance; Part C then turns to whether the plaintiffs brought this action for an improper purpose under Rule 11(b)(1); Part D explains how the district court should proceed on remand.

First, the ground clearing. The plaintiffs' attorneys in this case had adequate notice of the possibility of sanctions and the possible grounds for the same.[62] The

---

[62] This is certainly so with respect to the plaintiffs' legal contentions. As for the evidentiary support Rule 11(b)(3) required for those claims, Karp's separate motion for sanctions expressly discussed factual deficiencies in the plaintiffs' complaint. Even if this were not the case, "Rule 11 alone should constitute sufficient notice of the attorney's responsibilities since the rule explicitly requires the attorney to certify that a complaint is well grounded in fact." Donaldson v. Clark, 819 F.2d 1551, 1560 (11th Cir. 1987) (en banc); id. at 1561 ("When an attorney has failed to present necessary factual support for claims despite several opportunities to do so, for example, further hearing on the sanctions issue may well be not only unnecessary but also a waste of judicial resources."). Notably, in their briefs to this court, plaintiffs said nothing about the adequacy of the notice they received regarding the possibility of sanctions against them or their attorneys.

94

PSLRA itself gave statutory notice. See ATSI Commc'ns v. Shaar Fund, Ltd., 579 F.3d 143, 152 (2d Cir. 2009) ("By virtue of this statutory notice, consideration of sanctions in the PSLRA context can never be sua sponte and can never come as a surprise, because Congress, not the court, has prompted and mandated a Rule 11 finding."). Moreover, as discussed above, in their motions to dismiss the three complaints, the defendants asked the court to retain jurisdiction to impose sanctions. In response to the second amended complaint, Karp also sought sanctions in a separate motion. Finally, the district court personally warned the plaintiffs' attorneys about the requirements of Rule 11. In response to these motions and in their briefs to this court, the plaintiffs' attorneys never attempted to excuse their filing of frivolous claims because extenuating circumstances precluded an adequate prefiling investigation. Nor could they have. The plaintiffs' attorneys brought this case five months after filing a similar complaint against Media in an Indiana circuit court; then, the district court gave the plaintiffs two chances to amend their initial complaint. Because the plaintiffs' attorneys had adequate notice and ample time to research the claims, all that remains to be decided is whether the complaints contained frivolous legal claims or factual allegations, or were brought for an improper purpose.

A. Rule 11(b)(2) Compliance

Rule 11(b)(2) prohibits claims that are not "warranted by existing law or by a nonfrivolous argument for [changing] existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2) (2006). The plaintiffs asserted claims under four federal securities law provisions which are subject to the PSLRA's mandatory sanctions review: (1) the 1933 Act § 11 claims, brought by Thompson in the initial complaint and Thompson and Jacoby in the first amended complaint; (2) the 1933 Act § 12 claims, brought by Thompson in the initial complaint and Thompson and Jacoby in the first amended complaint; (3) the 1934 Act § 10(b), Rule 10b-5 claims (the "Rule 10b-5 claim(s)"), brought by Thompson in the initial complaint, Thompson and Jacoby in the first amended complaint, and Jacoby in the second amended complaint; and (4) the 1934 Act § 20(a) claims brought by Thompson and Jacoby in the first amended complaint and Jacoby in the second amended complaint.

## 1. The Section 11 Claims

The § 11 claims advanced in both the initial and the first amended complaints are legally frivolous. Section 11 prohibits false or misleading statements in a registration statement. 15 U.S.C. § 77k. Section 11 provides, in relevant part, "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state

96

a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security" may sue.  Id. § 77k(a).  Thus, to state a § 11 claim, a plaintiff must show (1) the purchase of a security under a registration statement, (2) after the registration statement became effective, and (3) that the registration statement contained a "material misstatement or omission."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L. Ed. 2d 548 (1983).  Because the § 11 claims in the initial and first amended complaints differed, I address each in turn.

a. The Initial Complaint's Section 11 Claim

In the initial complaint, Thompson was the only plaintiff, and the unregistered-broker theory was the only alleged material misstatement or omission.  Thompson purchased Media stock in two transactions: 50,000 shares in the 2005 June private offering, and 10,000 shares in the open market after his shares were registered.

Thompson's private offering purchase could never have formed the basis for a § 11 claim because he did not purchase the shares under any effective registration statement.  By definition, a private offering means that the shares were issued in reliance on an exemption from registration.  It would have been impossible for Thompson to rely on a registration statement that never existed.  Accordingly, as a

97

private offering purchaser, Thompson could never have succeeded on a § 11 claim.

Because, however, Thompson claimed to represent the open market purchasers—presumably based on his July 2006 open market purchase—Thompson and some of his class members purchased shares that had been registered. The class period stretched from May 24, 2005 to August 28, 2006 (Thompson first filed this suit on August 28, 2006). During that time, only two registration statements existed: Chubasco's February 2005 statement, in effect for the entire class period, and Media's July 2006 registration statement, in effect after July 14, 2006. Therefore, with the exception of one month, the sole registration statement in effect during the class period was Chubasco's.

It would have been impossible, however, for Chubasco's registration statement to misrepresent or omit Media's use of an unregistered broker because it became effective in February 2005—well before any of this alleged wrongdoing took place. Indeed, as of February 2005, Relationserve had not even been organized. Without a crystal ball, it would have been impossible for Chubasco to predict that Relationserve would suggest a merger, much less that it would use an unregistered broker. Therefore, no open market purchaser who bought before July 14, 2006, could ever have succeeded on a § 11 claim.

Media first filed the other registration statement on March 20, 2006, to allow its private offering purchasers to sell their shares. This registration statement was amended three times and became effective on July 14, 2006. Thus, for purchasers of Media stock between July 14 and August 28, 2006, Thompson could at least identify an effective registration statement that was issued after the alleged use of an unregistered broker.

Still, for the § 11 claim to have any chance of success, the July 14 registration statement would have had to fail to disclose Media's use of an unregistered broker when it became effective. Again, the unregistered-broker theory was the only misrepresentation or omission identified in the initial complaint. The July 14 statement, however, disclosed Thompson's state court action and Thompson's allegation that Media failed to disclose a commission it paid to Summit and Altavilla. And indeed, Thompson eventually contended that the May 20 amendment to this registration statement corrected the alleged omission of Media's use of an unregistered broker. (See Second Am. Compl. ¶ 73 ("Between RelationServe's the [sic] May 23, 2006 disclosure [in Media's amended registration statement] and June 15, 2006, RelationServe[ Media's] shares fell . . . . This drop was caused by the public's knowledge of Thompson's lawsuit.").) Thus,

even for this class of purchasers, Thompson failed to identify any misstatement or omission.

Even putting all of this aside, Thompson could never have recovered on a § 11 claim based on his open market purchase. Section 11 expressly prohibits recovery by persons who "at the time of [the] acquisition [] . . . knew of such untruth or omission." 15 U.S.C. § 77k(a). By his own admission, Thompson knew of Media's alleged use of an unregistered-broker when he purchased the 10,000 shares in July 2006. Accordingly, Thompson could never have succeeded or adequately represented the open market purchasers on a § 11 claim.

Particularly egregious was the initial complaint's § 11 claim against the individual Officers. For an individual to be liable under § 11, the individual must have either (1) signed the registration statement, (2) been a director of the issuer at the time of the filing, (3) been named as about to become a director, (4) been named as a person having prepared or certified any report or valuation used in connection with the registration statement, or (5) been an underwriter. Id. None of the individual defendants were even affiliated with either Media or Chubasco when either registration statement was first filed.[63] Nor do their names appear as having

---

[63] Thompson sued Danielle Karp, Mandee Heller Adler, Ohad Jehassi, and Warren "Pete" Musser. Karp stopped working for Media on February 3, 2006; Adler on November 11, 2005; Musser on October 31, 2005. Although it is unclear when Jehassi ended his tenure, he was

certified any report or valuation used in either registration statement. Finally there is no allegation and there is no evidence that any of these Officers sold stock under the registration statement, thus it would have been impossible for these individuals to act as underwriters. Nevertheless, the plaintiffs sought to hold "[Media] and the individual Defendants" liable for violating § 11. (Compl. ¶ 54.)

Overall, Thompson's § 11 claim in the initial complaint is frivolous beyond doubt. None of the individual defendants had anything to do with either registration statement. As against Media, the initial complaint attempted to state a § 11 claim on the basis of a registration statement that did not exist (Thompson's private offering purchase), or, alternatively, a registration statement that never contained a material misstatement or omission when it became effective (Chubasco's registration statement became effective long before any of the alleged misconduct took place and by the time Media's July 14 registration statement became effective, it, too, had been cured of all deficiencies). Finally, Thompson admittedly knew of the alleged fraud when he purchased his shares, so the § 11 claim would fail even had the July 14 registration statement omitted the alleged fraud. No argument for the modification of existing law could be deemed reasonable in view of Thompson's complete failure to satisfy the basic elements of

_____

never a director, and never signed a registration statement in any capacity.

101

§ 11. Therefore, the district court necessarily abused its discretion by failing to sanction Thompson's attorneys for bringing this § 11 claim.

### b. The First Amended Complaint's Section 11 Claim

The first amended complaint's § 11 claim differed from the initial complaint's iteration by adding Jacoby as a co-lead plaintiff, adding ten new individual defendants, and adding three new theories of misrepresentation. Nevertheless, like the initial complaint, the first amended complaint's § 11 claim is frivolous: Jacoby lacked standing to sue; Thompson knew of the alleged fraud.

As discussed above, any viable § 11 claim could only have been based on Media's July 14, 2006, registration statement. To have standing to sue under § 11, a plaintiff must have bought the shares "pursuant to" an effective registration statement. Huddleston, 459 U.S. at 382, 103 S. Ct. at 687. That is, a plaintiff must be able to "'trace the purchase of his securities to the registration statement that allegedly violated section 11.'" In re Hamilton Bankcorp., Inc. Sec. Litig., 194 F. Supp. 2d 1353, 1356–57 (S.D. Fla. 2002) (quoting In re Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353. 1369 (S.D. Fla. 2001)). Here, Jacoby swore that his only purchases of Media stock occurred in July and August of 2005. It therefore would have been impossible for Jacoby to trace his stock to the July 14, 2006, registration statement and his § 11 claim is clearly frivolous.

102

Turning to Thompson's two purchases, his attorneys' new theories of alleged fraud did not render Thompson's § 11 claim non-frivolous. The July 14 registration statement did not disclose the facts underlying the kickback, overstated income, and sued-director theories, but, even so, Thompson could never have prevailed. For one, the sued-director theory is simply frivolous on the merits: Media had no duty to disclose the fact that a <u>former director</u> had been sued—but not necessarily found liable—for securities violations.[64] Assuming that Media had a duty to disclose the overstated income and kickbacks, Thompson's claim is still frivolous because, as discussed above, Thompson <u>admitted</u> that he knew of the facts underlying the alleged fraud when he completed his July 2006 open market purchase.[65] (<u>See</u> First Am. Compl. ¶¶ 97, 80, 71, 81, 62, 3.)

---

[64] The sued director, director Musser, served on the board from June 2005 to October 2005. No registration statement was issued during that period and there is no duty to disclose information about the lawsuits of past directors. <u>See</u> 17 C.F.R. § 228.401(d) (2005) ("Describe any of the following events . . . that are material to an evaluation of the ability or integrity of any director, person nominated to become a director, executive officer, . . . of the small business issuer."). What is more, the plaintiffs alleged only that director Musser had been sued for securities law violations, not that he had actually been found liable, which is a prerequisite for reporting. 17 C.F.R. § 228.401(d)(4) (2005) ("Being found by a court of competent jurisdiction (in a civil action) [or by] the Commission . . . to have violated a federal or state securities . . . law . . . .").

[65] Thompson's claim may well be frivolous for another reason: he suffered no damages that could be traced to the disclosure of any of the alleged misrepresentations. Under § 11, a plaintiff need not plead damages or loss causation as a part of a prima facie case, <u>Huddleston</u>, 459 U.S. at 382, 103 S. Ct. at 687. Moreover, the damages are presumed to be the difference between the higher of the price paid or the offering price and the "<u>value</u>" of the security at the time of the suit. 15 U.S.C. § 77k (emphasis added). Accordingly, even where, as here, the lawsuit at issue is the first disclosure of the alleged misrepresentation, a plaintiff can argue that

Most troubling, in both plaintiffs' § 11 claims, the plaintiffs' attorneys repeated their egregious claims against three of the initial complaint's individual defendants who could never have been held liable for any § 11 violation based on the July 14 registration statement. Worse, in the face of the district court's Rule 11 warning not to sue officers just because they were officers, the plaintiffs' attorneys added ten new defendants, four of whom had nothing to do with the July 14, 2006, registration statement. This brought the total of individuals who were allegedly liable for the § 11 violation to thirteen, seven of whom could never have been liable under the plain language of § 11. Specifically, as to defendants Karp, Adler, Musser, Young, Hill, Honig, and Hirsch, the plaintiffs' § 11 claim is frivolous beyond any doubt.[66] Young, Hill, and Honig never worked for Media; Karp,

---

the damages are the difference between the market price on the day the suit was filed and the actual value of the stock on that day. See Grossman v. Waste Mgmt. Sys., Inc., 589 F. Supp. 395, 415–16 (N.D. Ill. 1984). Thompson, however, could never succeed on such a theory because he bought Media stock in the open market and sold it one day later; accordingly, he both purchased and sold over-valued stock and suffered no loss. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003).

[66] Defendants Soltoff, Wasserman, McNamara, and Brauser signed the initial March 20 iteration of the July 14, 2006, registration statement; Gould signed the third amendment to this registration statement. Obeck was not a director and did not sign or certify the registration statement, but sold stock under the July 14, 2006, registration statement and may have been a control person underwriter. See 15 U.S.C. § 77b(11) ("The term 'underwriter' means any person who . . . offers or sells for an issuer in connection with[] the distribution of any security . . . . [T]he term 'issuer' shall include . . . any person directly or indirectly controlling or controlled by the issuer . . . .").

Adler, Musser, and Hirsch all ended their tenure with Media well before the registration statement was first filed on March 20, 2006.[67]

## 2. The Section 12 Claims

The § 12 claims—brought as Count II in both the initial and first amended complaints—are legally frivolous beyond doubt. Section 12 prohibits any person from offering or selling securities by means of a false or misleading statement in a prospectus or oral communication. 15 U.S.C. §77*l*. Because the 1933 Act requires, in relevant part, that a prospectus include the "information contained in the registration statement," 15 U.S.C. § 77j(a)(1), there is substantial overlap between § 11 and § 12. The major difference between the two statutes is that § 12 imposes a privity requirement not found in § 11 and § 12 allows liability for "oral communications." See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). Thus, even assuming that § 12's privity requirement is satisfied here, Thompson's and Jacoby's § 12 claims are frivolous for the same reasons as their § 11 claims.[68]

---

[67] Adler stopped working at Media on November 11, 2005; Karp on February 3, 2006; Musser on October 31, 2005; Hirsch on February 2, 2006.

[68] It is very unlikely that the privity requirement could be satisfied here because Media did not sell the stock, its private offering purchasers did. See Ehlert v. Singer, 245 F.3d 1313, 1316 (11th Cir. 2001) ("Section 12 liability extends to those who transfer title to the security and to those who successfully solicit the purchase."); Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 7(7) (6th ed.) ("The issuer will not ordinarily be a section 12 seller since

Nevertheless, in responding to the defendant's motion to dismiss the first amended complaint, the plaintiffs' attorneys defended Thompson's § 12 claims on the basis of certain oral communications by Altavilla. (See Pls.' Resp. to Defs.' Mot. to Dismiss First Am. Compl., Jan. 29, 2007.) This argument is frivolous because the plaintiffs never identified these oral communications in any complaint.[69] (See, e.g., Compl. ¶¶ 55–56; First Am. Compl. ¶¶ 122–23.)

the presence of an underwriter as an intermediary means that the issuer is not in privity with the purchaser of the security."); id ("[O]rdinarily an issuer's officers and directors will not have a sufficiently substantial connection to qualify as sellers . . . .").

[69] Even had Thompson pled the alleged "oral communications," his claim would still border on frivolous because the oral communications were made in connection with his June private offering purchase. The Supreme Court has made clear that the only oral communications that count are those that "relate to a prospectus." Gustafson v. Alloyd Co., 513 U.S. 561, 567–68, 115 S. Ct. 1061, 1065–66, 131 L. Ed. 2d. 1 (1995). And, by defining "prospectus" as a "term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder," the Supreme Court has limited § 12 claims to public offerings. See id. at 584, 115 S. Ct. at 1073–74.

Thompson's claim would "border" on frivolous because it is not on all fours with Gustafson. Gustafson involved a private secondary sale of securities from one equity holder to another, id. at 564–65, 115 S. Ct. 1064–65; Thompson purchased Media shares in a private primary sale from an issuer. See, e.g., Yung v. Lee, 432 F.3d 142, 148 (2d Cir. 2005) (noting that the Second Circuit had yet to "reach the issue of whether the rationale for . . . Gustafson . . . necessarily precludes a Section 12(a)(2) claim with respect to any private securities transaction). But when the plaintiffs' attorneys filed the initial and first amended complaints, at least three circuits had already held that no § 12 claim could lie in any private offering. See id. (citing Lewis v. Fresne, 252 F.3d 352, 357 (5th Cir. 2001); Maldonado v. Dominguez, 137 F.3d 1, 8 (1st Cir. 1998); Joseph v. Wiles, 223 F.3d 1155, 1161 (10th Cir. 2000)). Nevertheless, this circuit had not ruled on the question prior to Thompson's suit. Therefore, had Thompson alleged the oral communications, I would remand so that the district court could make the Rule 11 determination in the first instance. In any event, I note my deep concern that Thompson's attorneys never mentioned Gustafson and simply justified the § 12 claims because "an oral communication is sufficient so long as an instrument of interstate commerce is involved." (Pls.' Resp. to Defs.' Mot. to Dismiss First Am. Compl. 25, Jan. 29, 2007.)

106

### 3. The Section 10(b), Rule 10b-5 Claims

To evaluate the legal sufficiency of the Rule 10b-5 claims in all three complaints, it is first necessary to clarify who brought the claim. In the initial complaint, Thompson alone brought the claim; in the first amended complaint, Thompson and Jacoby brought the claim together; in the second amended complaint, Jacoby alone brought the claim. I first discuss Thompson's Rule 10b-5 claims in the initial and first amended complaints, and then turn to Jacoby's in the first and second amended complaints.

Implementing § 10(b), Rule 10b-5 forbids, in relevant part, "any person, directly or indirectly . . . (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5 (2005). To state a claim for an omission, a plaintiff must plead six elements with particularity: (1) an omission of material fact, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the omission, (5) economic loss, and (6) loss causation (a causal relationship between the omission and the economic loss). See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42, 125 S. Ct. 1627, 1630–31, 161 L. Ed. 2d. 577 (2005).

Ultimately, I conclude that all of the Rule 10b-5 claims are so frivolous that the district court necessarily abused its discretion when it denied sanctions. Thompson's claims are frivolous because he never identified a false or misleading statement and because he knew of the alleged fraud when he purchased his shares. Jacoby's claims are frivolous because he too failed to allege any actionable omission, he egregiously failed to allege scienter with the specificity required by the PSLRA and Rule 9(b), and because he advanced a frivolous argument so as to cherry-pick the starting point for measuring loss causation.

### a. Thompson's Rule 10b-5 Claims

Neither of Thompson's purchases form the basis for a nonfrivolous Rule 10b-5 claim. As for the purchase in the 2005 June private offering, Thompson never identified any false or misleading statement. As for the July 2006 open market purchase, Thompson admittedly knew about the alleged fraud when he bought the stock and suffered no loss that could have been traced to any fraud on the part of the defendants.

Thompson identified no actionable false or misleading statement in connection with his 2005 June private offering purchase. The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" 15 U.SC. § 78u-4(b(1). In the

108

initial complaint's Rule 10b-5 claim, Thompson alleged only the unregistered-broker theory of misrepresentation.  E.g. Compl. ¶ 37.[70]  The trouble is that the 2005 June private offering formed the basis for this alleged omission, thus no SEC filing prior to Thompson's purchase could have disclosed the alleged contingent liability—the contingency had not happened yet.[71]  Moreover, Media did disclose Summit's unregistered status in the June 16 current report, which Thompson certified that he had read.  Thompson thus did not—and could not—point to any specific statement that was misleading because of Media's use of an unregistered broker prior to Thompson's June 2005 purchase.

In his Indiana state securities law fraud claim (brought in Count VII of the initial complaint), Thompson did allege other specific omissions.  Giving Thompson's attorneys the benefit of the doubt, I will assume that Thompson meant to plead these same omissions in his Rule 10b-5 claim.  On this assumption, Thompson alleged that Media: (1) failed to disclose "sizeable commissions and fees to Altavilla" and (2) failed to explain that the shares in the private offering

---

[70] In the first amended complaint, Thompson added the kickback theory, the overstated-income theory, and the sued-director theory.  Any Rule 10b-5 claim based on these theories is frivolous because Thompson completely failed to plead loss causation.  See page 95–96, infra.

[71] This fact is especially significant because throughout this litigation, Thompson's purchase was the only purchase specifically identified as having been illegally brokered by Summit.

were restricted securities and were not registered. (Compl. ¶ 78.) But Media disclosed all of this in the subscription agreement Thompson signed. Thompson "acknowledge[d] that . . . [he] has read and evaluated . . . the Company's Current Report on Form 8-K . . . on June 16, 2005." Relationserve Media Inc., Current Report (Form 8-K), Ex. 4.1 (Subscription Agreement), ¶ 1.4 (June 30, 2005). The June 16, 2005 Form 8-K attached Media's agreement with Summit, including the provision that Summit would be paid a seven percent finder's fee. Thompson also

> recognize[d] that the purchase of Units involves a high degree of risk in that . . . (ii) the Units are not registered under the Securities Act of 1933 . . . or any state securities law; (iii) there is no trading market for the Units, none is ever likely to develop, and the Subscriber may not be able to liquidate his investment.

Id. ¶ 1.2.

Even further assuming Thompson had alleged—as he did in Indiana circuit court—that Altavilla never provided him with the full subscription agreement and told him the shares would be registered and could be quickly sold for a profit, it would not save his Rule 10b-5 claim. The subscription agreement expressly required Thompson to

> represent[] that, except as expressly set forth in the Offering Documents, no representations or warranties have been made to the Subscriber by the Company or any agent, employee or affiliate of the Company and in entering into this transaction, the Subscriber is not relying on any information, other than that contained in the Offering

110

documents and the results of independent investigation by the Subscriber.

Id. at ¶ 1.14. In view of this representation, any argument that Thompson justifiably relied on Altavilla's misrepresentation is frivolous. See Rissman v. Rissman, 213 F.3d 381, 383–84 (7th Cir. 2000) (joining two courts of appeals in holding "that non-reliance clauses in written stock-purchase agreements preclude any possibility of damages under the federal securities laws for prior oral statements"). And because justifiable reliance on a misrepresentation is a prerequisite to a Rule 10b-5 recovery, even this hypothetical Rule 10b-5 claim utterly fails.

Any Rule 10b-5 claim based on Thompson's July 2006 open market purchase is preposterous. It is hornbook law that an investor who is aware of the fraudulent conduct cannot recover in a Rule 10b-5 action predicated on that same fraudulent conduct because it is impossible to prove reliance or transaction causation. See Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12(10) (6th ed.); see, e.g., Gurary v. Winehouse, 190 F.3d 37, 44–45 (2d Cir. 1999). And indeed, by Thompson's own admission, he became aware of the alleged fraud on May 1, 2006, fully two months before his open market purchase. (First Am. Compl. ¶ 97 ("Thompson did not discover the omissions set forth above

111

until May 01, 2006.").)  Worse than simply knowing of the alleged fraud, when wearing the open market purchaser hat, Thompson caused his own harm. Specifically, he brought suit in an Indiana circuit court, then, five months later, sued in federal court purporting to represent a class of shareholders injured by Media's failure to disclose the factual basis of his Indiana lawsuit.  Thus, there can be no doubt that Thompson purchased Media stock in the open market with full awareness of the alleged fraud, if fraud there was, and could not, under any circumstances, have succeeded in a Rule 10b-5 claim based on that purchase.

Even assuming Thompson did not have knowledge, he could never have proved loss causation.  Thompson purchased 10,000 shares on July 17, 2006, at .42 cents a share, only to sell them the very next day at .39 cents per share.  To prove loss causation, Thompson would have needed to show that the market became aware of the alleged fraud in the twenty-four hours between his purchase and sale. Thompson alleged no such disclosure, nor could I find one.  In fact, Media did not file any SEC documents on July 17th or July 18th, or any day thereafter until August 14, 2006.

For many of the same reasons, Thompson could never have "fairly and adequately" represented the subclass of purchasers who bought Media's shares in the open market as required by Federal Rule of Civil Procedure Rule 23(a)(4).

112

Unlike Thompson, most open market purchasers who purchased before the disclosure of Thompson's Indiana lawsuit, would not have had <u>actual</u> knowledge of Media's use of an unregistered broker. <u>See, e.g.</u>, <u>Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation. . . . there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it.") (internal citations omitted).[72]

Worse, Thompson had a fundamental conflict of interest with the open market purchasers. Assuming, for the sake of argument, that Thompson could have rescinded his private offering purchase, Media's illegal sale of securities gave him a <u>de facto</u> "put option" at two dollars per-share. A put option grants the holder the right to sell the securities at a given price (the seller promises to buy the

---

[72] In addition to Thompson's inability to satisfy the Rule 23(a)(4) requirement of "fairly and adequately" representing the class, Thompson's class would likely fail for want of typicality and commonality. Fed. R. Civ. P. 23(a)(2)–(3); <u>see</u> <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 713 (11th Cir. 2004) ("A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.") (internal citations and quotations omitted) (<u>overruled on other grounds by</u>, <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 457, 126 S.Ct. 1195, 1197, 163 L. Ed. 2d 1053 (2006)). Because Thompson's initial purchase was in a private offering, Thompson had received and relied on information (the offering documents and subscription agreement) not available to those who bought shares in the open market. Accordingly, it is highly doubtful that he could have fulfilled the typicality and commonality requirements of Rule 23(a)(2) and (3).

113

securities at that price). Thus if Thompson could have rescinded his purchase, Media would have had to return his full purchase price (two dollars per share) in exchange for the securities (50,000 shares plus warrants). Of course, Thompson would never have exercised this right if the value of his shares grew beyond two dollars per share; but if they fell, he could have recouped his entire investment less the cost of enforcement. Thompson essentially had a risk-free investment that harmed the open market purchasers. Accordingly, Thompson "derive[d] a net economic benefit from the very same conduct alleged to be wrongful" to the open market purchasers. Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1190 (11th Cir. 2003). When a named plaintiff has such a conflict with the proposed class, the named plaintiff can never adequately represent the class. See id. at 1189 ("A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class. In such a situation, the named representatives cannot 'vigorously prosecute the interests of the class through qualified counsel.'") (quoting In re HealthSouth, 213 F.R.D. 447, 461–62 (N.D. Ala. 2003)). No reasonably competent attorney could have contended otherwise.[73]

---

[73] Here, of course, the plaintiffs' attorneys did so contend by arguing to the district court that "there is no conflict between Plaintiffs and other class members—all investors are aligned in the common interest of recovering the maximum possible damages from defendants." (Mem. of

114

b. Jacoby's Rule 10b-5 Claims

I now turn to Jacoby's Rule 10b-5 claims in the first and second amended complaints. Under a literal reading, Jacoby's claim is simply laughable. Jacoby alleged that Media and its officers "offered and sold Relationserve [Media] securities in violation of 15 U.S.C.A. § 17q and Rule 10b-5." (Second Am. Compl. ¶ 103 (emphasis added); see also First Am. Compl. ¶ 127 ("The Defendants, including the Individual Defendants . . . offered and sold the shares of Relationserve [Media] . . . .") (emphasis added).) Jacoby purported to bring this claim on behalf of the open market purchasers, but Media never "offered and sold" securities in any public offering. Rather, Media only sold securities in exempt private offerings. No Rule 10b-5 claim can survive on the basis of an offer and sale of securities that never existed.

In an abundance of caution, however, I will read Jacoby's Rule 10b-5 claim broadly to invoke the fraud-on-the-market doctrine. Under the fraud-on-the-market doctrine, a plaintiff must still plead all the elements of a Rule 10b-5 claim, but benefits from a presumption that the plaintiff indirectly relied on the alleged misrepresentation by relying on the integrity of the stock price established by the

Law in Supp. of Pls.' Mot. for Appointment as Co-Lead Pls. 12, Nov. 3, 2006.)

115

market.  See Basic, 485 U.S. at 242, 108 S. Ct. at 989 (citing Peil v. Speiser, 806 F.2d 1154, 1160–61 (3d Cir. 1986)).

Read broadly, Jacoby claimed that Media misstated its financial health in sundry SEC filings by failing to report "$2,000,000 in contingent civil and criminal liabilities and other material information to the investing public."  (E.g. Second Am. Compl. ¶ 11.)  In the first amended complaint, Jacoby asserted four theories of fraudulent omissions, which formed the basis of this liability: the unregistered-broker theory, the kickback theory, the overstated-income theory and the sued-director theory.  In the second amended complaint, Jacoby only replicated the unregistered-broker theory.[74]  Whether based on any of these theories, Jacoby's Rule 10b-5 claim is legally frivolous.

The three abandoned theories are the easiest to conclude are frivolous.  Assuming Media had a duty to disclose the kickbacks, overstated income, and sued director, Jacoby never alleged that the truth became known to the market and that this failure caused any economic loss to him.  No Rule 10b-5 claim can survive

_____

[74] Actually, Jacoby also pled the sued-director theory of liability.  (Second Am. Compl. ¶ 95(b).)  In Jacoby's response to the defendants' motion to dismiss, however, Jacoby abandoned it and did not press it here.  (See, e.g., Pls.' Mem. in Resp. to Defs.' Mot. to Dismiss 7, n.3, April 30, 2007 ("Jacoby withdraws this allegation as [Media] is correct in its . . . assertion that there is no nexus between this *specific* failure and Jacoby's damages.").)  Similarly, Jacoby did plead the facts underlying the overstated-income theory, but did not assert it as an actionable Rule 10b-5 omission.  (See Second Am. Compl. ¶¶ 60, 3, 86, 95.)  Jacoby did not press any claim based on overstated income here.

without these elements; Jacoby completely failed to plead them—despite three chances to do so—rendering any claim based on the theories frivolous.[75]

Only the unregistered-broker theory remains. On this theory, Jacoby's fraud-on-the-market, Rule 10b-5 claim fails because Jacoby never identified an actionable omission, utterly failed to plead scienter, and advanced an untenable theory of loss causation.

i. Jacoby Failed to Identify an Actionable Omission

Most importantly, Jacoby never identified any actionable omission. Under the plain language of Rule 10b-5, for the omission of a material fact to be actionable, there must have been a duty to disclose the fact. 17 C.F.R. § 240.10b-5 (2005) (prohibiting the omission of a material fact "necessary to make the statements made . . . not misleading."); Basic, 485 U.S. at 239, n.17, 108 S. Ct. at 987, n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Most commonly, a duty to disclose is triggered either because the omitted fact was necessary to render a preexisting statement not misleading, or because the securities law otherwise required its disclosure. Thomas Lee Hazen, supra, § 12.19(1).

---

[75] This reasoning also applies to any claim based on these alleged omissions by Thompson in the first amended complaint.

117

Here, Jacoby identified no specific statements made by the defendants rendered actually misleading by the alleged omission, or any other duty to speak. The closest Jacoby came was quoting the Sarbanes-Oxley Act certifications signed by Officers Adler and Wasserman on Media's August 2005 Form 10-QSB. (Second Am. Compl. ¶ 58.)[76] Jacoby alleged that Adler and Wasserman certified that the Quarterly Report "complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 [and that] the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of the operations of the Company." (Id.) Jacoby further alleged that the "statements" Adler and Wasserman made in their certifications "were false and

---

[76] Jacoby also pointed to other Sarbanes-Oxley certifications. I say this was the closest Jacoby came because the August 2005 certifications were closest in time to Summit's alleged illegal conduct.

Jacoby also pointed to Media's failure to disclose Summit's involvement in the June private offering on SEC Form D filed on July 16, 2005. The 2005 Form D required disclosure of certain background information with respect to "each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering." Assuming, for the sake of argument, that Media knew that Summit "solicited" purchasers—which would go beyond merely acting as a finder—this amounted to an omission. The trouble for Jacoby is that he did not base his claim on this omission. Rather, he alleged that Media failed to disclose and account for the $2 million contingent liability flowing from the use of an unregistered broker. Indeed, if the Form D omission had formed the basis for his claim, this alleged omission was corrected on March 20, 2006, when Media disclosed its August 2005 payment to Summit of a total "success fee" of $28,500 "in connection with a private placement of its common stock." Relationserve Media, Inc., Registration Statement under the Securities Act of 1933 (Form SB-2), at F-22 (March 20, 2005). Jacoby, however, alleged that the omission was not corrected until the May 23, 2006 disclosure of Thompson's Indiana lawsuit.

118

misleading because they failed to indicate that Relationserve [Media] and its

officers and directors had violated state and federal securities law, presenting a

$2,000,000.00 contingent civil and criminal liability." (Id. ¶ 59.) As the district

court aptly noted, however, "Jacoby's argument is circular because it contends that

the filing was misleading precisely because the filing promised not to be

misleading." (Dismissal Order 7, June 12, 2007.)

Again endeavoring to give the plaintiffs' lawyers the benefit of the doubt, I

will not stop here. I will assume that Jacoby meant to say that, after the June 2005

private offering, Media had a duty to report the contingent liability on its financial

statements or SEC reports either because of specific SEC disclosure requirements

or a GAAP violation (because Media promised to comply with GAAP).[77] Even

so, Jacoby did not point to an actionable omission.

As relevant here, two line-items on the 2005 Form 10-QSB required

management to disclose certain contingent liabilities. See 17 C.F.R. § 228.10 et

seq. (2005) (repealed 2008). First, Item 103 of Regulation S-B required disclosure

of "any pending legal proceeding" or of "any proceeding that a governmental

authority is contemplating (if the small business issuer is aware of the

---

[77] Relationserve Media Inc., Quarterly Report (Form 10-QSB), at 6 (Aug. 18, 2005) ("The consolidated financial statements are prepared in accordance with generally accepted accounting principles in the United States of America ('US GAAP').").

119

proceeding)." id. § 228.103.  Second, Item 303 of Regulation S-B required

disclosure of "[a]ny known . . . uncertainties that have or are reasonably likely to

have a material impact on the small business issuer's short-term or long-term

liquidity."  Id. § 228.303(b)(1)(i) (emphasis added).[78]

For its part, at the time, GAAP, via Financial Standards Accounting Board

("FASB"), Financial Accounting Standards 5 ("FAS 5"),[79] required the reporting of

a "loss contingency"[80] when "there [wa]s at least a reasonable possibility that a loss

or an additional loss may have been incurred."  FAS 5, ¶ 10; see also id. ¶ 3

(distinguishing loss contingencies that are "probable," that is, "the future event or

events are likely to occur;" from those that are "reasonably possible," that is, "the

chance of the future event or events occurring is more than remote but less than

likely;" from those that are "remote," that is, "the chance of the future event or

---

[78] The assumption that Item 303 of Regulation S-B would impose an actionable duty to speak under Rule 10b-5 is generous.  At least the Third Circuit has expressly held that "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" and that where plaintiffs fail to plead "any actionable misrepresentation or omission" under Rule 10b-5, Item 303 cannot provide a basis for liability. Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000).  Item 303 of the 2005 iteration of Regulation S-B and Item 303 of Regulation S-K are materially identical.

[79] See City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 677–78 (6th Cir. 2005) (identifying FAS 5 as GAAP); Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n.4 (2d Cir. 2000) ("The SEC treats the FASB's standards as authoritative.").  FAS 5 has since been superseded by FASB's codification of GAAP, which became effective in 2009.

[80] FAS 5 defined a "contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain . . . or loss."  FAS 5, ¶ 1.

events occurring is slight"). GAAP did not require disclosure of loss contingencies arising out of "unasserted claims" when there was no indication that the potential claimant was aware of the claim, <u>unless</u> it was both "probable that a claim w[ould] be asserted" and there was a "reasonable possibility that the outcome w[ould] be unfavorable." FAS 5, ¶ 10.[81]

Despite Jacoby's shotgun pleadings, his allegations do not even remotely suggest that Media or any of its officers knew enough about Thompson's possible claim to trigger a reporting obligation under Regulation S-B or GAAP. For one, as of August 2005, Media had no duty to report the claim as a pending legal proceeding. Other than Thompson's March 3, 2006, Indiana lawsuit, Jacoby did not allege that any private placement purchaser sued Media. Nor did Jacoby allege any government investigation into Media's contract with Summit (despite Media's

---

[81] Appendix A of FAS 5 gave this example:

[A]n enterprise may believe there is a possibility that it has infringed on another enterprise's patent rights, but the enterprise owning the patent rights has not indicated an intention to take any action and has not even indicated an awareness of the possible infringement. In that case, a judgment must first be made as to whether the assertion of a claim is probable. If the judgment is that assertion is not probable, no accrual or disclosure would be required. On the other hand, if the judgment is that assertion is probable, then a second judgment must be made as to the degree of probability of an unfavorable outcome. . . . If an unfavorable outcome is probable but the amount of loss cannot be reasonably estimated, accrual would not be appropriate, but disclosure would be required . . . .

FAS 5 at ¶ 35.

full disclosure of that agreement in the June 2005 Form 8-K). As a result, Media had absolutely no duty to report the so-called contingent liability as a pending legal proceeding.

Nor did Jacoby allege facts that would have required disclosure under Item 303 of Regulation S-B, "Management's Discussion and Analysis." Jacoby claimed that Media should have disclosed a contingent liability arising out of the conduct of another entity, Summit. In the consulting agreement, Summit represented that it was not a registered broker and that it did not need to be a registered broker, because it would only act as a finder. Under federal law, this contract was not per se illegal. See Paul Anka, SEC No-Action Letter, Fed. Sec. L. Rep. ¶ 79,797 (July 24, 1991) (granting no action relief to a finder who would merely refer accredited investors to the issuer). State regulation of broker/dealers and finders varies. Thus, to show a "known" "uncertainty" "reasonably likely to have a material impact" on Media's liquidity, Jacoby would have had to plead some facts indicating that Media knew that Summit had breached its agreement and violated federal or state law.[82] Jacoby failed to do so.

---

[82] In fact, at the time, Media would have had no reason to believe Summit would breach the consulting agreement and broker a private offering purchase in violation of state law. This is because the cost to Summit would have likely been prohibitive. Breaching the consulting agreement in this manner would, in addition to rendering Summit liable to the purchaser for rescission or damages, have exposed Media to potential civil and criminal liability. If Media were sued by a purchaser, the company would have demanded that Summit hold it harmless.

Jacoby identified only one private offering transaction allegedly brokered by Summit: Thompson's.[83] The factual allegations concerning Thompson's purchase focused almost entirely on Summit's interaction with Thompson rather than Summit's interaction with Media. (See, e.g., Second Am. Compl. ¶ 40 ("In June 2005, Altavilla began soliciting Thompson and other class members and encouraged them to purchase RelationServe [Media] securities by way of a private offering."); id. at ¶ 41 ("Thompson . . . . reviewed all documents presented by Altavilla, and listened to the sales pitch of Altavilla.").) It simply does not follow that because Summit gave Thompson a sales pitch that Media knew about the sales pitch, much less that it would subject Media to legal liability.

The closest Jacoby came to alleging Media's awareness of Summit's breach was, "Altavilla negotiated the purchase price of [Thompson's] shares, facilitated the wire transfer, and oversaw the delivery of certificates." (Id. at ¶ 42.) Viewed in the light most favorable to Jacoby, it could be inferred that Altavilla had some contact with someone at Media. It cannot be inferred that whoever acted for Media

Depending on the outcome of the litigation, Summit might have had to return to Media the 1,050,000 shares it received pursuant to the consulting agreement, as well as any finder's fees it may have earned.

[83] In the first amended complaint, Jacoby did allege one other sale through an unregistered broker to a Stuart Feick. I do not include Feick in this discussion because the allegation was abandoned and not pled in the second amended complaint. See Part IV.B, infra.

gleaned that the exchange gave Thompson the ability to rescind his purchase, let alone that it was "reasonably likely" that Thompson would seek rescission.

This is especially so in light of Indiana law. Thompson's theory of liability relied on Indiana Securities Law § 8(b). Section 8(b) provided, in relevant part, "[i]t is unlawful for a[n] . . . issuer to employ an agent unless the agent is registered." I.C. § 23-2-1-8(b) (2005) (repealed 2008). An "agent" was defined as an "individual, other than a broker-dealer, who represents a[n] . . . issuer in effecting or attempting to effect purchases or sales of securities." I.C. § 23-2-1-1(b) (2005) (repealed 2008). However, an agent did <u>not</u> include "an individual who represents an issuer in: . . . (2) effecting transactions exempted by section 2(b) of this chapter." <u>Id.</u> Section 2(b)(10), in turn, exempted transactions where: (A) the issuer reasonably believed there were no more than 20 purchasers in Indiana; (B) the issuer did not "offer or sell . . . securities by means of a form of general advertisement or general solicitation;" (C) the issuer reasonably believed that each purchaser was buying for the purchaser's own investment and was aware of the restrictions imposed on the transferability of the securities; (D) . . . (E) . . . (F) . . . ; (G) "[t]he issuer need not [have] compl[ied] with clause (D), (E), or (F) if: . . . there [were] not more than fifteen (15) purchasers in Indiana and each Indiana purchaser [wa]s an accredited investor . . . ." <u>Id.</u>

124

Media had every reason to believe that it complied with this exception. Media's Form D disclosed that there were only five (5) Indiana investors total. To qualify for the Rule 506 Regulation D exemption under federal law, Media could not have offered or sold securities by means of a general advertisement or solicitation. In signing the subscription agreement, Thompson certified that he purchased the units "for his . . . own account, for investment only." Relationserve Media Inc., Current Report (Form 8-K), Ex. 4.1 (Subscription Agreement), ¶ 1.7 (June 30, 2005). Additionally, Thompson certified that he knew the shares were not registered under the 1933 Act and that the shares could not be traded under federal law "for at least one (1) year . . . and there can be no assurance that the conditions necessary to permit such sales . . . will ever be satisfied." Id. at ¶1.8; see also id. at 1.2. Finally, Thompson certified that he was an accredited investor under Indiana law.[84] Consequently, even assuming that Media knew of Summit's

---

[84] Compare I.C. § 23-2-1-1(r) (2005) (repealed 2008) (equating the definition of "accredited investor" with the definition in the federal Securities Act), and 17 C.F.R. 230.215(f) (2005) ("accredited investor" includes a "natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year."), with (Defs.' Mot. to Dismiss, at 58, ex. F (Oct. 20, 2006) (certifying that Thompson satisfied the requirements of 17 C.F.R. 230.215(f)).).

breach, Media would have had little reason to suspect that Thompson would have sued because he could not recover under state law.[85]

Even putting the exemption aside, this would still be correct. Indiana law prevented plaintiffs who knowingly participated in a violation of the securities law from prevailing. See I.C. § 23-2-1-19(a) (2005) (repealed 2008) ("A person who offers or sells a security in violation of this chapter . . . is liable to any other party to the transaction <u>who did not knowingly participate in the violation or who did not have, at the time of the transaction, knowledge of the violation</u> . . . .") (emphasis added). Again, in the subscription agreement, Thompson certified his knowledge of Summit's unregistered status and that he relied only on the offering documents.

By now, it should be apparent that Jacoby did not plead sufficient facts to show that the alleged contingent liability was "known," much less "reasonably likely" to materially impact Media's liquidity. Therefore, Regulation S-B imposed no duty to report the so-called contingent liability on Media's Forms 10-QSB or 10-K. A fortiori, then, Jacoby failed to allege sufficient facts to trigger a reporting

---

[85] Indeed, after the district court dismissed this case, the plaintiffs pressed Thompson's state court claims in a Florida circuit court. That court granted the defendant's motion to dismiss in part because Media complied with Indiana's limited offering exemption, Indiana Code § 23-2-1-2(1). <u>Thompson v. Sendtec, Inc.</u>, No. 07-17797(09), slip op. at 4–5 (Fla. Cir. Ct. Aug. 6, 2007).

obligation under GAAP. Under GAAP, because Jacoby did not allege that any lawsuit had even been threatened, Media had a duty to report the purported liability only if it was both probable that a suit would be filed and reasonably possible that Media would lose. I have already explained at length why Media would have had no reason to believe either that Thompson would have filed suit or that he could have succeed.

All in all, even giving Jacoby the benefit of the doubt by assuming that he invoked the fraud-on-the-market theory, Jacoby completely failed to point out any actual statement that was misleading on account of the alleged omission or any other duty to speak. Even further assuming that Jacoby had pled a duty to report the liability under Regulation S-B or GAAP, his claim is still frivolous because he alleged no facts that would have triggered any reporting requirement. An actionable misrepresentation or omission is step one in any Rule 10b-5 claim; Jacoby failed to take this first step, and his claim is therefore frivolous under any reasonable view of the law.

ii. Jacoby Made Only Frivolous Scienter Allegations

Jacoby's Rule 10b-5 claim is also legally frivolous because he completely failed to plead scienter with the specificity required by established law. This is especially inexcusable with respect to the Officers because the district court

127

cautioned against "just automatically su[ing] everyone that happens to be on the list of officers and directors."  (Teleconference Tr. 4, 6–7 (Nov. 3, 2006).)

Negligence has long been insufficient to trigger civil liability under Rule 10b-5.  In Ernst & Ernst v. Hochfelder, the Supreme Court held that a defendant must act with scienter, defined as a "mental state embracing intent to deceive, manipulate, or defraud."  425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976).  In this circuit, "severe recklessness" can amount to scienter, but it is the bare minimum.  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282–83 (11th Cir. 1999) ("We quantify scienter as encompassing at least a showing of severe recklessness . . . .").  "'Severe recklessness is limited to those 'highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care.'" Id. at 1282 n.18 (quoting McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989)).

Since 1996, the PSLRA has required plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. 78u-4(b)(2) (emphasis added).  Thus, in a securities fraud class action, a plaintiff may no longer plead the scienter element generally, as was previously possible under Rule 9(b).  Rather, the complaint must allege facts supporting a strong inference of scienter "for each defendant and with respect to

128

each violation."  Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004).  Jacoby's attorneys do not come close to meeting this standard because they alleged only conclusory statements, not facts giving rise to an inference of scienter.

Jacoby's best argument is that Karp intentionally hid Summit's involvement in the 2005 June private offering on the Form D she signed and filed with the SEC. Karp did not list Summit in response to a question that asked for basic information about "each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering."  Relationserve Media, Inc., Notice of Sale of Securities Pursuant to Regulation D (Form D), at 3 (July 16, 2005).  At the time, however, it was unclear that a finder constituted a person compensated for "solicitation" of purchasers.  A new version of Form D, adopted by the SEC in 2009, requires information about any person paid transaction-based compensation "in connection with" the offering, "including finders."  Thus, it is unclear that Karp even knew that she needed to disclose Summit on the Form D, particularly so because Media had already publicly disclosed that Summit could act as a finder on the June 16, 2005, current report.

Jacoby's remaining scienter allegations can loosely be grouped into three categories: (1) the officers must have known, (2) the "venal" character of the corporation, and (3) motive and opportunity.

Typical of Jacoby's "they must have known" allegation is the following: "The ongoing fraudulent scheme and violation of securities laws described in this Complaint could not have been perpetrated over a substantial period of time . . . without the knowledge and complicity of the personnel at RelationServe[ Media's] highest level, including the individual Defendants." (Second Am. Compl. ¶ 81.)[86] When Jacoby filed the first and second amended complaints, it was absolutely clear that this sort of conclusory allegation could not satisfy the requirement that the complaint state "facts" "with particularity." See, e.g., In re Recoton Corp. Sec.

---

[86] (See also Second Am. Compl. ¶ 76 ("Defendants acted with scienter, in that Defendants knew RelationServe[ Media's] public documents and statements issued and/or disseminated by or in the name of RelationServe [Media] were materially false and misleading."); id. ¶ 78 ("Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents."); id. ¶ 79 ("Defendants, by virtue of their receipt of information reflecting RelationServe [Media] and its business practices, control over or receipt of RelationServe [Media] materially misleading statements and/or their associations with RelationServe [Media] were active and culpable participants in the fraudulent scheme alleged herein."); id. ¶ 24 ("The above-listed Defendants, by virtue of their high-level positions with RelationServe [Media], directly participated in the management of RelationServe [Media], were directly involved in RelationServe[ Media's] day-to-day operations at the highest levels, and were privy to proprietary information concerning RelationServe [Media] and its business operations and financial condition as alleged herein."); id. ¶ 25 ("The above-listed Defendants were involved in the drafting, producing, reviewing, and/or dissemination of misleading statements and were aware—or recklessly disregarded—of the fact that misleading statements were being issued and approved or ratified these statements in violation of federal securities law.").)

130

Litig., 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005) ("Conclusory allegations that do no more than state that [the defendant] 'would have known,' 'knew and ignored,' or 'recklessly failed to know' are insufficient to state a claim under PSLRA and 9(b).") (footnotes omitted). Rather, this kind of allegation is a mere conclusion. And particularly because of the theory of liability asserted here—Media's failure to disclose a contingent liability arising from Summit's breach of its contract with Media—it is a dubious conclusion at that.

This conclusory allegation that "they must have known" is particularly dubious when applied to certain Officers. Recall that the alleged fraud involved Summit's breach of the consulting agreement during the June private offering. Media's SEC filings indicate that the offering ended on June 30, 2005. Of all the individual defendants named in the complaints, only Karp, Hirsch, Adler, and Musser worked for Media when Summit allegedly breached the agreement. Moreover, Adler and Musser did not commence their employment with Media until June 21, 2006, only nine days prior to the end of the June private offering. All of the other individual defendants either never worked for Media (Young, Honig, and Hill), or began their tenure after Summit's alleged breach concluded (Jehassi, Wasserman, Brauser, McNamara, Soltoff, Obeck, and Gould). See Table at 142, infra. As applied to the latter group of defendants, the "they must have

131

known" allegation is absurd. Without more, especially after a personal warning from a district court not to sue officers just because they were officers, no reasonably competent attorney could have sued these officers.[87]

Perhaps recognizing the insufficiency of the "they must have known" allegations, Jacoby's counsel also alleged that accounting irregularities show that Media had a venal corporate character. According to Jacoby, an officer of Media discovered a memorandum from "Richard Hill . . . a founder of Relationserve to [an employee] in RelationServe's finance department . . . instruct[ing the employee] to recognize specific revenue in violation of company operating procedures, applicable law, and generally-accepted accounting principles." (Second Am. Compl. ¶ 60.) This entire argument is frivolous because the alleged accounting irregularities were ordered by Richard Hill, who was never a Media Employee or even a defendant in the second amended complaint.[88] Especially

---

[87] Even worse, the plaintiffs repled the same "they must have known" allegations in the second amended complaint after the district court had warned them against such reasoning in the teleconference when the court dismissed the first amended complaint. The court explained to the plaintiffs that "[i]t's not fair to throw every defendant in there when we know from the facts we have alleged in the first amended complaint that some of these defendants could not be held responsible for some preexisting public statements." (Hr'g Tr. at 10, Mar. 6, 2007.)

[88] Plaintiffs sued Hill in the first amended complaint. Hill moved to dismiss in part because he was "never an officer or director of Relationserve [Media] . . . and Plaintiffs plead no other facts to establish that Hill controlled corporate affairs or policies." (Def. Hill's Mot. to Dismiss First Am. Compl. 5.) The plaintiffs did not rename Hill as a defendant in the second amended complaint.

because the alleged misconduct violated "company operating procedures," it cannot be inferred that Media had a venal corporate culture based on the misdeeds of a non-employee.

Moreover, the Media employee who allegedly followed Hill's instruction was not a corporate officer or defendant in the suit and never signed an SEC filing. In any event, five months before Jacoby filed his second amended complaint, this court squarely held that accounting irregularities, even violations of GAAP in Sarbanes-Oxley certified accounting statements, cannot support an inference of scienter unless the officer certifying the statements was "severely reckless." Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006).  This standard is satisfied if  "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  Id.[89]  Here, Jacoby pointed to no glaring violations in Media's certified accounting statements.  Thus, he based his venal corporate culture

---

[89]  Garfield v. NDC Health Corp., 466 F.3d 1255 (11th Cir. 2006) was decided on October 12, 2006; Jacoby filed his second amended complaint on March, 19, 2007.  Even prior to Garfield, we had made clear that "allegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."  Ziemba v. Cascade Intern., Inc., 256 F.3d 1194, 1208–09 (11th Cir. 2001); see also id. at 1209 ("[P]laintiffs must therefore allege more than mere violations of auditing standards.").

133

allegation on the misdeeds of two individuals when neither individual was a defendant in the second amended complaint and both acted in violation of company policy. Without more, alleging that the defendant Officers or Media had a "venal character" is unfounded and irresponsible.

Finally, Jacoby claimed that scienter could be inferred because "[t]he individual Defendants engaged in the above-alleged activities to inflate the price of RelationServe [Media] securities, to protect and enhance their respective positions, and to enhance the substantial compensation they obtained thereby." (Second Am. Compl. ¶ 82.) It is immediately apparent that, like the other scienter allegations, this one is conclusory. Notably, Jacoby never alleged that any officer or director defendant sold Media stock during the class period, or did anything else that would support the motive and opportunity theory. It stands to reason, of course, that a company's officers and directors have a motive to commit securities fraud. But that could be said of any public company's officers and directors, which is why the precedent of this circuit squarely forecloses any argument that stand-alone allegations of "motive and opportunity" will satisfy the PSLRA's standard. Bryant, 187 F.3d at 1285–86 ("While allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations,

without more, are not sufficient to demonstrate the requisite scienter in our

Circuit.").

Jacoby's scienter allegations boil down to three empty conclusions born of

no facts: because the defendants were officers or directors of Media, (1) they must

have known about Summit's breach, (2) they were immoral, and (3) they had a

motive to lie. These allegations probably fail under ordinary notice pleading

standards;[90] they certainly fail under any reasonable view of the PSLRA's

heightened pleading requirements. Without more, no reasonably competent

attorney could have brought Jacoby's claim.

### iii. Jacoby Advanced a Frivolous Loss Causation Argument

Finally, Jacoby's Rule 10b-5 claim is legally frivolous because he advanced

an untenable theory of loss causation. Loss causation is an essential element of a

Rule 10b-5 claim and requires a plaintiff to prove that the defendant's fraud

proximately caused the plaintiff's loss. Dura, 544 U.S. at 346, 125 S. Ct. at 1633.

As explained above, Jacoby's Rule 10b-5 claim alleged that Media fraudulently hid

a $2 million contingent liability arising out of Summit's work in the 2005 June

---

[90] For the purposes of this sanctions discussion, the law is frozen as it existed in 2006—as such, Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) does not apply. Nevertheless, our cases made clear that although we accept a plaintiff's allegations as true, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts" are insufficient to avoid dismissal. See Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

private offering. Jacoby's theory fails because he began to measure loss causation over twenty days after the market had learned of the alleged fraud.

Even before Dura, our cases "explicitly require[d] proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448 (11th Cir. 1997) (citing cases). To prove loss causation, a plaintiff must allege that the fraud-induced price inflation was removed from the stock price and caused the plaintiff's losses. Id. (granting judgment as a matter of law for defendant company because there was "no evidence that this price inflation [caused by defendant's fraud] was removed from the market price of [the] stock.").

Jacoby's loss causation theory boils down to this: Media's May 23, 2006, disclosure of Thompson's Indiana lawsuit corrected Media's failure to disclose its use of an unregistered broker-dealer; on May 23, Media's shares traded at $1.35 and eventually fell to $.63 per share on June 13, 2006; the May 23 disclosure caused this stock price drop. Media, however, initially disclosed Thompson's Indiana suit on May 1, 2006. Jacoby's loss causation argument is frivolous because the market had already known and digested all the information supposedly added by the May 23 disclosure.

136

On March 3, 2006, Thompson filed his Indiana lawsuit against Media. Media's first disclosure of this lawsuit came in the May 1, 2006 amendment to the registration statement that was filed on March 20. That amendment disclosed, in pertinent part, that

> On March 3, 2006, Richard F. Thompson, Thompson Family Wealth Management, Dwight Thompson, Greg Thompson and Parabolic Investment Fund, L.P. commenced an action in the State Court of Indiana, County of Hamilton, against Anthony D. Altavilla, Summit Financial Partners, LLC, Barron Partners, LP, US MedSys Corp. and RelationServe Media, Inc. The plaintiffs in this action assert a variety of claims against non-related defendants. As against the Company, plaintiffs seek rescission of the RSMI common stock they purchased in July 2005, alleging that the shares they received were not registered as required under Indiana Law, and that the Company failed to disclose a commission to Mr. Anthony Altavilla. The Company believes this action is without merit, and intends to vigorously defend itself with respect to this matter, however; its outcome or range of possible loss, if any, cannot be predicted at this time. The Company cannot provide any assurance that the outcome of this matter will not have a material adverse effect on its financial position or results of operations.

Relationserve Media, Inc., Amend. No. 1 to Form SB-2 Registration Statement (Form SB-2/A), at 53 (May 1, 2006). Jacoby seems to have alleged that this disclosure was insufficient because it was incomplete. (See Second Am. Compl. ¶ 72 ("On May 23, 2006, RelationServe [Media] updated its disclosure concerning Thompson's lawsuit . . . .").)

137

Media filed a second amendment to the registration statement on May 23,

2006, which amplified the May 1 amendment.[91]  This amendment stated:

> On March 3, 2006, Richard F. Thompson, Thompson Family Wealth
> Management, Dwight Thompson, Greg Thompson and Parabolic
> Investment Fund, L.P. commenced an action in the State Court of
> Indiana, County of Hamilton, against Anthony D. Altavilla, Summit
> Financial Partners, LLC, Barron Partners, LP, US MedSys Corp. and
> RelationServe Media, Inc.  The plaintiffs in this action assert a variety
> of claims against non-related defendants.  As against the Company,
> plaintiffs seek rescission of the 110,000 shares of Company[] common
> stock they purchased in July 2005 (plaintiffs also received warrants
> for 55,000 shares of RSMI common stock), alleging that the shares
> they received were not registered as required under Indiana Law, and
> that the Company failed to disclose a commission.  The Company
> intends to file a motion to dismiss this action because the shares did
> not need to be registered under Indiana Law, as they were exempt
> from registration as a "federal covered security."  Mr. Altavilla did not
> sell shares on the Company's behalf.  Mr. Altavilla did receive, in
> addition to other compensation, a finder's fee in the amount of 7% of
> total gross funding provided for introductions made by him to
> investors not already having a preexisting relationship with the
> Company.

---

[91]  Recall that Media filed this amendment after receiving an inquiry from the SEC on May 11, which asked (1) whether the shares sold to Thompson were registered under Indiana law; (2) whether Altavilla sold shares for Media and received compensation for each sale; and (3) because Thompson was seeking rescission, the number of shares he purchased and the price he paid.

Media did allege that even the May 23 amendment failed to disclose Altavilla's sales in other states and the amount of Summit's commissions.  I assume that Jacoby still deemed the May 23 amendment sufficient to give the market notice of the fraud and simply included these observations for some other purpose.  I say this for two reasons: (1) if the May 23 amendment did not give the market notice of the fraud, then Jacoby would have no loss causation argument at all, and (2) as a matter of fact, Media had already disclosed the full amount of the finder's fees it paid to Summit.

Relationserve Media, Inc., Amend. No. 2 to Form SB-2 Registration Statement (Form SB-2/A), at 64–65 (May 23, 2006).

Jacoby's argument that the May 1 amendment was incomplete and that the public did not know about the compensation package Summit and Altavilla received is frivolous. As relevant to the unregistered-broker theory, the May 23 amendment added the number of shares purchased by the plaintiffs, and that Summit did not sell shares on Media's behalf but did receive a finder's fee. The material aspects of both of these amplifications had already been disclosed to and digested by the market. The efficient market theory—on which Jacoby relies—posits that all publicly available information about a security is reflected in the market price of the security. As of July 14, 2005, the market knew that Media sold $340,000 worth of stock to five Indiana investors. Relationserve Media, Inc., Notice of Sale of Securities Pursuant to Regulation D (Form D), at 7 (July 14, 2005). As of June 16, 2005, the market knew that Summit could act as a finder and would be paid a seven percent finder's fee. Relationserve Media, Inc., Current Report (Form 8-K), Ex. 2.6 (June 16, 2005). And as of March 20, 2006, the market knew that Media paid Summit a total "success fee" of $28,500 in connection with its private placement of common stock. Relationserve Media, Inc., Registration Statement under the Securities Act of 1933 (Form SB-2), at F-22

139

(March 20, 2005).  Accordingly, the market had absorbed this information well before the May 23 amendment.  If not, those shares were not being traded in an "impersonal, well-developed" and efficient market, as required for the application of the fraud-on-the-market doctrine.  Basic, 485 U.S. at 247, 108 S. Ct. at 991.  It follows that the proper starting place for measuring loss causation should have been no later than May 1.

4. The Section 20(a) Claims

The § 20(a) control-person claims are frivolous beyond doubt.  As discussed in Part II.B & C, supra, § 20(a) is a parasitic federal securities claim that imposes joint and several liability against individuals "who, directly or indirectly, control[] any person liable under any provision of [the 1934 Act] or of any rule and regulation thereunder."  15 U.S.C. § 78t(a).  In this circuit

> [A] defendant is liable as a controlling person under section 20(a) if he or she "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."

Brown v. Enstar Group, 84 F.3d 393, 396 (11th Cir. 1996) (quoting Brown v. Mendel, 864 F. Supp. 1138, 1145 (M.D. Ala. 1994) (alteration in original); see also Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001).

Here, the plaintiffs' attorneys alleged that each of the fourteen individual defendants in the first amended complaint and the eleven individual defendants in the second amended complaint were liable as "control persons" under § 20(a). All of the § 20(a) claims are frivolous because the plaintiffs never pled a nonfrivolous primary Rule 10b-5 claim. Moreover, some of the defendants never even worked for Media; therefore, absent extraordinary facts not alleged here,[92] they could not conceivably have had the power to control either Media's "general affairs" or to directly or indirectly control or influence the specific "corporate policy" resulting in the primary liability. Thus, even had the plaintiffs pled a valid Rule 10b-5 claim, as against defendants Young, Hill, and Honig—who never worked for Media—plaintiffs' § 20(a) claim would still be clearly frivolous. Either way, the § 20(a) claims were so frivolous that the district court necessarily abused its discretion when it denied sanctions.

## B. Rule 11(b)(3) Compliance

I now review all three complaints for Rule 11(b)(3) compliance. Rule 11(b)(3) requires that the factual contentions "have evidentiary support or, if

---

[92] For example, the plaintiffs might have an argument if the non-employees had the power to control the corporate policy of Media by contract, majority shareholder status, or otherwise. Cf. Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001) (rejecting the argument that a minority stake gave the § 20(a) defendants the power to control the general busines affairs of the company).

141

specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3) (2006). Ordinarily, it is difficult for a court of appeals to conclude that a complaint's factual contentions lack all non-frivolous evidentiary support because there is no requirement that all evidence be attached to the complaint. Here, however, it is possible to conclude this with respect to some of the factual contentions because the plaintiffs' attorneys misrepresented easily verifiable SEC filings. After setting out these violations, I also point out suspicious factual contentions to facilitate the district court's review on remand.

First, the blatant violations. As discussed above, in their § 11 claims, the plaintiffs' attorneys alleged that each of the individual defendants met at least one of the statutory conditions necessary to their liability as individuals. Paraphrasing, to be liable, an individual must have either, (1) signed the registration statement in some capacity, (2) been a director or named as about to become a director, or (3) been an underwriter. See 15 U.S.C. § 77k. When the plaintiffs filed suit, the two registration statements and the SEC filings clearly indicated that eight of the named individual defendants could not possibly have fit into either of the first two categories. With respect to the underwriter category, with one exception, none of these eight individual defendants even sold shares under either registration

142

statement.  Moreover, there is no allegation that any of the individual defendants had been underwriters.  Accordingly, the plaintiffs' factual contention that these individual defendants fit into § 11's  categories of those who could be held liable is frivolous beyond doubt.  See also supra part IV.A.1.

Moving on, in all three complaints, the plaintiffs' attorneys alleged that Media and its Officers knew and failed to report in SEC filings that Summit and its agents were not registered with the SEC.  (Compl. ¶ 33; First Am. Compl. ¶ 68; Second Am. Compl. ¶ 45.)  But as explained above, Media repeatedly disclosed Summit's unregistered status.  On June 16, 2005, Media made its entire agreement with Summit public by filing it with the SEC.  The agreement declared: "IT IS SPECIFICALLY UNDERSTOOD THAT [Summit] IS NOT AND DOES NOT HOLD ITSELF OUT BE [sic] A BROKER/DEALER, BUT IS MERELY A 'FINDER' IN REFERENCE TO THE COMPANY PROCURING FINANCING SOURCES AND ACQUISITION/MERGER CANDIDATES."  Relationserve Media, Inc., Current Report (Form 8-K), Ex. 2.6 (Consulting Agreement), at 6 (June 16, 2005).  Media attached the same agreement to its August 2005 quarterly report.  See Relationserve Media, Inc., Quarterly Report (Form 10-QSB), at 26 (Aug. 15, 2005) (incorporating the agreement by reference).  In light of these

disclosures, no reasonably competent attorney could have alleged that Media failed to disclose Summit's unregistered status in its SEC filings.

Nor could a reasonably competent attorney have alleged, as plaintiffs' attorneys did, that Karp signed a Form 10-QSB on June 14, 2005, which "failed to indicate that RelationServe [Media] had contracted with Summit to sell RelationServe [Media] securities or alert the investing public to the contingent civil and criminal liabilities that derive from this agreement." (Second Am. Compl. ¶ 37.) This is because Karp never signed this Form 10-QSB; Scott Young did on behalf of the predecessor public corporation, Chubasco. See Chubasco Resources Corp., Quarterly Report (Form 10-QSB), at 8 (June 14, 2005) (signed by Scott Young, dated June 13, 2005). Plaintiffs' counsel also alleged that Karp signed a "Form 10SB" "[o]n June 30, 2005" (Second Am. Compl. ¶ 43) but no such filing exists (only a Form 8-K was signed or filed on that date). No reasonably competent attorney could have contended that Karp signed forms that were never filed or forms that were filed but without her signature.

I now turn to some of the questionable factual assertions that the district court should examine on remand. To begin, the first amended complaint contained allegations and defendants not realleged and renamed in the second amended complaint. The first amended complaint alleged: (1) Altavilla sold Media

144

securities to Florida resident Stuart Feick, and (2) Media received information about employee thefts and kickbacks in July 2005. (First Am. Compl. ¶¶ 62, 92.) Neither allegation appears in the second amended complaint. In the first amended complaint, the plaintiffs named Barry Honig and Richard Hill as defendants, but not in the second. To be sure, there may be a completely innocent explanation for not realleging these facts and renaming these defendants, but the district court must determine what evidentiary basis the plaintiffs had in the first place.

Appearing in both the first and second amended complaints, another questionable factual contention is that Media traded on the NASDAQ stock exchange. (See First Am. Compl. ¶ 24; Second Am. Compl. ¶ 26.) Media's SEC filings indicate that it traded only on the National Association of Securities Dealers' Over-the-Counter Bulletin Board. This seems to be confirmed by the OTCBB website, which has stock prices for Media beginning in July 2005 through the filing of the second amended complaint. If Media traded on NASDAQ, Jacoby would have had an easier time proving his Rule 10b-5 claims. This is because Jacoby seemed to invoke the fraud-on-the-market doctrine, which requires a plaintiff to prove that the security traded on an efficient market. Securities traded on NASDAQ are often presumed to be traded on an efficient market. E.g., Burke v. China Aviation Oil (Singapore) Corp., 421 F. Supp. 2d 649, 653 (S.D.N.Y.

145

2005) ("The NASDAQ is recognized as maintaining an efficient market, but the Court is unaware of any court holding that the OTCBB or Pink Sheets meet this same standard."). If an efficient market cannot be presumed, a plaintiff must plead and prove its existence. E.g., id. Although I cannot take judicial notice that Media never traded on NASDAQ, the district court should explore the basis for the plaintiffs' contention.

Finally, in the initial and second amended complaints, Jacoby in effect alleged that Summit sold all of the securities in the June private offering where Media grossed $2 million dollars from buyers in California, Connecticut, Florida, Illinois, Indiana, Nevada, New Jersey, New York, Ohio, and Pennsylvania. Relationserve Media, Inc., Notice of Sales of Unregistered Securities (Form D), at 4, 7–8 (July 14, 2006). This allegation is implicit because the plaintiffs repeatedly claimed that Media failed to report a $2 million dollar contingent liability arising out of Media's sales of securities through Summit. (See, e.g., Second Am. Compl. ¶¶ 44, 46; see also Compl. ¶ 24 ("In order to complete the purchase of RelationServe [Media] shares by the Plaintiff and Class members . . . .").) This allegation is suspicious for two reasons.

First, other than Thompson, in the initial and second amended complaints plaintiffs never provided specific facts about private offering purchasers in the

146

other states.  Second, in the initial and second amended complaints, the plaintiffs never alleged that any unregistered broker participated in the sales except for Summit.  This latter point is significant because Summit was entitled to a 7% finder's fee of the "total gross funding provided" by investors Summit introduced to the company.  Relationserve Media, Inc., Current Report (Form 8-K), Ex. 2.6 (Consulting Agreement), at 6 (June 16, 2005).  Therefore, if Summit had been responsible for all $2 million raised in the June private offering, it would have earned a $140,000 finder's fee.  Media's SEC filings, however, indicate that Summit received only $28,500.  Relationserve Media, Inc., Registration Statement under the Securities Act of 1933 (Form SB-2), at F-22 (March 20, 2005).  Thus, the district court should find out what evidence the plaintiffs had to support their claim that Summit's activity subjected Media to a $2 million liability.

I could go on, but will stop here.  The plaintiffs' attorneys must be sanctioned for their clear violations of Rule 11(b)(3) and the district court should explore their questionable factual contentions—both those I identified and any others—on remand.

## C. Rule 11(b)(1) Compliance

Rule 11(b)(1) prohibits filing papers for an improper purpose.  On this record, while there are indications that the plaintiffs' attorneys brought this action

147

for an improper purpose, it is not so clear that the district court necessarily abused its discretion in denying sanctions under Rule 11(b)(1).

Most troubling is that, in the face of a warning by the district court, the plaintiffs' attorneys sued multiple officers with only the barest allegation that they had any part in—or even knowledge of—the alleged wrongdoing. This is especially so in light of the particular Officers the plaintiffs added in the first amended complaint: nine out of ten of the new defendants either never worked for Media or began working there after (and in most cases long after) Summit allegedly breached the consulting agreement. See Table at 142, infra. And, particularly with respect to the § 11 claims, the defendants added four new plaintiffs who could not possibly be held liable under the statute bringing the total number of such defendants to seven (eight if Jehassi is included from the initial complaint). Suing individual defendants without any legal or evidentiary basis is strong evidence that, as the defense counsel argued, plaintiffs were conducting scorched earth litigation. (Hr'g Trans. 4, Nov. 3, 2006.)

And indeed, it could be inferred that the plaintiffs' attorneys attempted to extort a settlement by strategically bringing frivolous claims, adding numerous defendants, overstating the scope of the plaintiffs' injury, and filing difficult to decipher shotgun pleadings, all while counting on the district court not to clear the

148

smoke. If plaintiffs' counsel pursue this strategy long enough, defendants will settle. Further evidence of this comes from plaintiffs' attorney Richard Bell's letter, replying to defense counsel's warning that the suit was frivolous, that "at some point in time both our clients will want to resolve or settle this case."

On the other hand, the plaintiffs' attorneys did voluntarily drop some of the Officer defendants and some of their frivolous claims. And as for Bell's letter, most civil cases settle. Accordingly, it is unclear whether the plaintiffs' attorneys were employing a calculated strategy or were just incompetent.[93] After considering any new Rule 11(b)(2) and (3) violations, the district court should evaluate the evidence and determine whether the attorneys brought this case in bad faith or for an improper purpose.

Finally, I note that the district court must determine whether Jacoby or Thompson violated Rule 11.[94] The current record is much less developed in this regard, but there is still one fact that raises an eyebrow: Thompson's purchase on

---

[93] The plaintiffs' attorneys expressly disavowed any incompetence in their argument to the district court that they should be appointed class counsel: "The attorneys at Cohen & Malad are highly skilled and experienced practitioners with extensive experience in federal securities class action litigation and are throughly committed to the vigorous prosecution of this action." (Mem. of Law in Supp. of Pls.' Mot. for Appointment as Co-Lead Pls. 13, Nov. 3, 2006.)

[94] "A represented party who is responsible for a violation of Rule 11 may be sanctioned. Responsibility for a violation will depend on the extent of the client's involvement in the management of litigation and the decisions that resulted in a violation of the Rule." James Wm. Moore et. al., Moore's Federal Practice § 11.23[6][c][i] (3d Ed. 2009).

July 17, 2006, of 10,000 Media shares, only to sell them the next day for a small loss. This could indicate that Thompson purchased the shares to enable himself to act as lead plaintiff for the open market purchasers. The district court should consider this on remand.

### D. The Plaintiffs' Attorneys' Rule 11 Violations Trigger the PSLRA's Presumptive Sanction of Attorney's Fees and Other Expenses

Having identified the violations of Rule 11(b) that can be conclusively determined from the record, all that remains is to determine whether the violations are "substantial." The PSLRA creates a presumptive sanction of a defendant's attorneys' fees incurred in the action for "any complaint" that "substantially" fails to comply with Rule 11.

Here, I would hold that the plaintiffs' attorneys triggered this presumption three separate times. In the initial complaint, all of the federal securities claims violated Rule 11(b)(2)—the § 11 claim, the § 12 claim, and the Rule 10b-5 claim. In the first amended complaint, all of the federal securities claims violated Rule 11(b)(2)—Thompson and Jacoby's § 11 claims, § 12 claims, Rule 10b-5 claims, and § 20(a) claims. In the second amended complaint, Jacoby realleged his frivolous Rule 10b-5 and § 20(a) claims. Even setting aside the Rule 11(b)(3) violations and the possibility of 11(b)(1) improper purpose violations, it is clear

150

that each of the three complaints "substantial[ly] fail[ed]" to comply with Rule 11. 15 U.S.C. § 78u-4(c)(3)(A)(ii).[95] On remand, the plaintiffs will have the opportunity to rebut the presumption by demonstrating that the award of attorneys' fees would impose an unreasonable, unjust burden on them and that the failure to award fees would not impose a greater burden on the defendants. See 15 U.S.C. § 78u-4(c)(3)(B)(i).

## E. Summary

In sum, with respect to Karp's motion for Rule 11 sanctions under the PSLRA, I would hold as follows. I would hold that the plaintiffs' attorneys violated Rule 11(b)(2) with respect to every federal securities claim brought in this case. I would hold that the plaintiffs' attorneys violated Rule 11(b)(3) by alleging that some of the individual defendants' met § 11's statutory requirements, Karp signed and filed SEC filings that she never signed or filed, and Media never disclosed Summit's unregistered status. Finally, I would hold that the Rule 11(b) violations triggered the PSLRA's presumptive sanction of the defendant's attorneys' fees incurred in the entire action. A remand would still be necessary for

---

[95] Although the Rule 11(b)(2) violations alone trigger the PSLRA's presumption, a remand is still necessary for further findings regarding (b)(1) and (3) because further violations will have a bearing on the scope of the harm caused to the defendants and the plaintiffs' ability to rebut the presumption.

151

four determinations: (1) whether Thompson and Jacoby violated Rule 11, (2) whether the plaintiffs' attorneys violated Rule 11(b)(1) by filing any or all of the complaints for an improper purpose, (3) whether other Rule 11(b)(3) violations exist, and (4), in any event, whether the plaintiffs can rebut the PSLRA's presumptive award of attorneys' fees. I would also instruct the district court to consider whether the plaintiffs should be sanctioned under 28 U.S.C. § 1927 for "unreasonably and vexatiously" multiplying these proceedings.

## V. The Court Errs by Ignoring Karp's Cross-Appeal for Rule 11 Sanctions on the State Law Claims Advanced in the Second Amended Complaint

The court does not address Karp's cross-appeal seeking non-PSLRA Rule 11 sanctions against the plaintiffs' attorneys for filing the state law claims. Karp properly moved for Rule 11 sanctions only with respect to the second amended complaint. See Fed. R. Civ. P. 11(c)(2) (requiring that a motion for sanctions be made separately from any other motion and be served but not filed for twenty-one days). The district court did not consider Karp's motions for sanctions because it refused to exercise its supplemental jurisdiction over the claims and dismissed them without prejudice. Such a dismissal does not and should not insulate frivolous claims from Rule 11 scrutiny. Accordingly, I would vacate the district court's refusal to consider Rule 11 sanctions on the state law claims brought in the

152

second amended complaint and order the district court to decide whether to impose sanctions for those claims.

## VI. Conclusion

Congress enacted the PSLRA to address the "evils flowing from abusive securities litigation," especially in the class action format.[96]  As the Senate Judiciary Committee observed, these evils generally have their onset with "the filing of the complaint and continue through to the final disposition of the action."[97]  Among other evils, these actions generate "an in terrorem effect on Corporate America[,] . . .  add[ing] significantly to the cost of raising capital and represent[ing] a 'litigation tax' on business."[98]  This is precisely what has occurred in this case.  In addition to imposing a litigation tax on Media, this action has wreaked havoc on individuals who had absolutely nothing to do with the injuries purportedly suffered by Jacoby and Thompson and the members of the classes they attempted to represent.

A careful reader of the orders and opinions in this case—the district court's perfunctory order refusing to sanction plaintiffs' counsel because, although

---

[96]  S. Rep. No. 104-98, at 8 (1995),  reprinted in 1995 U.S.C.C.A.N. 679, 687.

[97]  Id.  As the Committee saw it, "[a] complaint alleging violations of the Federal securities laws is easy to craft and can be filed with little or no due diligence."  Id.

[98]  Id. at 9, 1995 U.S.C.A.N. 688.

153

plaintiffs were unable to state a claim sufficient to withstand a Rule 12(b)(6) motion to dismiss, their claims were not frivolous, and this court's opinion—may conclude that Congress was out to lunch when it enacted the PSLRA. For, if this case is typical, the federal courts cannot, as a practical matter, enforce the PSLRA. That is, if a case is pled as this case was, handled in the district court as this case was, and disposed of on appeal as this case is, I doubt that the time, expense, and burden on judicial resources incurred in PSLRA enforcement is worth the candle. The point is not to pick fault with Congress for passing the PSLRA; the point is that the courts must carry out the PSLRA mandate by enforcing it in a manner consistent with congressional intent.

This case was litigated under the Rule 12(b)(6) umbrella. The initial and two succeeding complaints were typical shotgun pleadings[99] and thus were practically incapable of precise comprehension by the district judge and opposing counsel. After reading the first amended complaint, the district judge indicated as much in a telephone conversation he conducted with counsel. Referring to the complaint's allegations, he made these observations: "Nothing is tied together;" "I see very little connecting the dots;" "Seems to me there are some real gaps there;"

---

[99] See, e.g., supra note 22.

"Again, it's kind of hard to follow. It's like . . . who did what?"[100] The court

therefore gave plaintiffs' counsel one more chance to file a comprehensible

pleading that would connect the dots, close the gaps, and explain who did what.

They responded with the second amended complaint. It did not clear the air, so the

court dismissed it under Rule 12(b)(6) for failure to satisfy the heightened pleading

standards of Rule 9(b) and the PSLRA.

When the court subsequently turned to the question of whether the plaintiffs

and/or their attorneys should be sanctioned under the PSLRA for noncompliance

with the requirements of Rule 11(b), it did not parse the allegations of the

complaints that had been filed, as I have done here. Rather, it perfunctorily

concluded—without reference to any of the complaints' allegations—that

plaintiffs' had complied with Rule 11. The court stated, "Plaintiffs' claims are not

frivolous, or so devoid of evidentiary support as to warrant sanctions. Likewise,

there is no evidence that Plaintiffs instituted this action for improper purposes,

such as to harass Defendants or needlessly increase the cost of litigation." (Order

on Mot. For Attys.' Fees and Rule 11 Sanctions, 1, June 12, 2007 (internal

citations omitted).). I am convinced that the court ruled in this way because it did

not realize just how insufficient the pleadings were; the court was too busy to plow

_____

[100] (Hr'g Tr. at 8, Mar. 6, 2007.)

155

through the pleadings and see them for what they were—simply smoke and mirrors.

This case demonstrates that it is easy for a district court to dismiss a federal securities law complaint under Rule 12(b)(6) and Rule 9(b) without carefully parsing it, identifying which allegations pertain to which claims, and squeezing the controversy down to its core. That approach, however, is not consistent with the PSLRA's requirements. The PSLRA forces a district court to determine whether the complaint—three complaints in this case—satisfied "each requirement of Rule 11(b)," and, having done that, to enter "in the record specific findings regarding compliance" with those requirements.[101] The approach the court must take is the one I have taken here: parse the complaint's allegations, determine which allegations pertain to which claims, and examine the claims under the PSLRA's lens.

The PSLRA and the broader interests of justice would best be served by a district court laying the foundation for this task early on. Here, for example, the district court could have done so after it examined plaintiffs' first amended complaint.[102] It could have parsed the complaint, detailed the problems, and,

_____

[101] See 15 U.S.C. 78u-4(c)(1).

[102] The court did not read the initial complaint due to plaintiffs' request for leave to file an amended complaint. The court's first encounter with plaintiffs' allegations came when it read

156

pursuant to its inherent power, ordered a repleader.  Such an order would be akin to

a Federal Rule of Civil Procedure 12(e) motion for a more definite statement in

that it would "point out the defects" of the complaint and explain what would be

necessary to cure them.[103]  We have stated on several occasions that

> The importance of using the Rules to uncover bogus claims and
> defenses, thereby reducing the parties' dispute to its bare essentials,
> cannot be overemphasized.  As we have stated on several occasions . .
> . if, in the face of a shotgun complaint, the defendant does not move
> the district court to require a more definite statement, the court, in the
> exercise of its inherent power, must intervene <u>sua sponte</u> and order a
> repleader.[104]  Implicit in such instruction is the notion that if the
> plaintiff fails to comply with the court's order—by filing a repleader

the first amended complaint prior to its telephone conference with the parties' attorneys.

[103]  Federal Rule of Civil Procedure 12(e) provides:

A [defendant] may move for a more definite statement of a [claim] . . . which is
so vague or ambiguous that the party cannot reasonably prepare a response. The
motion must be made before filing a responsive pleading and must point out the
defects complained of and the details desired. If the court orders a more definite
statement and the order is not obeyed within 14 days after notice of the order or
within the time the court sets, the court may strike the [claim] or issue any other
appropriate order.

[104]  Discharging this duty ensures that the issues get defined at the
earliest stages of litigation. The district court "should [strike] the
complaint[ ] and instruct[ ] counsel to replead the[ ] case[ ]-if
counsel could in good faith make the representations required by
Fed. R. Civ. P. 11(b)." <u>Cramer v. Florida</u>, 117 F.3d 1258, 1263
(11th Cir. 1997) citing <u>Ebrahimi v. City of Huntsville Bd. of
Educ.</u>, 114 F.3d 162 (11th Cir. 1997) (per curiam); <u>Cesnik v.
Edgewood Baptist Church</u>, 88 F.3d 902, 905 (11th Cir. 1996);
<u>Anderson v. Dist. Bd. of Trustees of Cent. Fla. Community
College</u>, 77 F.3d 364, 366–67 (11th Cir. 1996); <u>Pelletier v.
Zweifel</u>, 921 F.2d 1465, 1517–18 (11th Cir. 1991); <u>Fullman v.
Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984).

with the same deficiency—the court should strike his pleading or, depending on the circumstances, dismiss his case and consider the imposition of monetary sanctions.

Byrne v. Nezhat, 261 F.3d 1075, 1132–33 (11th Cir. 2001) (footnote in original).[105]

The attorneys representing the plaintiffs in this case purport to be sophisticated class action lawyers who specialize in federal securities law cases.  I have no doubt that faced with a detailed order requiring a more definite statement "connecting the dots," filling in the "gaps," and indicating "who did what," so that the allegations would not be "hard to follow," sophisticated securities lawyers would have done a better job of drafting the second amended complaint.  Better yet, had the court engaged counsel face-to-face in chambers, explained what the PSLRA and Rule 11(b) demanded, and told them what they would have to allege to stay in court, we probably would not be here.  Counsel would have dismissed the case voluntarily under Federal Rule of Civil Procedure 41(a)(1)(A), or, if they produced an amended complaint that simply mimicked their earlier complaint (as the second amended complaint did), the court, in the exercise of its discretion, would have dismissed the complaint under Rule 41(b) and its inherent power for

---

[105] Fed. R. Civ. P. 16 provides further authority for a district court to squeeze down the case sua sponte.  "At any pretrial conference, the court may consider and take appropriate action on the following matters: (A) formulating and simplifying the issues, and eliminating frivolous claims or defenses; (B) amending the pleadings if necessary or desireable . . . ."  Fed. R. Civ. P. 16(c)(2)(A)–(B).

failure to comply with a court order.[106]  Had the court dealt with plaintiffs' counsel in this way, it would have been easier for the court—regardless of the tact plaintiffs' counsel may have taken in responding to the court's demand for a more definite statement—to carry out its PSLRA duties at the end of the day.

Of course, that is not how the district court handled this case.  And that would have been satisfactory had the district court taken up the task of parsing the complaints at the end of the action.  Instead, the district court kicked the task down the road.  Today, this court unfortunately follows the same approach.  This judicial approach takes the teeth out of the PSLRA and delays the day when the parties will have repose.  Meanwhile, litigants in the court's queue waiting to have their cases heard will have to wait even longer.  Worst of all, handling PSLRA cases in this

---

[106]  As we stated in State Exch. Bank v. Hartline,
The Federal Rules expressly authorize a district court to dismiss a claim, including a counterclaim, or entire action for failure to prosecute or obey a court order or federal rule. Fed. R. Civ. P. 41(b)-(c). See, e.g., Veazey v. Young's Yacht Sale & Service, Inc., 644 F.2d 475 (5th Cir. 1981). In addition to the federal rule, this power, as well as the power to strike a pleading, is inherent in a trial court's authority to enforce its orders and ensure prompt disposition of legal actions. Link v. Wabash Railroad Co., 370 U.S. 626, 630–31, 82 S. Ct. 1386, 1388–89, 8 L. Ed. 2d 734 (1962); Marshall v. Southern Farm Bureau Casualty Co., 353 F.2d 737, 737 (5th Cir.), cert. denied, 384 U.S. 910, 86 S. Ct. 1352, 16 L. Ed. 2d 363 (1966). Cf. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1526 at 597 (1971) (defense may be stricken for failure to provide information required in pretrial order).  An appellate court reviewing the exercise of this power is constrained by the abuse of discretion standard.  Link, 370 U.S. at 633, 82 S. Ct. at 1390.

693 F.2d 1350, 1352 (11th Cir. 1982).

manner destroys confidence in the ability of the courts to resolve disputes and administer civil justice. Congress, the courts, the litigants, and the public deserve better.

I respectfully dissent.

**Table**[107]

| Defendant | Complaint(s) Named as Defendant | Relationserve Media, Inc. Term of Service |
|---|---|---|
| Danielle Karp | Initial, First Amended, Second Amended | CEO (6/13/2005–6/21/2005) President (6/13/2005–2/3/2006) Dir. (6/13/2005–2/3/2006) |
| Scott Hirsch | First Amended, Second Amended | COO (6/13/2005–2/2/2006) |
| Mandee Adler | Initial, First Amended, Second Amended | CEO (6/21/2005–11/11/2005) Dir. (6/30/2005–11/11/2005) |
| Warren Musser | Initial, First Amended, Second Amended | Dir. (6/21/2005–10/31/2005) |
| Ohad Jehassi | Initial | COO (7/2005– ) |
| Adam Wasserman | First Amended, Second Amended | CFO (8/9/2005–2/3/2006) Employee (2/3/2006–6/15/2006) |
| Michael Brauser | First Amended, Second Amended | Chairman (10/31/2005–9/7/2006) |
| Shawn McNamara | First Amended, Second Amended | Interim CEO (11/30/2005–2/3/2006) SVP (11/30/2005–6/15/2006) |

---

[107] This table is based on the allegations plaintiffs made in the second amended complaint, supplemented by SEC filings where noted below.  The abbreviations are: chief executive officer ("CEO"), director ("Dir."), chief operating officer ("COO"), chief financial officer ("CFO"), assistant secretary ("Assistant Sec'y"); senior vice president ("SVP").

The difference between the dates listed and what was pled are as follows: Danielle Karp (the second amended complaint alleged only that she was president from June 13, 2005 to February 3, 2006); Mandee Heller Adler (the CEO dates are the same but the second amended complaint alleged only that she served as a director); Adam C. Wasserman (the second amended complaint alleged only that he served as CFO from August 9, 2005 until February 3, 2006); Shawn McNamara (the start dates are the same but the second amended complaint lumped together the interim president and SVP positions by alleging that McNamara served in both roles for his entire time at Media).

| | | Assistant Sec'y (11/30/2005–6/15/2006) |
|---|---|---|
| Paul Soltoff | First Amended, Second Amended | CEO (2/3/2006– ) Dir. (2/3/2006– ) |
| Eric Obeck | First Amended, Second Amended | President (2/3/2006– ) |
| Donald Gould, Jr. | First Amended, Second Amended | CFO (2/3/2006– ) |
| Scott Young | First Amended, Second amended | None (resigned on consummation of merger) |
| Richard Hill | First Amended | None |
| Barry Honig | First Amended | None |